# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROSE M. BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-603-JJF |
| v. | ) | |
| | ) | |
| WALMART #2555, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## APPENDIX TO OPENING BRIEF OF DEFENDANT WAL-MART STORES EAST, LP IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

POTTER ANDERSON & CORROON LLP
Kathleen Furey McDonough (# 2395)
Sarah E. DiLuzio (#4085)
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
kmcdonough@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant Wal-Mart Stores East, L.P.*

## TABLE OF CONTENTS

| Description | Page Number |
|---|---|
| Affidavit of Jennifer Lawrence | A1 |
| Affidavit of Radcliff Sinclair | A3 |
| Charge of Discrimination dated October 14, 2005 | A5 |
| EEOC Dismissal and Notice of Rights dated July 6, 2006 | A6 |
| Wal-Mart Associate Handbook | A7 |
| Wal-Mart Discrimination and Harassment Prevention Policy | A57 |
| Wal-Mart Open Door Communications Policy | A60 |
| Wal-Mart Coaching for Improvement Policy | A63 |
| Plaintiff's Acknowledgement of Receipt of the Wal-Mart Associate Handbook | A68 |
| Plaintiff's New Hire Orientation Training Plan | A69 |
| Completed Training Report for Plaintiff | A71 |
| Plaintiff's Exit Interview dated May 4, 2005 | A72 |
| Performance Appraisal of Rose Bailey dated April 19, 2005 | A73 |
| Performance Appraisal of Rose Bailey dated April 14, 2004 | A75 |
| Performance Appraisal of Rose Bailey dated April 27, 2003 | A77 |
| Performance Appraisal of Rose Bailey dated April 5, 2002 | A79 |
| Performance Appraisal of Rose Bailey dated May 1, 2001 | A81 |
| Performance Appraisal of Rose Bailey dated April 22, 2000 | A83 |
| Performance Appraisal of Suzanne Swift dated March 31, 2005 | A85 |
| Performance Appraisal of Sandhya Sen dated October 21, 2005 | A87 |
| Excerpts from Deposition Transcript of Rose Bailey on October 11, 2007 | A89 |

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROSE M. BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.  06-603 JJF |
| | ) | |
| WALMART #2555, | ) | |
| | ) | |
| Defendant. | ) | |

### AFFIDAVIT OF JENNIFER LAWRENCE
### IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | ss |
| COUNTY OF NEW CASTLE | ) | |

I, Jennifer Lawrence, being duly sworn, do depose and say as follows:

1.      I am employed by Wal-Mart Stores East, LP ("Wal-Mart"), the defendant in this action, as an Assistant Store Manager at Store # 1741 in Milford, Delaware.  I submit this affidavit in support of Defendant's Motion for Summary Judgment.  I have personal knowledge of the facts set forth herein.

2.      I am an African American female.

3.      Prior to my current assignment, I was the Co-Manager at Wal-Mart Store #2555 in New Castle, Delaware, a position I held since July 17, 2004.

4.      On or about May 2, 2005, a situation regarding Rose Bailey, the plaintiff in this action, was brought to my attention by other members of the management team at Store #2555. Assistant Manager Radcliff Sinclair and Support Manager Cynthia Brittingham relayed to me that Ms. Bailey engaged in a verbal altercation with Ms. Brittingham on the sales floor, in front of customers and other associates, and refused to follow a direction that had been given.  Mr. Sinclair reported to me that he overheard Ms. Bailey yelling from across the store.

**A1**

5.  As a result of Ms. Bailey's behavior on the sales floor, I, in consultation with Store Manager Merl Corday, was responsible for determining the appropriate discipline. I spoke with Ms. Bailey to offer her a chance to explain her actions. Ms. Bailey did not dispute that the altercation occurred, nor did she apologize for her actions. On the contrary, Ms. Bailey seemed to believe that yelling at Ms. Brittingham on the sales floor was acceptable. In fact, Ms. Bailey's behavior was in direct violation of Wal-Mart policy, specifically insubordination, and grounds for immediate termination.

6.  Accordingly, on May 4, 2005, I and former Assistant Manager Toby Fields met with Ms. Bailey for an exit interview, where she was informed that she was being terminated for insubordination.

7.  At no time during her exit interview, or at any other time, did Ms. Bailey indicate that she felt she was being harassed or discriminated against by any member of the management team.

8.  I was not aware of any other complaint lodged by Ms. Bailey indicating that she felt harassed or discriminated against while an employee of Wal-Mart.

9.  Ms. Bailey was terminated from Wal-Mart for insubordination. Her race (African American) played no role in my decision to terminate her employment.

JENNIFER LAWRENCE

Subscribed and sworn to before me on this 13 day of December , 2007.

Notary Public
My commission expires: 4-9-08

A2

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ROSE M. BAILEY,          )
                                  )
          Plaintiff,       )
                                  )
        v.             )     C.A. No.  06-603 JJF
                                  )
WALMART #2555,          )
                                  )
          Defendant.    )

## AFFIDAVIT OF RADCLIFF SINCLAIR
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STATE OF DELAWARE      )
                            )    ss
COUNTY OF NEW CASTLE  )

I, Radcliff Sinclair, being duly sworn, do depose and say as follows:

1.    I am employed by Wal-Mart Stores East, LP ("Wal-Mart"), the defendant in this action, as an Assistant Store Manager at Store # 1736 in Dover, Delaware.  I submit this affidavit in support of Defendant's Motion for Summary Judgment.  I have personal knowledge of the facts set forth herein.

2.    I am an African American male.

3.    Prior to my current assignment, I was an Assistant Manager at Wal-Mart Store #2555 in New Castle, Delaware.

4.    On or about May 2, 2005, Rose Bailey, the plaintiff in this action, engaged in a verbal altercation with Support Manager Cynthia Brittingham on the sales floor.  I was assisting a customer in the automotive department of the store when I heard very loud shouting.  I left the automotive department to investigate the source of the shouting and, several yards away, saw

A3

Ms. Bailey yelling at Ms. Brittingham on the sales floor of the hardware department. Ms. Brittingham walked away from Ms. Bailey, but Ms. Bailey followed her and continued to yell, in full view of customers and other associates. At that point, I approached Ms. Bailey and told her to calm down and tell me what the problem was. Ms. Brittingham came back and asked that we have the conversation in the office. I advised Ms. Brittingham to write a statement regarding the incident, which I would relay to the Store Manager in the morning.

5.    Ms. Brittingham and I then walked to the Personnel office, where Ms. Bailey joined us to discuss what had occurred. I advised Ms. Bailey that I would report the incident to the Store Manager and Co-Manager, Ms. Lawrence.

6.    I recommended to Ms. Lawrence that Ms. Bailey be terminated for her actions, because her unprofessional and insubordinate behavior amounted to gross misconduct under Wal-Mart policies.

7.    At no time did Ms. Bailey indicate that she felt she was being harassed or discriminated against by any member of the management team.

RADCLIFF SINCLAIR

Subscribed and sworn to before me on this _13_ day of December , 2007.

Notary Public
My commission expires: _4·9·08_

A4

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 170-2005-03706 |

| Delaware Department of Labor | and EEOC |
|---|---|

State or local Agency, if any

| Name (Indicate Mr., Ms., Mrs.)<br>**Ms. Rose M. Bailey** | Home Phone No. (Incl Area Code)<br>**(302) 454-8274** | Date of Birth<br>**04-18-1955** |
|---|---|---|

Street Address                    City, State and ZIP Code

**612 Candlestick Lane, Newark, DE 19702**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**WALMART STORE #2555** | No. Employees, Members<br>**500 or More** | Phone No. (Include Area Code)<br>**(302) 324-0900** |
|---|---|---|

Street Address                    City, State and ZIP Code

**117 Wilton Boulevard,  New Castle, DE 19702**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address                    City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br>☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.) | Earliest **04-15-2005**    Latest **05-04-2005**<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.     I was hired on or about May 25, 1999 for the position of Customer Service Specialist. In or about April 2005 I was given a pay raise less than similarly situated non-black employees. On or about May 4, 2005 I was discharged.

II.     I was not given an explanation  why my pay raise was less than similarly situated non-black employees.  On or about May 4, 2005 I was informed by Jennifer Lawrence (W), Co-Manager and a white male Assistant Manager that I was being discharged because on or about April 29, 2005 I had "went looking for Cindy (?) (W), Support Manager, to inform her that I was going to report her for harassment."

III.     I believe that I have been discriminated against because of my race, black and retaliation (704a). In or about April 2004 I received approximately a 35-cent pay raise.   In or about April 2005 Suzanne (?) (W), another white female (whose name I cannot recall) and an East Indian female (whose name I cannot recall) informed me that they had received a 50-cent pay raise.  Suzanne and I were hired approximately the same time and the other two employees were hired after my hire.  Since my hire, my employment record has been, at the least, satisfactory.  I acknowledge that on or about April 29, 2005 I informed Cindy that I planned to report her for harassment to the corporate office because I believed that her harassment was because of my race.  Since Cindy's promotion to Co-Manager, she had discharged four (4) employees, including me, all of whom are black.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Oct 14, 2005**    _Rose M Bailey_<br>Date              Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

A5

U.S. ...QUAL EMPLOYMENT OPPORTUNITY COM... ...SION

EEOC Form 161 (10/96)

## DISMISSAL AND NOTICE OF RIGHTS

To: Ms. Rose M. Bailey
612 Candlestick Lane
Newark, DE 19702

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[ ]   *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170-2005-03706 | Legal Unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]   Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[ ]   The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[ ]   We cannot investigate your charge because it was not filed within the time limit required by law.

[ ]   Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]   While reasonable efforts were made to locate you, we were not able to do so.

[ ]   You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]   Other *(briefly state)* _____

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice;** otherwise, your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Marie M. Tomasso, District Director

*(Date Mailed)*

Enclosure(s)

cc:  Walmart Store #2555
Patrick J. McDonnell, Esquire  (For Respondent)

A6

JUL - 7 2006





A7



Sam and Bud Walton



Welcome to the Wal-Mart Family! When my brothers and sister and I were growing up, we always worked in Dad's stores — sweeping floors, carrying boxes, even running the ice cream machine. I remember feeling that all the Associates in the store were part of the family, always willing to pitch in and help each other. The Company has grown from just a handful of stores to over 4,000 stores today across the globe, but every day I still see examples of that "family attitude" we all shared back then. It is possible for a business as big as ours to keep that feeling of belonging, of working together to make a positive contribution to our communities and our country.

As we grow, one of the biggest challenges we face is "thinking small." We all need to pay attention to details that have made Wal-Mart such a success — keeping the aisles clean and the shelves stocked, thinking of new ways to display and merchandise items, and always giving our customers the very best service. But the most important thing we can do is to respect the talents and individuality of our fellow Associates. If we do all these things, if we consider ourselves as members of a wonderful extended family, there's no limit to what we can accomplish.



This is a very exciting period for our Associates, who literally have a world of opportunities within Wal-Mart to learn and grow. In South America, Asia, Europe, Mexico, and Canada, Wal-Mart is receiving rave reviews from millions of new customers who appreciate our customer service, great values, and the way we respect each other. In the United States, we will continue to post record results at our distribution centers, clubs, and stores. And it's all thanks to your hard work and dedication.

Let's go out there and do the very best we can, and take pride in the fact that we're all members of a family that really cares…the Wal-Mart Family.

Thanks for doing such a great job, always!



Rob Walton
Chairman of the Board, Wal-Mart Stores, Inc.

A9

Servant Leadership .....................................7
Open Door ..................................................7
Union Philosophy ........................................8
Information Sharing .....................................8
Wal-Mart Today ..........................................9
Wal-Mart Television ....................................9
Grass Roots ...............................................10

The Customer is the Real Boss ...................11
Satisfaction Guaranteed ..............................11
The Sundown Rule ......................................12
Meet 'Em & Greet 'Em .................................12
We're Merchants First ..................................13
Every Day Low Price ...................................13
VPI Program ..............................................14
S.W.A.S. ....................................................14

Honesty ....................................................15
Company Property .......................................15
Shrinkage Control .......................................15
Preventing Shrinkage ...................................16
Expense Control .........................................16
Preventing Accidents ...................................17
Protecting Our Assets ..................................17
Idea Generators .........................................18
It IS My Job! ..............................................18
Be Successful .............................................18

Promotions & Transfers ...............................18
Performance Appraisals ................................19
Training .....................................................19
The Walton Institute ....................................20
Computer Based Learning ............................20

Attendance ................................................23
Coaching ...................................................23
Drug-Free ..................................................23
Fraternization .............................................24
Gifts and Gratuities .....................................24
Harassment and
Inappropriate Conduct .................................24
Employment of Relatives ..............................25
Identification Badges ...................................25
Managing Your Time ....................................25
Meal and Break Periods ...............................26
Personal Finances .......................................26
Personnel Records ......................................26
Smoking ....................................................26
Statement of Ethics .....................................27
Transfers ...................................................27
Work Attire .................................................27
Work Time ..................................................27
Workplace Violence .....................................28

Profit Sharing Plan ......................................29
401(k) Plan ................................................29
Associate Stock Ownership Plan ...................30
Full-Time Associate Benefits .........................31
Peak-Time Associate Benefits ........................31
Temporary Associate Benefits .......................31

United Way .................................................32
Children's Miracle Network ...........................32
Environment ...............................................32
Volunteerism Always Pays ............................33
Associate Matching Gift ...............................33
Scholarship Programs ..................................34
Store Level Grants to Our Communities ..........34
Missing Children's Network ...........................34

# Welcome

**"OUR LEGACY IS THAT OF BEING UNIQUE; SWIMMING UPSTREAM, DOING THINGS OTHERS THINK IMPOSSIBLE."**

*- Lee Scott*
*President and Chief Executive Officer*
*Wal-Mart Stores, Inc.*



*Lee Scott,*
*President and C.E.O.*

As an Associate of Wal-Mart Stores, Inc., you should take pride in working with our nation's largest and most successful retailer. We employ people from all walks of life, from every educational level — people who have many different talents and ambitions.

Our founder, Sam Walton, along with family and Associates, proved that people can make a difference. If you have a vision, with dedication and hard work you can realize your greatest dreams. Whatever your goals may be, you have an excellent opportunity to achieve them at Wal-Mart. We encourage you to stay and grow with us.

Our Company is not just bricks and mortar, cash registers and signs — it's people working together to serve our customers and each other. That is our philosophy. And while our Company today hardly resembles our first small store in Rogers, Arkansas, our early values remain with us.

Wal-Mart has been successful because we have been willing to change the way we do things. We are constantly seeking new ways to better serve our customers and each other. This handbook is a guide, not a legal contract. It is an introduction to

our Company culture. No handbook can cover everything, we encourage you to ask many questions. The rules and policies in this handbook may change. Remember, in the midst of a constantly changing world, our Company values remain the same.

As you read your handbook, be aware of the values our founder helped instill in all of us. Sam Walton called them our Three Basic Beliefs:

1. **Respect for the Individual**
2. **Service to our Customers**
3. **Strive for Excellence**

These basic beliefs are the structure for our handbook. As you read about each belief, think about how you can apply it to your work.

As a Wal-Mart Associate, you are what people will remember about Wal-Mart Stores, Inc. And you are the reason our customers will choose to come back. If you truly love what you do, you'll be out there every day trying to do the best you can. And when you demonstrate this passion, a really incredible thing happens; others will catch the passion from you.

At Wal-Mart, we strive for success in all areas. We are driven to be the best we can be. Personal success is measured on an individual basis. The only thing we know for sure is that your success begins with expecting great things from yourself.

We're glad you've joined the Wal-Mart team, and we look forward to the difference you will make. By challenging yourself a little more every day, you will continue to grow and become more valuable as an Associate.

A11

"I HAD NO VISION OF THE SCOPE OF WHAT I WOULD START. BUT I HAD CONFIDENCE THAT AS LONG AS WE DID OUR WORK WELL AND WERE GOOD TO OUR CUSTOMERS, THERE WOULD BE NO LIMIT TO US."

— *Sam Walton*

Today's Wal-Mart facilities are still driven by the Three Basic Beliefs that drove our very first store. In this handbook, you will find many quotes and references to Sam Walton. Mr. Sam left a legacy with us, his ideas and ethics providing a timeless recipe for success.

Wal-Mart has achieved its present success because of a history of never being satisfied with the way things are. Our Company is a visionary Company that learns from and cherishes its past, but does not live in it. Here are a few brief highlights of the greatest retail Company ever! These highlights are intended to show you how Mr. Sam's vision from a few years ago has grown — a vision that now includes you as a new Associate.

The 1950s and '60s allowed Sam Walton to prove that large discount operations can succeed in small towns.

In the 1970s, Wal-Mart opened its first Distribution Center and Home Office, a 72,000 square-foot complex in Bentonville, Arkansas. Today, the Home Office totals over 700,000 square feet, and the Company's Distribution Centers average 1.2 million square feet.



**1950** Walton's 5-10 opened in Bentonville, Arkansas.



**1962** First Wal-Mart Store opened in Rogers, Arkansas.

**1970** Wal-Mart became a public company entering the world of Wall Street. Our 32 Wal-Mart Stores had sales of $31 million.

At left, Sam Walton is flanked by two exchange officials as our stock symbol "WMT" on the board behind shows opening price of $33 per share.

**1972** Profit Sharing Plan implemented to give Associates an opportunity to share in the profitability of our Company.

**1978** The Wal-Mart auto service center, jewelry and shoe divisions began operations. The first Regional Distribution Center and Display Office opened in Searcy, Arkansas.

A12

# History

5

> "THIS THING WE'VE GOT GOING WITH OUR COMPANY AND OUR PEOPLE IS SO GRATIFYING TO ME THAT I FIND IT VERY EASY TO BE ENTHUSIASTIC ABOUT OUR FUTURE AND TO BE OPTIMISTIC ABOUT WHAT WE CAN ACCOMPLISH TOGETHER."
>
> *– Sam Walton*

The 1980s were the decade of new ventures. During this decade, SAM'S Clubs and Wal-Mart Supercenters became permanent divisions of our Company.



**1980**  Over 300 Wal-Mart operated facilities with sales of $1.2 billion.

**1983**  Wal-Mart opened its first three SAM'S Clubs. SAM'S Club, named in honor of founder Sam Walton, is a membership warehouse operation.

**1987**  SAM'S Club does its first billion dollars in sales.

**1988**  Wal-Mart opened the first of several Wal-Mart Supercenters, which combined general merchandise and grocery. The first SAM'S Club Distribution Center opened in Dallas, Texas.

**1989**  SAM'S Travel Club is introduced. SAM'S fresh departments (meat, bakery, and produce) are introduced in Oklahoma City, Oklahoma.

The 1990s continued to offer a bright future with no limits.

**1991**  Joint venture with CIFRA, a Mexican retailer, introduced First Club (later known as SAM'S Club) to Mexico. The first SAM'S Club opened outside the United States in Polanco within Mexico City.

**1993**  Wal-Mart opened its first environmental demonstration store in Lawrence, Kansas. The Grocery Distribution Center opened in Clarksville, Arkansas. SAM'S Club earned Texas China.

**1997**  Wal-Mart became the first company with revenues exceeding $100 billion in sales. First Neighborhood Market opened in Bentonville store 711.




**1992**  Shortly before his death, Mr. Sam received the Presidential Medal of Freedom from President George Bush.

A13

"THE UNDENIABLE CORNERSTONE OF WAL-MART'S SUCCESS CAN BE TRACED BACK TO OUR STRONG BELIEF IN THE DIGNITY OF EACH INDIVIDUAL. WE VIEW OUR ASSOCIATES AS MUCH MORE THAN A PAIR OF HANDS TO DO A JOB, BUT ALSO AS A WONDERFUL SOURCE OF NEW IDEAS. OUR PEOPLE REALLY DO MAKE A DIFFERENCE!"

*– Don Soderquist,*
*Senior Vice Chairman, Retired,*
*Wal-Mart Stores, Inc.*

Our Company has been built on some very simple and basic values and beliefs. One of the main foundations of our people philosophy is that our people make the difference. This belief carries over to everything we do.

We use first names at Wal-Mart. This helps promote the warm, friendly atmosphere our customers and Associates have come to expect, and provides a pleasant working environment for all of us. Wal-Mart believes that its Associates should reflect the diversity of the customers and communities it serves. To be competitive, Wal-Mart must attract and retain a diverse work force.

Wal-Mart is fully committed to complying with applicable equal employment opportunity laws.

**It is the policy of Wal-Mart to provide recruitment, hiring, training, promotion, and other conditions of employment without regard to race, color, age, gender, religion, disability, national origin, or veteran status.**

Wal-Mart expects its Associates to treat their colleagues and subordinates with respect and dignity and to fully support Wal-Mart's objectives of providing equal opportunity employment and maintaining a workplace free of harassment of any kind.

Our commitment to equal opportunity for all Associates is reinforced by policy and by actions. We do not tolerate discrimination of any kind. Not only is discrimination against our beliefs, it's against the law.

You may have worked for companies where supervisors and managers were "bosses." Here, your supervisor or manager is your coach. They are here to help by assisting you with training and resolving issues that affect your job.

Our Managers have been selected and trained in the technical aspects of their job. They are also accustomed to working with general management and people issues. They know the business and know the value of open communication. The caliber of our Management team is respected throughout the industry.

*Don Soderquist,*
*Senior Vice Chairman,*
*Retired,*
*Wal-Mart Stores, Inc.*

A14

# Respect for the Individual

> "IF YOU WANT A SUCCESSFUL BUSINESS, YOUR PEOPLE MUST FEEL THAT YOU ARE WORKING FOR THEM – NOT THAT THEY ARE WORKING FOR YOU."
> – Sam Walton

Our founder, Sam Walton, taught us that effective leaders do not lead from behind their desks. Our leaders are out on the floor with you. Whether you are in a Store, Club, Distribution Center, or one of our other facilities, your Supervisor is out there with you. Some Management Associates based out of the Home Office travel extensively in the field so they stay in touch with our business. Expect to see these Associates and feel free to ask them questions, because they are there to serve you.

People at Wal-Mart are known for their listening skills. Because we teach people to listen, we are able to react to each other's ideas and needs. We encourage you to talk to your Supervisor about issues affecting you. He or she wants to hear your comments, ideas, and concerns. Approach your Supervisor because you have ideas that we want to hear. Wal-Mart believes we should provide leadership that serves each Associate. Your Supervisor is there to guide, support, encourage, and provide

opportunities for every Associate to be successful. These principles are known as Servant Leadership.

Servant Leadership has long been a part of Wal-Mart. Our Company was founded by one of the greatest Servant Leaders of all: Sam Walton. Sam taught his Management team to visualize an upside-down pyramid. The Manager is at the bottom of the pyramid supporting and maintaining a balance for the rest of the pyramid.

You don't have to be a member of the Management team to practice Servant Leadership. Every Associate can be a Servant Leader. Here are some simple but effective examples: you can assist fellow Associates with their work, help make decisions at meetings, volunteer for fund-raisers or safety committees. By doing this, it will not only help fellow Associates and the Company, but will also develop your leadership skills.

## Open Door

Our Open Door Policy says that if you have an idea or a problem, you should go to your Supervisor to talk about it without fear of retaliation. Faster resolution may occur when the immediate Associate goes through the immediate Supervisor first. However, if the Associate feels the Supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, the Associate may go to any level of management in the Company. Remember, while the Open Door promises that you will be heard, it cannot promise that your opinion will always prevail. Any suppression of, or retaliation for using the Open Door Policy by a Supervisory Associate may result in disciplinary action, up to and including termination.

A15

> "COMMUNICATE EVERYTHING YOU CAN TO YOUR ASSOCIATES. THE MORE THEY KNOW, THE MORE THEY'LL CARE. ONCE THEY CARE, THERE'S NO STOPPING THEM."
>
> – *Sam Walton*

Wal-Mart is strongly opposed to third party representation. We are not anti-union; we are pro-Associate. We believe in maintaining an environment of open communication between all Associates. At Wal-Mart, we respect the individual rights of our Associates and encourage everyone to express their ideas, suggestions, comments, or concerns. Because we believe in maintaining an environment of open communications through the use of the Open Door, we do not believe there is a need for third party



representation. It is our position that every Associate can speak for him/herself without having to pay his/her hard earned money to a union in order to be listened to and have issues resolved.

Our practice of information sharing sets us apart not only from our competition, but also from most other businesses. Wal-Mart has always believed we can work smarter if we all understand our Company's goals and how well we are meeting those goals. Sharing information helps all of us work together to keep our Company moving in the right direction.

For example, most Associates understand our sales goals and how each job impacts our achievement of those goals. We probably share more sales information with our Associates than any other retailer shares with their employees. This is just one example of our trust in each other. Along with the information comes a

responsibility to keep it within our Company. Much of the information we share regarding profit margin, future plans, sales, and shrinkage is confidential. It is up to every one of us to protect our competitive edge by keeping this information within our Company. Therefore, we consider it a violation of Company policy if you disclose confidential information to someone outside the Company, even a family member. Even something as simple as our intercom codes regarding shoplifters is valuable information that must be kept within our Company.

Communication is an important part of our success. We believe our Associates will enjoy their jobs more and work smarter if they understand our Company's goals. It's also important that each Associate has a way to tell others about their ideas. On the next few pages, we have listed some of the ways we communicate with each other.

A16

"YOU CAN'T JUST KEEP DOING WHAT WORKS ONE TIME, EVERYTHING AROUND
YOU IS CHANGING. TO SUCCEED, STAY OUT IN FRONT OF CHANGE."
-Sam Walton

Our first Company newsletter was published in 1970. Shortly thereafter, it was named *Wal-Mart World* as a result of an Associate contest. For 23 years it kept that name and evolved as a communication source focused on Associates and Company news. In 1993, it was renamed *Wal-Mart Today*. It reflects our growing Company as well as the changing retail industry. We currently have three Company publications:



- *Wal-Mart Today* is published monthly for all Associates in all divisions. This publication supports our commitment to reporting Company news, perpetuating our culture, educating, motivating, and providing recognition for our Associates' outstanding deeds.

Over 200 articles are received every month from Associates throughout our Company who report what is happening in our facilities around the world. The addresses for sending in your articles are listed in every issue of *Wal-Mart Today*.

*The Wal-Mart Pipeline* is a web-based information tool. It is sometimes referred to as Wal-Mart's Intranet (internal internet). It is a navigable site that allows our associates to move through different types of information by simply following the links provided. The content includes policies and procedures, on-line forms, departmental sensitive material and other useful corporate information. Please contact your personnel manager to see where Pipeline is available in your facility.

*Wal-Mart Television* -- Our Company began satellite television broadcasts in January 1988. This private network was established to provide visual communication to all of our Stores, Supercenters, Clubs, Distribution Centers, and Transportation Operations. Programming consists of merchandise information, sales reports, training and development, corporate updates, and general interest Company news.

Today, Wal-Mart Television is one of the largest private satellite networks in the world. In addition to the daily satellite broadcasts, we produce other programming that is delivered to our facilities on videotape. We also produce multimedia for Computer Based Learning modules and provide audio/visual support for numerous corporate meetings throughout the country.



WAL★MART
*Television*

Reason for the Individual

# "WE CAN DO WHAT WE KNOW. THE MORE WE KNOW, THE MORE WE CAN DO. TALK TO ASSOCIATES, TALK TO EACH OTHER, LEARN AND TEACH."

*- Tom Coughlin*
*President and C.E.O. of Wal-Mart Stores/Supercenters U.S.A*
*Wal-Mart Stores Division*



## Grass Roots

Each year, all Associates from all areas of our Company gather to talk openly about ideas and concerns. These Grass Roots meetings provide our Associates with a forum to discuss issues they believe are important. While we encourage Associates to use the Open Door at any time, Grass Roots allows for all our Associates to meet collectively.

During the meeting, your ideas and concerns are addressed, and your management team will answer your questions. You will also complete a confidential survey during the Grass Roots process. You should express yourself freely and feel confident that your questions and comments will never be used against you.

All Associates attend Grass Roots meetings. If additional information is needed to address your issue or concern, it is management's responsibility to follow up and get back to you with an answer. Additionally, results from your Grass Roots surveys are shared with company leaders to ensure that your concerns are heard at all levels.

Many divisions have mini Grass Roots meetings throughout the year. This encourages management and all Associates to keep the lines of communication open all year and not just during the yearly Grass Roots survey. These meetings support the basic belief of respect for the individual and the belief that our Associates provide the best ideas for our Company's future growth and success.

A18





Service to our Customers

## "IMPROVEMENTS IN PRODUCT TECHNOLOGY HAVE GREATLY IMPROVED OUR ASSOCIATES' PRODUCTIVITY AND EFFICIENCY AT STORE LEVEL."

*Don Harris*
*Executive Vice President of Operations*
*Wal-Mart Stores Division*

Sam Walton said many times that customer service distinguishes our Company from all others. In his words, "Give customers what they want – and a little more. Let them know you appreciate them. Make good on all your mistakes, and don't make excuses – apologize. Stand behind everything you do. The two most important words I ever wrote were on the first Wal-Mart sign – "Satisfaction Guaranteed.""

### The Customer Is the Boss

Each one of us represents Wal-Mart to our customers. Without our customers, we would not be in business. Occasionally, you may encounter a dissatisfied customer — remember this customer is just as important to us as the satisfied customer.

We don't want any customer to leave our store or club dissatisfied. Consistently exceeding our customers' expectations is what puts us on top. If you need help with an unhappy customer, it is okay to ask your supervisor for assistance.

### Exceeding Customer Expectations

Simply stated, this means doing everything we can to please the customer. Repair, exchange, or refund with a thank-you and a smile. Customers are our livelihood. Your job is to make them feel like they are the most important part of our business by meeting their needs and exceeding their expectations. A customer is not just the person who shops in our stores, but is everyone you come in contact with. If the phone rings — it's a customer. If you receive a letter — it's a customer. If fellow Associates ask you for help — remember that they are also your customers.



*"All Associates work for the customers who buy our merchandise. In fact, the customers can fire everybody in our Company, and they can do it by simply spending their money somewhere else. The greatest measure of our success is how well we please the customer. Our Boss? Let's all support Aggressive Hospitality and have our customers leave 100% satisfied every day."*

*Sam Walton*
*The Boss' Creed*

A19

# 12

## "EXCEED YOUR CUSTOMERS' EXPECTATIONS. IF YOU DO, THEY'LL COME BACK OVER AND OVER. GIVE THEM WHAT THEY WANT, AND A LITTLE MORE."

### – Sam Walton

This rule says that all Associates should respond to calls from customers, Stores, or Clubs by sundown of the day they are received. This is just one example of our commitment to friendly customer service. Responding quickly to customers shows that you care. You won't always solve every problem or complete every task before sundown, but by keeping your customers informed you demonstrate one of the foundations of our Company — that we care.

One way of meeting your customers' needs and exceeding their expectations is practicing aggressive hospitality or "meet 'em and greet 'em." For example, if a customer asks you where a product is:

* Meet the customers' needs by showing them where the department is.

* Exceed their expectations by taking them to the product.

Make customers feel welcome — smile, look them in the eye, and greet everyone who comes within ten feet of you. This is called the "10-Foot Attitude." If at all possible, call the customer by name.

The People Greeter program is one example of Wal-Mart's aggressive hospitality that started a trend. The People Greeter has the unique responsibility of meeting and welcoming customers as they enter Wal-Mart facilities. The People Greeter has many responsibilities, including the job of handing out shopping carts and smiles, and letting our customers know we're glad they came to Wal-Mart.



We are in business to sell merchandise. Merchandising products to our customers is what we are all about. These guidelines can help us maintain that focus.

* We must have what our customers want.

* Our merchandise has to be the quality that they demand.

* We must have the sizes and styles our customers need.

* We must have the quantities they want.

* We must understand the features and benefits of each product.

* We have to offer a better value, on the same or similar products, than any of our competitors.

You have to make customers feel good about the products they buy and the values they take home. As David Glass said, "So many times we over-complicate this business. But if you simply think like a customer, you will do a better job of merchandise presentation and selection than any other way."

Service to our Customers



"IF WE DEVELOP OUR ASSISTANT MANAGERS AND OUR DEPARTMENT MANAGERS, THERE IS NOTHING WE CAN'T DO TO TAKE BUSINESS AWAY FROM OUR COMPETITORS."

— Lee Scott
President and Chief Executive Officer
Wal-Mart Stores, Inc.

"Every" and "Day" are two words...but there's nothing everyday about this strategy. First and foremost, EDLP is an economic strategy. It means we work hard to keep our expenses lower than our competitors so that we can afford to sell for less. At Wal-Mart, our customers get our best price every day, not just during sales. Every Associate contributes to EDLP. The process of keeping costs low, improving productivity through self-improvement, and contributing ideas makes it possible for us to lower or "roll back" our prices regularly. As a result of practicing EDLP, customers recognize that Wal-Mart's prices are lower so they shop at Wal-Mart more often. EDLP is a responsibility and an opportunity for each Wal-Mart Associate. EDLP is what we do for our customers.

A21

"IF WE TRULY DEDICATE OURSELVES TO INSTILL THAT THRILL OF MERCHANDISING – THE THRILL OF BUYING AND SELLING SOMETHING AT A PROFIT – INTO EVERY ONE OF OUR ASSOCIATES, NOTHING CAN EVER STOP US."
— *Sam Walton*

### THE ITEM MERCHANT

Retailing is a lot more than just putting merchandise on a shelf with the hope that it will sell. It's all about being a merchant. Sam Walton discovered early in his retail career that his efforts to feature and promote merchandise made a huge difference in sales.

Sam had a vision that every Associate would learn to be a merchant and that each would learn merchandising to improve the sales rate of items. To teach this concept, Sam developed the VPI/GPI Program. VPI stands for Volume Producing Item in Wal-Mart and GPI stands for Gross Profit Item in SAM'S Club. These programs exist to teach us merchandising. Sam expected that every Associate would choose an item that had under-developed potential, feature that item prominently, and demonstrate to customers the value and importance of the item. Sam found that every time an Associate did this, sales of the item improved dramatically.

### STORE WITHIN A STORE (S.W.A.S.)

"We call it Store Within A Store, and it's the simplest idea in the world." (From "Sam Walton: Made in America.") This is one of the greatest examples of true empowerment.



Wal-Mart is a huge Company. A Company this size could not run efficiently and effectively if the authority to make decisions rested only with the upper levels of management. The "Store Within A Store" concept helps shrink Wal-Mart down to size — we can concentrate on running the Company one department at a time.

In "Store Within A Store" or "Club Within A Club," Department Managers manage their own business. Department Managers learn the costs of their goods, the freight costs, and the profit margins. They see how their store ranks with every other store in their Division. They order and promote their merchandise.

This is a unique approach to retailing and to most other businesses. No formal education is required to become a Department Manager or to run a "Store Within A Store." The only thing required is a zest for learning and the willingness to use the power given to you to the best of your ability.



A22



# Strive for Excellence

## "YOUR OBLIGATION IS TO CONTRIBUTE TO OUR HISTORY."

*- David Glass*
*Chairman of the Executive Committee of the Board of Directors*
*Wal-Mart Stores, Inc.*

Wal-Mart takes great pride in having an outstanding business reputation. As an Associate, you enjoy the same reputation for honesty and integrity as our Company does. You are expected to live up to high standards of personal integrity.

Wal-Mart's reputation for honesty is one of our greatest assets. Likewise, your reputation for honesty is one of your greatest assets. Always conduct yourself in a professional manner and use good judgment in your actions and dealings with others.

Dishonesty in any form will not be tolerated and may result in disciplinary action, up to and including termination. It is everyone's responsibility to protect our Company's assets; it's your duty to let a member of the Management team know if you have reason to believe someone is dishonest.

In a retail environment, taking anything, large or small, is dishonest. For example, eating candy from a broken bag without paying for it is dishonest. You should always conduct yourself in a manner that will leave no doubt as to your honesty. If you have any question about what action you should take, check with your Manager.

### Company Property

We will provide you with the supplies and materials needed to perform your job. All Company supplies, property, and facilities should be used for Company business only and should not be used for personal gain. Always use Company supplies and property conservatively and with respect. When you leave work at the end of your shift, all Company property (except items like your smock/vest, name badge, etc.) must remain in the facility.

### Shrinkage Control

Shrinkage is merchandise or dollars that can't be accounted for. Shrinkage includes shoplifting. Wal-Mart takes a very serious view of shoplifting and will prosecute, to the fullest extent of the law, anyone caught shoplifting. In addition to shoplifting, shrinkage occurs because of pricing errors, mishandled paperwork, mis-rings on the register, and simple counting errors. Money lost due to shrinkage comes straight out of our Company's profits and takes money out of your Profit Sharing account. It is everyone's responsibility to help stop shrinkage.

*David Glass, Chairman of the Executive Committee of the board of Directors*

A23

"GREAT PERFORMERS ARE RECOGNIZED AND GIVEN OPPORTUNITIES TO GROW AND CONTRIBUTE BEYOND THEIR EXPECTATIONS"

*- Celia M Swanson*

*Executive Vice President Membership, Marketing and Administration*
*SAM'S Club*

### What You Can Do To Reduce Shrinkage?

It pays to focus on controlling our shrinkage. Working together, we can eliminate shrinkage in everyone's area.

Follow these guidelines to help stop shrinkage:

- Help others to be honest by setting the example.
- Pay attention to details in following operational controls.
- Properly check-in merchandise and returns. Are we getting what we paid for?
- Serve our customers attentively. Look them in the eye and greet them whenever you're within ten feet of them.
- Try to do things right the first time. Paperwork errors cause a lot of our shrinkage. All of us who mark merchandise, take markdowns, and process invoices can help eliminate shrinkage.

Everyone works to keep our operating costs down so that we can consistently offer our customers lower prices. Cost-cutting ideas that are big money-savers by themselves, combined with hundreds of little cost-cutting ideas, drive our operating costs lower than our competitors.

### Expense Control?

Our most important commitment to our customers is to offer low prices — always. We can do this because we strongly believe in keeping our operating costs down. The more expenses we control, the more we can cut prices and stay ahead of our competition.

Controlling expenses is a way of doing business that Sam Walton began perfecting with his first store, a Ben Franklin franchise store, in Newport, Arkansas. He discovered that by dropping prices on an item, he sold more of that item. The store made less money on each item, but more money overall.

Sam learned the art of discount pricing. He also learned that a key to discount pricing was controlling expenses. Sam wanted to be a leader of discount pricing, so this in turn meant that Wal-Mart would be a leader in controlling expenses.

### What You Can Do To Prevent Accidents?

We must take every precaution to prevent accidents. You must take responsibility for your safety and for the safety of our customers. The key is consistent use of safe work practices. Here are some tips to help you have a successful and safe career with Wal-Mart, and to help you protect our customers:

- Stack merchandise in a stable manner so it won't fall.
- Protect your back by wearing a back support when you move merchandise and always practice good lifting techniques.
- Clean up any spill immediately so nobody slips.
- Help prevent falls — be alert for tripping hazards such as hangers on the floor, or even paper clips.
- Keep aisles and exits clear of boxes, merchandise, and unattended ladders to minimize hazards on the sales floor and in the stockrooms.

A24

# 17

## Executive Summary

> "TO PUSH RESPONSIBILITY DOWN IN YOUR ORGANIZATION, AND TO FORCE GOOD IDEAS TO BUBBLE UP WITHIN IT, YOU MUST LISTEN TO WHAT YOUR ASSOCIATES ARE TRYING TO TELL YOU."
>
> — *Sam Walton*

If we work together to fix recognized hazards and use safe work practices, we'll help eliminate accidents, ensure your well-being, help our customers enjoy a pleasant, safe shopping experience, and control a major source of expense to our Company. Wal-Mart is committed to maintaining a safe working environment for our Associates and a safe shopping environment for our customers and members. By giving daily attention to identifying and controlling areas of risk, every Associate can help live up to our commitment.

Following established procedures to help minimize losses is important to



you, to our customers, and to our vendors — it's just as important as providing value, quality and service. Your personal pledge to make Wal-Mart a safe place, and encouraging other Associates to do the same, is one of the most important pledges you can make. Safe work practices are everyone's responsibility.

In addition to our customers, Wal-Mart has two very important assets — our People and our Products.

Wal-Mart is committed to protecting our assets. Shrinkage and accident costs are expenses that can be controlled through proper work practices and careful attention to detail. By controlling these expenses, we can continue to sell merchandise to our customers at low prices while protecting your well being. With your help we can maintain our status as the industry leader in approaches to controlling shrinkage and preventing accidents.

Idea Generators come in all shapes and sizes. Sam Walton once said, "Listen to our Associates, they are our best idea generators." You can approach your supervisor with your ideas for improving your facility's operations.

We encourage you to contribute your money-saving ideas wherever and whenever you can. These ideas have allowed us to save millions of dollars. In addition to saving money, generating new ideas can also increase our levels of customer service.

The story of the first People Greeter is a classic example of Associate empowerment. The position was not created, as most people believe, by Sam Walton. It was created by an Associate in Crowley, Louisiana. Sam Walton and Tom Coughlin stumbled upon the first People Greeter in 1980. After Sam talked with the Store Manager and the People Greeter, he returned to the Home Office with what he thought was one of the greatest ideas he had ever heard.

A25

"SAM WALTON LEFT US A LEGACY. HE CREATED A COMPANY WITH AN ENVIRONMENT THAT ENCOURAGES US TO BE OVERACHIEVERS."

*– Lee Scott*
*President and Chief Executive Officer*
*Wal-Mart Stores, Inc.*

Sam took the idea from the Associate and built a position that has become a trademark symbolizing customer service for Wal-Mart.

The important position of a People Greeter would not have existed in all our stores if Sam Walton did not truly believe that the best ideas for our Company come from Associates at all levels of the Company. The success of our Company depends on you and your ideas. You have the power to take your ideas as far as they can go! Not all ideas can be used, but every idea will receive consideration. Always explore ideas, and always think of new and better ways to do business — because you have the power.

*This is My Job*

This phrase is seldom heard in other workplaces. You are probably accustomed to hearing "It isn't my job." Here you have the authority to make sure the customer receives the best service and the best value.

That means if you can improve your facility by doing something outside of your department — you can! You can by sharing your ideas and working

together. It is your job to make sure our customers get great value, selection, and courteous service in a clean, safe environment.

*The Next Big Idea*

You have countless opportunities to succeed. Some of the key ingredients for success at your job are listening, learning, and always doing your best. Set high expectations for yourself and work toward those goals. Share your ideas, and know you work for a Company that enables you to make decisions and to succeed.

Who knows? You may hold the next "People Greeter" idea for Wal-Mart!



*Promotions and Transfers*

Servant Leadership principles are evident in our record of promoting hourly Associates to the Management team. Approximately 60% of our Management team began their careers as hourly Associates. This figure reflects our belief in serving Associates by encouraging them and providing the tools necessary to develop their careers in our Wal-Mart family. If you are interested in the opportunity to be promoted, the first step is to speak to your facility Manager.

During your career with Wal-Mart, you may be cross-trained in other departments in your facility. This will challenge you in new areas and help you be a well-rounded Associate. We also allow transfers between divisions. Associates transfer from one division to another to take advantage of different opportunities as they become available. While you may desire a transfer at some point in your career, please keep in mind that there must be a position available and you must be the most qualified for the position. Other guidelines apply, so please visit with your Manager if you're interested in other opportunities.

A26

# Strive for Excellence

"RETAILING IS LIKE A SPORT. IT IS VERY COMPETITIVE, LIKE SPORTS, IT IS A LOT MORE FUN WHEN YOU KEEP SCORE, AND YOU CAN SEE THE PROGRESS THAT YOU ARE MAKING."

*– Mike Duke*
*Executive Vice President of Administration*
*Wal-Mart Stores, Inc.*

## Training

We support Associates by providing training to enhance their success with our Company. We believe training is an important part of understanding your job responsibilities. Your training will consist of formal and on-the-job training. It's your responsibility to listen, ask questions, learn, and apply what you've learned.

In our business, there is constant change. We must be able to adjust to meet our business needs. Because of this, your education doesn't stop with your initial job training. You will receive updates as new policies and procedures are implemented. If you are ever uncertain about how to handle a situation, please ask your Manager.

During your career with Wal-Mart, you will continue to receive training and coaching, both formal and informal. Your training will consist of both technical training and customer skills training. Your division will provide the training, but should you encounter a situation you don't know



how to handle, ask for assistance. Division-specific management training is provided to each Manager at different times during their careers.

While each division may refer to training courses by different names, they still teach the same basic Company Founding Beliefs. These courses teach people skills, how to coach and provide meaningful feedback to our Associates, and how to stay focused on our common Company direction.

## Performance Appraisals

Our performance appraisal program is designed to establish goals, appraise an Associate's performance, increase productivity, and make development/training plans. Future pay increases are generally based on performance. The frequency of pay increases will be determined by the guidelines of the division in which you work.

The performance appraisal becomes a part of your personnel file. It is a record of strengths and areas of improvement, a tool by which your progress is measured. Discuss all aspects of your performance appraisal openly with your Manager.



A27

**"POOR CUSTOMER SERVICE IS SOMETHING NO COMPANY CAN AFFORD."**

*- Coleman Peterson*
*Executive Vice President People Group*
*Wal-Mart Stores, Inc.*

20

In 1986, the Walton Institute began training our managers to be leaders and sharpen their management skills. Classes are now taught in the Bentonville area by our Training & Communications team and outside experts from around the country. The Institute is an extensive, weeklong class that teaches Managers new skills in organization, communication, teaching, problem-solving, and cooperative leadership. Our commitment to the team concept and your commitment to being a team player are becoming increasingly important as store sizes grow and the pace of completing tasks increases. We believe that when it comes to serving our customers' needs, working together as a team will win the customers' business over and over again.

Computer Based Learning (CBL) is an interactive, multimedia-based training tool. CBL training consists of completing modules. Modules contain information on a certain topic, including policies and procedures (e.g., Customer Service, Associate Safety). At the end of each module is a skill survey that checks your progress and reinforces learning. The modules that you see are based on your job. CBL training will then be reinforced with on-the-job training. CBL is not available in all divisions of the Company at this time. See your Personnel Manager to find out if CBL is available in your facility.



Rules

21

# "WHAT WE NEED IN OUR STORES IS INGENUITY, MORALITY AND HONESTY."
## – Sam Walton

Wal-Mart has high expectations to motivate you to perform at your top potential. To be successful, your performance must meet or exceed our company's needs and the requirements of your job.

An Associate's first 90 days of employment are considered a new hire period. During this time, your performance will be closely monitored. A "below expectations" new hire period may result in disciplinary action up to termination.

These rules, and those throughout this booklet, are designed for your well being and that of our Company. They apply to Associates in all divisions. All Associates are expected to be aware of and follow them. These are not all of the rules or procedures you will be expected to follow. Others will be discussed in Associate meetings, in person by your supervisor or posted on bulletin boards, and some things are just good common sense. Violation of these rules or other policies not listed in this handbook may result in disciplinary action, up to and including termination.

We expect the cooperation of all Associates in the observation of these rules, which are designed for our common protection and benefit. Every situation involving misconduct cannot possibly be listed here. However, keep in mind our rules are designed to promote safe work practices, efficiency, and orderly operations. Supervisors have responsibility for making sure we all meet these objectives.

1. All workplace injuries and accidents, no matter how slight, must be reported to a Supervisor immediately and a written report must be made.

2. If you have been injured on the job, you should follow your authorized doctor's orders.

3. Associates may not operate machinery, equipment, or power tools without the proper authority, training, or license. You must be 18 years or older to operate most machinery, equipment, or power tools.

4. All safety equipment that is issued or required to perform certain types of work shall be used while performing that work.

5. Running, scuffling, throwing objects, and horseplay will not be tolerated.

6. Associates must not remove or operate any machine without safety guards in place.

7. Firearms or other potentially dangerous or illegal weapons (except company-issued box cutters) are prohibited on Company property, including Company vehicles.

8. Dishonesty, for purposes of this handbook, may include such things as misappropriation of goods or money belonging to our Company or others; misuse of the Company discount privilege or other improper transactions for personal gain or loss to the Company; and unauthorized use or possession of property, equipment, materials, documents

## "WE GET OUR BEST RESULTS FROM ORDINARY PEOPLE DOING AN EXTRAORDINARY JOB."

— Sam Walton

or records belonging to our Company, a customer, or another Associate. It is your responsibility to inform a member of the Management team if you have reason to believe another Associate is being dishonest.

9. Profanity has no place at work, wherever your work location or whatever the circumstances. It will not be tolerated.

10. Loafing, idleness, sleeping, and excessive personal calls on work time will not be tolerated. Personal long-distance phone calls may not be charged on Company phones.

11. The use, possession, sale, transfer, acceptance, or purchase of illegal drugs at any time is strictly prohibited. The use, possession of an open container, personal sale, transfer, or acceptance of alcohol on Wal-Mart property or while performing Wal-Mart business is strictly prohibited.

12. Leaving Company property while on the clock, unless on Company business, is strictly prohibited.

13. Associates must not clock in or out for any other Associate.

14. Social relationships between supervisors and those they supervise, which may create the perception of favoritism, should be avoided.

In addition to these rules, each division may have specific rules tailored for that division. Please ask your facility manager for more details regarding any additional rules.

It's our hope that your employment experience with us will be a rewarding one. We realize that situations may arise when it becomes necessary to separate employment. Should you voluntarily resign your position, we ask that you give your Supervisor two weeks notice. This allows your Supervisor time to prepare for your departure.

When you leave, all Company charge and discount cards, name badges, and other Company property must be returned to your Supervisor at the time of separation.

These rules are in addition to the General Rules previously covered.

1. Shopping during work time is not permitted. You may shop during your meal or rest breaks.

2. Understocking merchandise to pay for later is considered misconduct and is not permitted.

3. Marking down merchandise for purchase by you, your relatives, or friends is not permitted.

4. Checking out relatives, friends, or yourself at the cash register is not permitted.

5. Food and beverages are prohibited while on the sales floor or in the receiving area.

6. Purchasing merchandise before it is on the sales floor is prohibited.

7. Parking spaces most accessible to the entrances are reserved for customers/members. Associates may not park in these areas during scheduled work time. Please see your facility manager for any additional parking guidelines.

8. All Associates are to enter and exit the facility through the front entrance during business hours. Please see your facility manager for the procedure during non-business hours.

A30

*policies and procedures*

23

"IF YOU LOVE YOUR WORK, YOU WILL BE OUT THERE EVERY DAY TRYING TO DO IT THE BEST YOU CAN, AND SOON EVERYONE AROUND YOU WILL CATCH THAT PASSION FROM YOU – LIKE A FEVER."

– Sam Walton

Your work schedule may vary depending upon the needs of our business and our customers. Your work hours will be scheduled to meet these changing needs. We will always do our best to work with your requirements, but your flexibility is also necessary.

Working during your scheduled hours is important for your success as a Wal-Mart Associate. If you are not able to come to work, or will arrive at work late, you are expected to personally notify your Manager each day before your scheduled time to report to work. Should you not report to work for three consecutive days without proper notification, we will consider this as your voluntary resignation.

People generally want to perform well and be successful. Our Coaching for Improvement process is designed to inform an Associate when they are not meeting the requirements and expectations of their position.

If an Associate's performance or conduct falls below the expectations of their position, then the Associate is informed of the problem and encouraged to take responsibility for their actions. This process will include developing a plan of action for improving performance to the required level, or changing conduct.

There are, however, certain actions of misconduct that may result in immediate termination. These actions include, but are not limited to, the following examples:

- Fraud
- Theft
- Unauthorized possession, use, or removal of Company property
- Dishonesty/Compromised Integrity
- Abuse of the Associate discount card
- Falsification of Company records
- Possession/use of a firearm or other dangerous weapon on Company property
- Violation of the Alcohol and Drug Abuse Policy
- Fighting/assault or threats
- Rude or abusive conduct toward a customer or Associate

- Under-ringing or ringing your own purchases
- Serious Harassment/Inappropriate Conduct
- Violating the Workplace Violence Policy
- Violating the Conflict of Interest Policy
- Grazing (eating or drinking from an open/damaged package or an item that has not been paid for, no matter how small)
- Violating the Statement of Ethics Policy
- Theft of Company time

We have made a commitment to provide a drug and alcohol-free workplace. The use, possession, sale, transfer, acceptance, or purchase of illegal drugs at any time is strictly prohibited. The use, possession of open containers, personal sale, transfer, or acceptance of alcohol on Wal-Mart property or while performing Wal-Mart business is strictly prohibited. Associates are prohibited from reporting to work under the influence of Alcohol, and/or consuming Alcohol

24

> "WE HOLD OURSELVES TO SOME OF THE HIGHEST STANDARDS OF ANY COMPANY IN THE NATION."
>
> - Coleman Peterson
> *Executive Vice President People Group*
> *Wal-Mart Stores, Inc.*

during their scheduled work shift, including break and meal periods. Any violation of this policy will be grounds for immediate termination and may result in a report to the appropriate law enforcement authorities.

Under no circumstances may a Supervisor become romantically involved with someone they supervise, or with someone whose terms or conditions of employment they may influence, or where the protection of company assets may be compromised. Hourly or Salaried Supervisors may not date Associates they supervise. Associates who violate this policy will be subject to immediate termination.

No gifts or gratuities that have monetary value are to be requested, encouraged, or accepted from any Supplier, Supplier Representative, or potential Supplier Representative.

Departments must not solicit gifts or gratuities from Suppliers for departmental parties or departmental events. Suppliers may not donate gifts for the purpose of raising funds for charities or non-profit organizations. Gifts or gratuities include, but are not limited to: "free goods," tickets to sporting or entertainment events, kickbacks in the form of money or merchandise, "special" discounts to one of Wal-Mart's Associates, discounted or no-longer-used samples, Supplier-paid trips, liquor, food products, meals, and personal services. When practical, any such item received must be returned to the sender with an explanation of this policy. Any item not returned shall be considered the property of Wal-Mart Stores, Inc.

Harassment or Inappropriate Conduct of any type, whether sexual, ethnic, or racial, is not tolerated at Wal-Mart. Wal-Mart is committed to

maintaining a work environment that is free of unlawful harassment as well as other inappropriate conduct, regardless of whether the conduct rises to the level of unlawful harassment. We want to provide a work environment where everyone is comfortable.

**Any negative or stereotypical comment or action, whether welcome or unwelcome, aimed at an individual's gender, race, religion, physical or mental disability, physical appearance, age, marital status, national origin, color, or sexual orientation is inappropriate at Wal-Mart and will not be tolerated.**

Associates who engage in any type of harassment or inappropriate conduct on Wal-Mart property, at Wal-Mart sponsored functions, or while traveling on behalf of the Company, whether "on the clock" or not will be subject to disciplinary action up to and including termination.



> "THE MOST IMPORTANT ASSETS THAT WE HAVE ARE INTEGRITY AND HONESTY IN DEALING WITH OUR ASSOCIATES, CUSTOMERS AND OUR SUPPLIERS."
>
> *- Dave Dible*
> *Executive Vice President Specialty Groups*
> *Wal-Mart Stores, Inc.*

**25**

Associates who are subjected to conduct prohibited under this policy are encouraged to report their concern to any salaried member of management. Prompt action will be taken and no retaliation will occur against the Associate making the report. All allegations of harassment/inappropriate conduct will be investigated. Confidentiality will be maintained to the extent that is practical. Appropriate action will be taken to eliminate such conduct and to ensure there will be no recurrence of the conduct.

If you, or someone you work with, have been a victim of harassment or inappropriate conduct, you should immediately report the offensive conduct to a salaried member of management. You may also contact your Regional Personnel Manager, the People Group, or the Ethics Hotline (1-800-WMETHIC).

Applicants will be considered for employment without regard to whether a relative of the applicant is employed by the company. No applicant or Associate, however, may be considered for or placed in a position where a member of the applicant's/Associate's immediate family member would supervise them or influence the terms or conditions of their employment. Immediate family members will not be assigned positions when such placements would adversely impact the protection of company assets.

Each Associate will be issued an identification badge that is required to be visibly worn above the waist during working hours. Each Associate will be checked to ensure that his or her badge is visibly displayed. Lending your badge to someone is grounds for termination. Report lost or stolen badges immediately. If you work in the Home Office and you lose your badge, you must pay the replacement cost of the badge.

This is one of your responsibilities. Our expectation is very clear. Always clock in to begin your workday and at other appropriate times; ask your Supervisor for specific details. If you forget to do this, notify your Supervisor immediately so corrections can be made. Your hard work is appreciated, and we want to pay you for this work. Remember that working off the clock is not only against Wal-Mart policy — it's against the law. Always clock in when you are working—Always! There are no exceptions.

**Never clock any other Associate in or out.** Violation of this policy may result in disciplinary action, up, to and including termination.

## "DEVELOP A RELIABILITY TO DO WHAT YOU SAY YOU'LL DO... AND DO IT WHEN YOU SAY YOU WILL."

*- Don Soderquist*
*Senior Vice Chairman, Retired,*
*Wal-Mart Stores, Inc.*

Associates will be provided break and meal periods during their scheduled work shift. Associates are paid for up to two break periods per work shift. No associate should work over six hours without taking at least a 30-minute meal period. Remember to clock in and out for meal periods.

Associates should not be required nor requested to perform work during their break and/or meal periods.

Where state law requires additional or more frequent break/meal periods will be followed.

Although your personal financial matters are private and confidential, writing insufficient-funds checks to the Company is a breach of our trust in you. These situations can lead to Coaching, being charged for the costs incurred by the Company, and possible termination of employment.

Each Associate has a personal file where employment records are maintained. Make sure you provide your Personnel Manager with changes that affect you personally. This includes information like address, phone number, or name changes; family status changes, insurance or Profit Sharing changes, and so on. This is necessary to keep all your records current.

Upon request, current Associates will be allowed reasonable access to view their personnel file with a member of management present.

Smoking and the use of smokeless tobacco products are permitted in designated locations only. Associates may not take longer or more frequent breaks to smoke or use smokeless tobacco. Your facility has specific guidelines regarding the use of tobacco (smokeless or cigarettes) products. Please familiarize yourself with these requirements. Failure to follow these guidelines or state laws regarding the use of tobacco products may result in disciplinary action, up to and including termination.



Wal-Mart Stores, Inc. has a Statement of Ethics Policy that applies to all Associates. All Associates are responsible for understanding, complying with, and reporting any violations or suspected violations of the Statement of Ethics. Reports of violations or suspected violations may be made by calling 1-800-WMETHIC. This includes business and personnel ethics. If you have any questions, please contact your facility Manager to review the Statement.

Policies and Procedures

"AS A WAL-MART ASSOCIATE YOU CAN MAKE A POSITIVE IMPACT ON OUR COMPANY, CUSTOMERS AND YOUR FELLOW ASSOCIATES. WELCOME ABOARD."
- Ed Kolodzieski
*Senior Vice President*
*Wal-Mart Neighborhood Market Stores*
*Wal-Mart Stores Division*

We encourage everyone to explore different avenues within our Company. When you were hired, you were most likely hired for a specific position or area, however, flexibility is important in our business.

Occasionally, you will be asked to work in areas other than your current assignment. You may also request a transfer from one division, facility, or department to another based on some specific guidelines. Some benefits may change if you transfer between divisions. Transfer requests will be given fair consideration if

1. Your performance, attendance and conduct are satisfactory or above; and
2. An open position for which you are qualified exists in the facility or department to which you want to transfer; and
3. Your Supervisor and any other involved members of the Management team approve the transfer.

Additional guidelines may exist in your facility. Please see your Manager for details. Please note, other facilities or divisions will not be able to discuss the transfer with you unless that facility or division has received a signed transfer request from your Manager.

The "Wal-Mart Way" is to always present the best image possible to our customer. It is important that your clothing be professional and appropriate for your job. You will be expected to maintain a clean and conservative personal appearance and good personal hygiene. Each work environment will have a specific policy for your particular job. Your Supervisor can provide additional information on your facility's dress code policy.

Work Time

Work time should be dedicated to serving our customers. For this reason, engaging in non-work related activities during work time is not permitted. Associates may not engage in solicitation or distribution of literature during work time. In addition, solicitation or distribution of literature is not permitted at any time in selling areas during the hours the store is open to the public. Distribution of literature is not permitted at any time in any work area. Non-Associates are prohibited from soliciting or distributing literature in any Company facility at any time.

A35

"THE COMBINATION OF OUR DISTRIBUTION AND TRANSPORTATION OPERATIONS, ALONG WITH OUR DEDICATED ASSOCIATES, GIVES US A UNIQUE, COMPETITIVE ADVANTAGE."

– Rollin Ford
Senior Vice President of Logistics
Wal-Mart Stores, Inc.

### Workplace Violence

Wal-Mart is committed to providing a safe and secure working environment for all Associates. In keeping with this commitment, all Associates are expected to assist in maintaining an environment that is free of harassment, violence, and threats of violence. This could include potentially violent situations with other Associates, Supervisors, Suppliers, Customers, or Associate acquaintances or family members.

Harassment, violence, threats of violence, and other similar conduct are unacceptable behaviors and violations of Company policy. Any Associate who violates this policy will be disciplined, up to and including termination from the Company. Any Associate who is terminated for violation of this policy will not be eligible for re-hire. In appropriate cases, the Company may seek criminal prosecution and will fully cooperate with law enforcement authorities.

Wal-Mart will not tolerate physical harassment, violence, or threats of violence, including, but not limited to, the following examples:

- Veiled threats of harm (Comments such as "You had better watch your back.")
- Intimidation
- Threatening harm or harming another person
- Bringing a gun, illegal knife, explosives, or other weapons of any kind onto Company property, in a Company vehicle, or to Company sponsored events
- Engaging in dangerous, threatening, or unwanted horseplay
- Striking, punching, slapping, pushing, or assaulting another person
- Fighting or challenging another person to a fight
- Stalking

Any Associate who is concerned about safety or violence should report it immediately to a salaried member of the management.

A36



# Benefits

29

> "SHARE PROFITS WITH ALL YOUR ASSOCIATES, AND TREAT THEM AS PARTNERS.
> IN TURN, THEY WILL TREAT YOU AS A PARTNER."
> —Sam Walton

## Profit Sharing Plan

Our Profit Sharing Plan began in 1972 because Sam and Bud Walton wanted to share the success of our Company with those who make it happen – our Associates!

As an Associate, you do not pay into our Profit Sharing Plan – it is supported 100% by Company contributions. But Profit Sharing is not a giveaway or a free ride. We all have to work hard to serve our customers and hold down expenses in order for our Profit Sharing accounts to grow. Average performance won't do it – we all have to excel in order to help set Wal-Mart apart from other retailers. Company profits help determine what Wal-Mart can contribute to our Profit Sharing accounts. Profit and sales performance help to determine the long-term performance of our stock, which is where the majority of our Profit Sharing Plan monies are invested. That's why so many of our Associates watch Company sales numbers and the stock price. They

have a financial interest in it because Profit Sharing depends upon it!

To participate in Profit Sharing, an Associate only has to work for one year and during that year work at least 1,000 hours of service during that 12-consecutive-month period. The first contribution can be made to your account on the January 31st following the 13th month of employment, provided you have met the eligibility requirements above and worked at least 1,000 hours during the Plan year (February 1 – January 31). Money is invested and remains in a trust until you leave the Company or reach the age of 69½.

To become vested (have ownership) of your Profit Sharing, you must remain with the Company over a period of time.

For more details on the Profit Sharing Plan, please refer to the Summary Plan Description in your Benefits book.

## 401(k) Plan

The 401(k) Plan offers our Associates yet another way to save for the future. Through the 401(k) Plan, you can contribute your own money toward retirement and have choices as to how the money is invested. The Company can also add money to your 401(k) account and help your savings grow even more!

The money you choose to save through the 401(k) Plan is handled through the convenience of payroll deductions and is taken out of your paycheck before federal income tax is withheld. This lowers your taxable income and helps you stretch your savings dollars even further. You have



A37

"FOR US, TREATING OUR ASSOCIATES AS IMPORTANT ASSETS IS NOT ONLY RIGHT, IT'S SECOND NATURE – SOMETHING THAT'S INGRAINED."

– *Sam Walton*





a range of investment choices and the flexibility to change your investment fund choices whenever you wish. The eligibility requirements for the 401(k) Plan are the same as for the Profit Sharing Plan.

Enrollment material is sent to you when you become eligible for the plan. For more specific information on the 401(k) Plan, please read the prospectus and Summary Plan Description in your Benefits book.

### Associate Stock Ownership Plan

Our Company strongly believes in the philosophy of partnership with our Associates. The Associate Stock Ownership Plan is a voluntary, easy way in which Associates can buy Wal-Mart stock and share in the ownership of the company. Any Associate who is the age of majority in his/her state (usually age 18) can participate by completing an enrollment card and turning it in to the Personnel Manager or Store Management Team. Management

will then be responsible for entering it into the Payroll System. You can have from $2 up to $1000 deducted from your check to buy stock. There are no fees involved in buying the stock.

If you choose to participate in the Associate Stock Ownership Plan, the Company will contribute 15% for every dollar you purchase, up to the first $1,800 you purchase each plan year through payroll deductions.

You can change or discontinue payroll deduction by turning in an enrollment card to your facility's Personnel Manager or Management Team. You can sell stock at any time by calling Equiserve at 1-800-438-6278. You will receive statements about your account twice a year.

Associates who own $2,000 or more of Wal-Mart stock may be able to borrow money by using stock in their accounts to secure a line of credit.

To learn about specific details and eligibility requirements of these benefits, please refer to the current Benefits Summary Plan Description.

A38

# benefits

"THE REAL KEY IS THE FACT THAT WE'RE PARTNERS.
I HOPE YOU FEEL LIKE A PARTNER WITH WAL-MART."

— Sam Walton

## Full-time Associates

Eligible full-time Associates receive the following benefits*:

- Profit Sharing (minimum of 1,000 hours per year and after 12 months employment).
- 401(K) (minimum of 1,000 hours per year and after 12 months employment).
- Stock Ownership Plan/Stock Loan Program.
- Vacation (after 1 year).
- Holiday Pay (after 90 days).
- Wal-Mart Associates – Wal-Mart Discount Card.
- SAM'S Club Field Associates – Advantage Membership Card.
- Child Care Discounts.
- Personal Time.
- Jury Duty.
- Leave of Absence (Medical, Personal, and Military).
- Illness Protection Plan.
- Medical Coverage.
- Dental Insurance.
- Life Insurance.
- Accidental Death and Dismemberment.
- Short/Long-Term Disability Coverage.
- Resources For Living (confidential professional counseling and assistance).
- Bereavement Leave.
- Scholarship Programs.
- Holiday Bonus (if hired prior to 1/1/01 and after 5 years of service).
- Child Care Discounts.

A full-time Associate is one who regularly works at least 28 hours per week or 20 hours per week if hired prior to September 1, 1979.

## Peak-time Associates

Eligible peak-time Associates receive the following benefits*:

- Profit Sharing (minimum of 1,000 hours per year and after 12 months employment).
- 401(K) (minimum of 1,000 hours per year and after 12 months employment).
- Stock Ownership Plan/Stock Loan Program.
- Vacation (after 2 years of employment).
- Holiday Pay (after 90 days).
- Wal-Mart Associates – Wal-Mart Discount Card.
- SAM'S Club Field Associates – Advantage Membership Card.
- Personal Time.
- Jury Duty.
- Leave of Absence (Medical, Personal, and Military).
- Medical Coverage (Associate only, after two years of employment).
- Resources For Living (confidential professional counseling and assistance).
- Bereavement Leave.
- Scholarship Programs.
- Holiday Bonus (if hired prior to 1/1/01 and after 5 years of service).
- Child Care Discounts.

A peak-time Associate is one who regularly works less than 28 hours per week.

## Temporary Associates

Eligible temporary Associates receive the following benefits*:

- Stock Ownership Plan
- Bereavement Leave (unpaid).
- Wal-Mart Associates – Wal-Mart Discount Card.
- SAM'S Club Field Associates – Advantage Membership Card.
- Jury Duty.
- Resources For Living (confidential professional counseling and assistance).
- Child Care Discounts.

Wal-Mart offers several benefit programs for our Associates to choose from. These benefits provide security and protection for many Associates and their families.

For more information on your benefits, please refer to the current Benefits Summary Plan Description (SPD) and Benefits Summary (WMP109).

*These benefits are not all inclusive. Please see your facility manager for additional benefits for which you may be eligible.

32

## "THE ENVIRONMENTAL ISSUE IS IMPORTANT TO OUR CUSTOMERS, SO IT IS IMPORTANT TO US."

*- Sam Walton*

As a responsible member of the community, our commitment goes beyond simply selling merchandise. Our Associates have earned a reputation for caring about the communities in which they live and work. To further demonstrate this, we have programs available to Associates and partners to showcase their interest in helping others. We give everyone the opportunity to take part in the fund raisers held every year for Company-supported projects such as Children's Miracle Network (CMN), or the events held for the Matching Grant program. Our people are a great asset to our communities, and we want to reward them for doing all they can!

Wal-Mart proudly sponsors United Way because it serves as a vital financial support to the broad needs in communities we serve. The money raised by each local United Way stays in the local community to support those needs

through various non-profit organizations such as the Salvation Army, Boys/Girls Clubs, American Red Cross, homeless shelters, battered women's shelters, and food banks, to name a few. Wal-Mart has a corporate campaign annually in which our Associates contribute through payroll deductions, and the Wal-Mart Foundation matches their gift dollar for dollar with no cap on the amount.

Wal-Mart recognizes the Children's Miracle Network as our "Charity of Choice," which means we support it as a Company every year in an annual fund raising campaign. During the year, our Associates raise money for this network of 170 hospitals across the United States, inspiring many critically ill children along the way. Wal-Mart/SAM'S Club is the largest corporate sponsor of Children's Miracle Network, as each of our locations participates in this campaign

to raise money for their local CMN hospital.

At Wal-Mart, we believe it is our responsibility to be a part of the collective effort to protect and preserve our natural resources. That's why we have developed a four-part Company wide commitment to:

- Provide environmentally improved products to our customers.
- Support educational programs for children.
- Look for better ways to build and operate Wal-Mart stores and offices.
- Support and encourage local community and environmental activities.

Wal-Mart provides grants to non-profit organizations or schools to support environmental efforts and education in the communities where

"DON'T COMPROMISE YOUR REPUTATION. IT'S A PRECIOUS COMMODITY. DON'T COMPROMISE YOUR INTEGRITY ... HAVE A GOOD NAME."
— *Sam Walton*

# Community Service

the stores are located. This Environmental Grant is available to each location once per year.



Each Store Manager is responsible for assigning a Green Coordinator for his/her store. The Green Coordinator is someone who has an interest in the environment and is eager to take on additional responsibility. Green Coordinators develop a Green Team to help with the direction of the store's environmental program. The Home Office also has a Green Team to promote recycling and participate in community events.

In 1993, Wal-Mart opened its first environmental store in Lawrence, Kansas. In 1995 and 1996, we followed with two additional stores in Moore, Oklahoma, and City of Industry, California. These innovative stores are energy efficient and environmentally friendly. They serve as laboratories for ideas that can be used in all future Wal-Mart stores. These stores are part of Wal-Mart's ongoing commitment to the environment. We invite all of you to work with us to achieve our goal of leaving the earth better than we found it.

What a wonderful way to recognize our Associates and partners for their community involvement! This program is available to every Associate within our Company who volunteers a minimum of 15 hours in a quarter with a qualifying 501(c)3 non-profit organization. The Foundation will then make a $100 contribution to the organization on

behalf of the Associate who gave of their time. So the next time you volunteer with organizations such as American Red Cross, or Boys and Girls Clubs, remember... Volunteerism Always Pays.

The purpose of this program is to encourage support of higher education by matching gifts made by Associates and Partners of our Company to eligible institutions. Any full-time Associate who has been with the Company for at least one full year is eligible to make this gift to an accredited college or institution. The gifts may support such programs as departmental studies, academic programs, student activities, or scholarship programs. The Wal-Mart Foundation will match the contributor's gift of $25.00 or more up to a maximum of $250.00 per fiscal year.

"IT'S NOT WHAT YOU GATHER IN LIFE, BUT WHAT YOU SCATTER THAT TELLS THE KIND OF LIFE YOU HAVE LIVED. LET'S SCATTER THE GOOD THINGS."

*– Helen Walton*
*Wife of Sam Walton*

### Scholarship Programs

As one of many Company benefits, Wal-Mart Associates who are high school seniors are eligible to compete for an Associate scholarship through a regional program sponsored by the Company. Wal-Mart also offers a scholarship for high school seniors who are the sons/daughters of Wal-Mart Associates who have been employed full time for one year at the time the scholarship is given. The applications are sent to your Personnel Manager, and should be available to you sometime in early spring.

Our Distribution Centers also have a scholarship program available to qualifying Associate applicants. The scholarship is awarded each spring by the Wal-Mart Foundation. These applications can be obtained through your location's personnel office.

### Matching Grants Program

Our largest community involvement program is the Matching Grant. Each location is given funds to match 501(c)3 non-profit organization's fund-raising profits up to $1,000. Your Store or Club may have a select group of people who oversee these programs, such as the SAM'S Spirit Committee, Green Coordinators, or Personnel Associates.

### Missing Children's Network

The Missing Children's Network is devoted to bringing kids home. It was formed in 1996 as a partnership between Wal-Mart and the National Center for Missing and Exploited Children (NCMEC). NCMEC is a non-profit organization and the most widely recognized finder of missing children.



Wal-Mart helps call attention to missing children by posting photos and information on bulletin boards in every Wal-Mart store and SAM'S Club nationwide. The faces of missing children are brought to the attention of thousands of people every day.

Listed with the photos and information is the all-important toll-free hotline to NCMEC (1-800-THE-LOST) so that the public can provide leads and assist in finding missing children.

A42



**35**

> "...WHEN ONE OF OUR EXPERIMENTS WORKS, WATCH OUT! TAKE SAM'S CLUB, FOR INSTANCE."
>
> – *Sam Walton*

## The Beginning of SAM'S Club

In the early 1980s, Mr. Sam heard of a new type of business. Wholesalers with very low overhead were selling merchandise at margins considerably below the discount retailers. Since Wal-Mart had always represented "Every Day Low Prices," Sam Walton saw a new challenge to achieve: a larger market share and provide greater value to a new customer base — small businesses. Soon after, in April 1983, the first SAM'S Club was opened in Midwest City, Oklahoma.

### Business Philosophy

We are committed to providing a higher standard of living to our members at an affordable price. We do that by increasing the value of Membership through the Productivity Loop. This means that we increase Membership and sales by lowering our expenses, which enables us to lower prices.



We offer a limited assortment of high volume items. The packaging of these items is in large, economical sizes.

Individual items are another portion of our merchandise assortment. These items change frequently, and create a new and exciting shopping experience for all Members. In addition, we offer several benefits to our Members. The different types of Memberships, benefits, and qualifications will be discussed during your orientation.

### SAM'S Club Dress Code

SAM'S Club Associates are expected to follow the Company's conservative dress code. Associates should be neat, well-groomed, and appropriately dressed while on the job. Name badges and back supports are issued to every Associate and are considered part of your daily work attire. Each work environment will have specific guidelines for your particular job. These guidelines are available from your Supervisor.

### Personal Hygiene

Appearance must be neat and clean. Hair should be clean and well groomed.

"THE TRULY GREAT COMPANIES UNDERSTAND THAT THE LEVEL OF SUCCESS IN ANY ORGANIZATION IS DIRECTLY RELATED TO THE LEVEL OF TALENT AND COMMITMENT OF THEIR ASSOCIATES. WE ARE FORTUNATE THAT SAM'S CLUB AND WAL-MART HAVE ASSOCIATES WITH THESE QUALITIES THAT HAVE MADE OUR COMPANY GREAT AND THEY CONTINUE TO DO SO EVERYDAY."

— *Tom Grimm*
*President and Chief Executive Officer*
*SAM'S Club*

*Miscellaneous*

Red vests are issued to certain Associates in certain areas of the club. If you do not bring your vest, badge, and back support to work with you daily, you may be asked to return home to get these materials. If you lose either the red vest or back support, you will be charged for the replacement of these items.

*Back Supports*

In a working warehouse, Associates are required to lift and move materials and merchandise frequently. Back supports (weight belts) play an important role in back protection.

*Forklifts*

Remember these key points about forklift safety during open hours of the club: (1) Two spotters are required to accompany any forklift on the floor. (2) Both spotters and the forklift driver must wear a vest for visibility when pulling merchandise. (3) The aisle where you are pulling merchandise must be sealed off with yellow rope on both ends to help

prevent any Member or Associates accidents.

*Floors*

All floors must be clear of foreign objects such as pallets or shrink-wrap. When spills occur, clean them up immediately. Make sure this area is blocked off to avoid member or Associate accidents.

*Box Cutters*

Floor partners are issued box cutters for stocking purposes. Make sure safe work practices are followed regarding box cutter procedures.

*Reserve Steel/Merchandise*

Pallets of merchandise are stored in reserve above selling slots all over the club. Be aware of the following:
(1) Make sure heavy items are not stacked on light merchandise to avoid accidents. (2) All merchandise in the steel must be completely shrink-wrapped and stored on a standard pallet in good condition. (3) Ensure all heavy display merchandise is secured.

All of these topics are explained in detail in the Risk Management

Resource Manual and will be reviewed further in your Risk Control training during orientation.

Purchases may be made during Associates' meal or rest breaks. Purchases may only be made when the warehouse is open for business. All Associate packages will be subject to inspection upon entering and leaving the club. Merchandise should be taken out of the club immediately after being purchased and not stored or held to be picked up later. SAM'S Club Associates may not purchase merchandise which has been marked down by the club in any area, including fresh departments. When purchasing merchandise, immediately take it to the registers after you finish shopping. Never place it in an understock (storage or holding) area.

Holding merchandise to purchase at a later date is against company policy.

A44

37

SAM'S Club

"WE WORK FOR A GREAT COMPANY AND WHAT MAKES THIS COMPANY SO GREAT IS OUR ASSOCIATES WHO ARE ON THE FRONT-LINES EVERY DAY TAKING CARE OF OUR MEMBERS. WE CAN BUILD BUILDINGS AND HAVE GREAT MERCHANDISE THAT OUR COMPETITORS CAN EASILY COPY, BUT THE ONE THING THEY CAN'T COPY IS OUR PEOPLE."

— Jim Haworth
Executive Vice President of Operations
SAM'S Club



SAM'S Club Advantage Card

All SAM'S Club field Associates, full- and peak-time, are eligible to receive a complimentary SAM'S Club Advantage Membership Card during their period of employment at SAM'S Club. This does not apply to SAM'S Club Home Office Associates. This complimentary membership card includes an additional card that may be issued to anyone over the age of 18 living in the Associate's household. These cards are non-transferable and entitle the cardholders to purchase merchandise at any SAM'S Club at the posted warehouse prices plus applicable sales tax. These cards are automatically renewed each year as long as the Associate is employed in the field by SAM'S Club. If it is determined that a Associate is abusing the privilege to use his/her membership card, the Associate will lose this benefit and may be subject to further disciplinary action. Should an Associate terminate employment with the Company, all Company property will be turned in, and the membership will deleted.

A45

"OUR ASSOCIATES WHO DRIVE THE TRUCKS AND WORK AT OUR DISTRIBUTION CENTERS DO AN OUTSTANDING JOB KEEPING THE SHELVES STOCKED FOR OUR CUSTOMERS."

- *Sam Walton*

Sam Walton's foresight to develop our own Logistics Operation has given Wal-Mart the competitive edge in the retail industry. Our Distribution Centers, in partnership with our Transportation Operations, are designed for the movement of millions of cases of goods each month. The Distribution Centers average 1.2 million square feet in size and operate around the clock to accommodate the needs of our customer, the stores, and clubs. Each Center has the latest possible technology built into it, including cutting-edge conveyor systems, electronic scanning equipment, and a complex computer system. Because of the type of work performed in the Centers and Transportation Operations, certain guidelines are necessary for the safety and well-being of our Associates.

### Logistics Dress Code

We have established conservative dress and appearance guidelines with safety in mind, and to allow for maximum mobility. Jeans are allowed, but must be in good repair and not frayed or ragged. For safety reasons, shirts or blouses should not have large baggy sleeves.

Associates working in the Distribution Centers and Transportation Operations are permitted to wear shorts during warmer months, provided they are no more than six (6) inches above the knee. Overly revealing clothing or bare midriffs are not allowed. It is important to protect your feet, therefore substantial shoes must be worn — no sandals or open-toed shoes. It is essential that all Associates practice good personal hygiene.

### Identification Badge Policy

Each Associate will be issued an identification badge that is required to be worn visibly at all times during working hours. As each Associate enters and leaves the facility, Loss Prevention will check to ensure that badges are worn with the picture facing front.

### Time Recording

Your pay is calculated from the time clock entries that you make using your ID badge. Correct time entries are your responsibility. Always clock in immediately before starting to work or returning from meals; clock out immediately after stopping work for meals or at the completion of your workday. If an error is made in clocking in or out, immediately go to your Supervisor or Manager to



A46

"OUR LOGISTICS ASSOCIATES CONSISTENTLY PROVIDE EXCEPTIONAL CUSTOMER SERVICE TO OUR NUMBER ONE CUSTOMER – THE STORES AND CLUBS."

- *Mike Duke*
*Executive Vice President of Administration*
*Wal-Mart Stores, Inc.*



have the correct time noted and initialed by you and your Supervisor or Manager.

Wal-Mart appreciates enthusiastic Associates, but in no case are you to ever volunteer your off-duty time by performing work without clocking in.

**No one is to clock any other badge but his or her own. Violation of this policy may result in disciplinary action, up to and including termination. Correct time entries and use of the designated clock are your responsibility.**

At the time you are hired, your normal working hours will be discussed with you. It is important you understand and follow your work schedule. You are not guaranteed the same schedule or position throughout your employment.

Occasionally, because of the fluctuating nature of our business, your schedule may have to be changed. You may be asked to work additional hours, or even fewer hours. You may also experience changes in the shifts you are scheduled to work, as well as the position.

If there is any reason you feel you could not change your work schedule or work overtime hours when needed, please discuss this immediately with your Manager or Supervisor.

They will try to work with you on these issues whenever possible.

You are expected to be in your work area at the beginning of your shift. Any time you are unable to report to work due to illness or unexpected circumstances, you must call in at least 30 minutes prior to your scheduled start time and speak to your Manager or Supervisor.

A47

40

"I'VE ALWAYS ENJOYED CHALLENGING OUR PEOPLE. IF YOU EXPECT GREAT THINGS FROM FOLKS, THEY'LL EXPECT IT FROM THEMSELVES. OUR PEOPLE HAVE NEVER LET US DOWN."

— *Sam Walton*

1. All injuries and accidents, no matter how insignificant, must be reported to a Supervisor immediately, and a written report must be completed.

2. Associates are not permitted to walk, stand, or climb on or over any type of conveyor, machine, equipment, or merchandise. This includes forklifts, tuggers, carts, slip sheets, and hand jacks.

3. Admittance to, or passage through, any area that has been roped off, barricaded, or otherwise designated as a danger zone is prohibited.

4. A 20-foot safety area around operating forklifts must be maintained when the load is being moved vertically.

5. Always keep your work area clean so it does not create a safety hazard to you or to others.

6. Unauthorized Associates shall not be permitted to perform any maintenance work on any equipment or machinery in the facility.

7. Sandals, open-toed shoes, and high heels should not be worn while working on the Distribution Center floor or shop area.

8. All equipment operators must have the appropriate permit(s) before operating power equipment.

9. Associates using any hand-held laser scanner must avoid looking into the end of the unit. At no time should this unit be pointed at another person.

10. Associates must park their vehicles in parking spaces in the direction of travel. Do not cut across the parking lot or park in visitor or disabled spaces.

11. Personal safety equipment issued to Associates must always be worn during work activity.

* Further safety information will be covered with you during new hire orientation



Beverages, eating, or use of tobacco products of any kind are not allowed in your work area. The use of tobacco products will be allowed only in designated, posted areas.





# Wal-Mart International

"THE MOST EXCITING AND REWARDING PART OF OUR INTERNATIONAL BUSINESS IS THE DEVELOPMENT OF OUR WAL-MART ASSOCIATES THROUGHOUT THE WORLD – THEY ARE THE WAL-MART CULTURE TO OUR MILLIONS OF CUSTOMERS WORLDWIDE."

*- John B. Menzer*
*President and Chief Executive Officer*
*Wal-Mart International Division*

 Argentina    Canada    Germany    Puerto Rico    United Kingdom

Brazil    China    Mexico    South Korea

Wal-Mart's Every Day Low Price promise is a message clearly understood in any language. As the world's largest retailer, we are constantly seeking avenues for growth. Some of the best opportunities now lie in markets outside the United States. Already, customers in Argentina, Brazil, Canada, China, Germany, Mexico, Puerto Rico, South Korea and the United Kingdom have begun to embrace the Wal-Mart way of doing business as our international expansion plans unfold. And many more opportunities are appearing on the horizon.

Wal-Mart became an international Company in 1991, when the first SAM'S Club opened in Polanco, within Mexico City. Since that time, our partnership with CIFRA S.A. de C.V. in Mexico has helped make us that country's largest retailer.

Our Company's opportunity north of the border in Canada came in 1994, when the 122-store chain of Woolco stores was purchased. After remodeling facilities and training Associates, the stores saw their sales per square foot double and their market share grow to more than 40% of the discount retail market.

With success in North America firmly established, expansion into points further away has quickly followed. South America, Latin America, Asia and Europe are providing excellent opportunities for development. With stores and clubs now open in Argentina, Brazil, Puerto Rico, China, South Korea, Germany and the United Kingdom, in addition to Mexico and Canada, we continue to keep a watchful eye toward new and exciting opportunities in other new markets around the world. In spite of cultural and business challenges, one thing becomes increasingly clear: Wal-Mart's Three Basic Beliefs translate well throughout the world.

The results of our international expansion efforts are exciting. Our new customers are proving just how universal Wal-Mart's philosophy of great values and customer service really is. In fact, grand openings in some of these overseas stores have set Company records as customers line up to experience low prices and value unheard of in their country's retail industry.

Eventually, Wal-Mart will be a household name as much throughout the world as it is here at home. So regardless of the language spoken, Wal-Mart's customer-first message is being heard loud and clear.

"ISN'T IT GREAT TO SEE PEOPLE DO MORE THAN THEY EVER DREAMED THEY COULD DO ... OR YOU THOUGHT THEY COULD DO?  THAT'S THE FUN OF THIS BUSINESS AS FAR AS I'M CONCERNED."

*— Sam Walton*

W al-Mart's Home Office on 8th Street in Bentonville was a necessity, not a luxury, when constructed. By 1969, there were 18 Wal-Mart stores in operation, which meant a centralized office would soon be needed, rather than the fragmented quarters in downtown Bentonville which also served the 14 Walton variety stores.

Fifteen acres on a farm outside of town were bought for the purpose of building this office space. The site was also to include an adjoining warehouse – the first real warehouse for the Company.

By today's standards, it was a very modest structure. The office was 15,000 square feet and the warehouse was 60,000 square feet. Both were completed and in use in early 1970.

The first office housed everything. All executive, administrative, merchandising, accounting, benefits, personnel, transportation, operations, dispatch, and support functions were

housed there. Sam Walton said at the time the complex was not only too large, but would "last for more than a lifetime." This is understandable because at the time there were only 21 stores and 1,500 total employees (the term "Associate" was not used until 1972). Even Sam later laughed at this prediction.

Since 1970, the offices have expanded greatly to reflect the growth of the Company, as would be expected of an enterprise that is now the world's largest retailer. The original site, once outside city limits, is now virtually at the mid-point of town. The first warehouse has become needed office space, and other expansions, additions, and parking soon consumed the initial 15 acres and a great deal more.

Now, Home Office operations can be found at many different locations in the Bentonville-Rogers area. All are interconnected by sophisticated communication technology.

Regardless of the location of the Home Office, one belief remains the same: Home Office Associates are here to support the field Associates that service each and every one of our customers day in and day out.

**Specific Work Rules:**

1. Associates must park their vehicles in parking spaces in the direction of travel.  Do not cut across the parking lot.  Do not park in visitor, disabled, United Way pharmacy parking spaces, or in fire lanes. Park only in areas designated for Associate parking. Excessive violations of this rule will result in coaching, up to and including termination.  The speed limit in all parking lots is 10 MPH at all times.

2. Associates may not add electrical appliances to any work area without prior approval of the Maintenance Electricians.

3. Anyone invited to the Home Office must register, wear a visitor's badge, and be escorted while in the facility.

A50

# Family and Medical Leave Act

43

> "IF WE ALWAYS BEGIN WITH THE BEST PEOPLE AND THEN ENSURE THAT THEY HAVE THE TRAINING NECESSARY TO EXCEL AT THEIR JOBS, WE WILL CONTINUE TO BE THE BEST PLACE FOR CUSTOMERS TO SHOP."
>
> *Coleman Peterson*
> *Executive Vice President People Group*
> *Wal-Mart Stores, Inc.*

Under the Family and Medical Leave Act (FMLA) of 1993, eligible Associates may take up to 12 work-weeks of unpaid, job-protected leave in a 12-month period, which begins on the first day of the leave, for certain family and medical reasons.

## Associate Eligibility

To be eligible for FMLA benefits, an Associate must:

1. work for a covered employer for a total of 12 months (Wal-Mart is a covered employer);
2. have worked at least 1,250* hours over the previous 12 months; and
3. work at a U.S. location or in any U.S. territory or possession where at least 50 Associates are employed by Wal-Mart within 75 miles.

*Wal-Mart's Leave of Absence policy requires only 1,000 hours (see Leave of Absence policy for more details.)*

## Leave Entitlement

An eligible Associate is entitled to a total of 12 work-weeks of unpaid leave during any 12-month period for one or more of the following reasons:

- to care for the Associate's child after birth or placement with the Associate for adoption or foster care;
- to care for the Associate's family member (spouse, child, or parent) with a serious health condition; or for the Associate's own serious health condition that makes him/her unable to perform his/her job.

Leave to care for the Associate's child after birth, or placement for adoption or foster care must conclude within 12 months of the birth or placement of the child.

"Serious health condition" means an illness, injury, impairment, or physical or mental condition that involves either:

- any period of incapacity for treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical-care facility, or
- continuing treatment by a health care provider that includes four or

more days of incapacity (i.e., inability to work or perform regular daily activities), or continuing treatment for any chronic, long-term, or incurable condition.

Where medically necessary, Associates may take *intermittent* or *reduced hours* FMLA leave, which means taking leave in blocks of time, or by reducing their normal work schedule, to care for a seriously ill or injured family member, or because the Associate is seriously ill or injured and unable to work. Associates should try to schedule such leave time as to not disrupt Company operations.

## Compensation and Health Benefits

Associates may elect to use vacation, personal, or illness protection time for compensation while on leave, however, such time will still count as FMLA leave and against the Associate's 12 work-weeks of leave time.

Wal-Mart will maintain group health insurance coverage for an Associate on FMLA leave whenever such insurance

A51

44

# "THIS COMPANY HAS SO MUCH MORE TO DO, SO MUCH MORE TO OFFER...

## LET'S FIRST TAKE CARE OF OUR ASSOCIATES."

*- Lee Scott*
*President and Chief Executive Officer*
*Wal-Mart Stores, Inc.*

was provided before the leave was taken and on the same terms as if the Associate had continued to work. Associates must make arrangements to pay their share of health insurance premiums while on leave.

Associates seeking to use FMLA leave are required to provide 30-days advance notice of the need to take FMLA leave when the need is foreseeable and such notice is practicable. However, where the need for leave is not foreseeable, notice must be given as soon as possible but not later than three days after beginning the leave.

Associates are also required to provide:

- medical certification supporting the need for leave due to a serious health condition affecting the Associate or a family member;
- periodic reports during leave regarding the Associate's status and intent to return to work, and
- certification of the Associate's ability to return to work when leave was taken for the Associate's own serious health condition.

Wal-Mart may also request second or third medical opinions (at Wal-Mart's expense) and periodic recertification during the leave.

Wal-Mart must inform Associates of their rights and responsibilities under FMLA, including posting a notice and giving specific written information on what is required of the Associate and what might happen in certain circumstances, such as if the Associate fails to return to work after FMLA leave.

Upon return from FMLA leave of 12 work-weeks or less, an Associate must be restored to his/her same job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment.

In addition, an Associate's use of FMLA leave cannot result in the loss of any employment benefit that the Associate earned or was entitled to before using FMLA leave, nor be counted against the Associate under an attendance policy.

Associates should contact a member of the Management team for additional information on FMLA or refer to Wal-Mart's Leave of Absence Policy for more specific information. You may also contact your Regional Personnel Manager or the People Group if you have any questions. Where state law provides more generous leave entitlements, state law will be followed.

A52







# Acknowledgment

After you have read the contents of this handbook:

1. **Read and sign the Acknowledgment,**

2. **Separate the Acknowledgment at the perforation, and**

3. **Give the signed Acknowledgment to your Manager.**

This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract. From time to time, Wal-Mart may determine that it needs to change some of the policies or programs in this handbook in order to better meet the requirements of our Associates and the Company. If any policies or programs are changed, modified, deleted, or supplemented, Wal-Mart will notify Associates as soon as possible.

I acknowledge that I have received and read this handbook as well as this Acknowledgment, and that I have had the opportunity to ask my Manager questions about both and that I fully understand the contents of both as they relate to my employment with Wal-Mart. I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract.

Date: _____

Social Security Number: _____

Print Your Name: _____

Signature: _____





©2001 Wal-Mart Stores, Inc.

A56

**All Material Wal-Mart Confidential. ©2005**

Printed By: Lindsay Boutilier              Page Source: The WIRE              Date Printed: Thu Sep 15 12:12:20 CDT 2005

Policies

### Discrimination & Harassment Prevention Policy (PD-19) - National

Updated: June 20, 2005

This Policy applies to all Associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Wal-Mart"), job applicants, Customers, Members, suppliers, and agents of Wal-Mart.

#### Policy

We believe in respecting the dignity of every individual. Respectful, professional conduct furthers our mission, promotes productivity, minimizes disputes, and enhances our reputation. Thus, we are committed to providing an environment that is free of discrimination or harassment based on an *individual's status*. Every Associate should avoid any conduct that could reasonably be interpreted as discrimination or harassment.

*Individual's status* means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, sexual orientation, or any other legally protected status. *Individual's status* also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described below, by or directed at any Associate, job applicant, Customer, Member, supplier, or agent of Wal-Mart. This "zero tolerance" Policy applies regardless of whether such conduct rises to the level of unlawful discrimination or harassment.

#### Prohibited Conduct

#### Discrimination

We prohibit any *discriminatory action* based on an *individual's status* in all aspects of our business.

*Discriminatory action* includes firing, refusing to hire, denying training, failing to promote, and discriminating in pay or other terms, conditions, or privileges of employment based on an *individual's status*. It also includes encouraging or assisting anyone to take *discriminatory actions*.

#### Harassment

We prohibit harassment based on an *individual's status* in all aspects of our business. This conduct includes:

- Using slurs or negative stereotyping;
- Verbal kidding, teasing, or joking;
- Making offensive comments about an *individual's status*, appearance, or sexual activity;
- Leering or making offensive gestures;
- Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, invitations, or other materials;
- Using Company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;
- Intimidating acts, such as bullying or threatening based on an *individual's status*;
- Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;
- Physical touching or assault, as well as impeding or blocking movements;
- Repeated unwanted sexual flirtations, advances, or propositions;
- Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors; or
- Any other conduct that shows hostility toward, disrespect for, or degradation of an individual based on the *individual's status*.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome, and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

#### Retaliation

A57

The WIRE

We prohibit taking negative action against any Associate, former Associate, job applicant, Customer, Member, supplier, or agent of Wal-Mart for:

- Reporting conduct that may violate this Policy;
- Filing a complaint of discrimination or harassment with a government agency or court;
- Assisting another individual in reporting conduct that may violate this Policy;
- Assisting another individual in filing a complaint of discrimination or harassment with a government agency or court;
- Cooperating in an investigation; or
- Opposing discrimination or harassment.

If you experience, observe, or become aware of any conduct you believe may be retaliatory, you should immediately follow the Reporting Procedures described below.

### Reporting Procedures

We are committed to preventing discrimination and harassment in all aspects of our business. We will take all reasonable measures to do so. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation. Therefore, the following procedures must be followed:

### Hourly Associates, Job Applicants, and Third Parties

If you experience, observe, or become aware of any conduct that may violate this Policy, you should immediately report the violation in one of two ways:

- You may report the violation to any Salaried Member of Management; or
- You may report the violation confidentially and/or anonymously to the Wal-Mart Ethics Helpline, 1-800-WMETHIC (1-800-963-8442).

If you believe a Salaried Member of Management may be violating this Policy, you are not required to report the violation to that person. You may report the possible violation to another Salaried Member of Management or call the Ethics Helpline.

You must cooperate with and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any Associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to discipline, up to and including termination.

We will take appropriate steps to ensure that there is no retaliation of any kind for using the Reporting Procedures described in this Policy. Retaliation of any kind for using the Reporting Procedures is strictly forbidden and violates this Policy.

### Salaried Members of Management

If you experience conduct that may violate this Policy, you should follow the same Reporting Procedures outlined above for <u>Hourly Associates, Job Applicants, and Third Parties</u>.

If you observe, receive a report, or otherwise become aware of a possible violation of this Policy, you must immediately report such conduct to the appropriate level of management for investigation. (Appropriate level of management includes, but is not limited to, the Field Logistics People Manager, Employment Advisor, Regional Personnel Manager, or People Director). A Salaried Member of Management who fails to report a violation of this Policy may be subject to discipline, up to and including termination.

### Investigation and Appropriate Action

We will take any reported violation of this Policy seriously. We will promptly and thoroughly investigate any report of a possible violation of this Policy in accordance with the procedures set forth in the Management Guidelines for this Policy and THE RED BOOK.

We will take appropriate action to eliminate conduct that violates this Policy and to ensure that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported Policy violation. Interim measures may include, but are not limited to, a leave of absence, suspension, or transfer of the Associate who reportedly violated this Policy.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an Associate has violated this Policy (or any other Policy), we will take corrective action regarding that Associate, including coaching and/or other discipline, up to and including termination.

A58

The WIRE

### Confidentiality

We will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution. Any disclosure of information, other than on a need-to-know basis as described above, will constitute a breach of confidentiality and will result in discipline, up to and including termination.

### Contact Person(s)

For guidance, contact:

| Facility | Contact |
|---|---|
| Wal-Mart Stores: | Store Manager<br>Regional Personnel Manager |
| SAM'S CLUBS: | Club Manager<br>Regional Personnel Manager |
| Field Logistics: | Field Logistics People Manager<br>Regional Personnel Manager |
| Home Office: | People Manager<br>People Director |

Last Updated: June 28, 2005

jvm_name=WPS_1A

https://wire.wal-mart.com/wps/myportal/_s.155/10007/_md/p.3/_p.1402528419/_/2002/_._/10008/_/860    9/15/2005

**Wal-Mart®
Corporate
Policy**

# Open Door Communications

### Policy

Number: PD-27

Revised:05/01/04

All Associates (salaried and hourly) may have Open Door discussions concerning all matters pertaining to Wal-Mart. The purpose of the Open Door is to bring your suggestions, observations, problems, or concerns regarding the Company or yourself to the attention of any supervisor or salaried member of management.

We foster a work environment that welcomes early identification of challenges or problems and mutual resolution of complaints. Open communication is important to meeting the needs of Associates and Customers and is welcomed by all Wal-Mart supervisors or salaried members of management.

The door is open to anyone who chooses to telephone or talk face to face with any level of supervision in our Company. Associates are encouraged to exercise the Open Door during their normal work hours. All issues discussed will be treated confidentially and impartially. Every Associate (salaried and hourly) is assured that each issue, concern or suggestion will be given priority consideration and addressed in a manner best suited to resolve the matter satisfactorily.

### Applies To

All current and former regular, temporary, full time, peak time, hourly and salaried Associates.

### Eligibility

- **Subject:** Anything related to Wal-Mart is a fair subject to raise through the Open Door process. Scheduling conflicts, pay, treatment, promotional opportunities, relocation, termination, concerns about another Associate's conduct, etc. may be discussed openly.

  In addition, it is important also to discuss ideas about how to improve customer service or other operating efficiencies. The Open Door is available not only for concerns, but it also is available for ideas and suggestions as well.

- **Individual:** Every Associate has the opportunity to discuss any matter of concern to him or her and to receive assistance resolving the issue. Both hourly and salaried Associates have the same right of access and are treated consistently under this policy.

### Notice

Associates will be advised of the Open Door communication process initially during orientation. On-going discussions reinforcing the availability of the Open Door will occur at regular intervals (i.e., weekly group or staff meetings).

Posters informing Associates about Open Door communication will be prominently displayed throughout every Wal-Mart facility.

### Access

In using the Open Door, faster resolution may occur when the Associate goes through the immediate supervisor first. However, if the Associate feels the supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, the Associate may proceed as outlined below:

• An Associate may contact the next level of supervision or any other supervisor or salaried member of management, up to and including Senior Management. No formal "chain of command" need be followed.

A60

• An Associate who wishes to call the Home Office may contact his or her Regional Personnel Manager, People Director, or any level of supervision or management they choose.

### Addressing

Concerns, comments, complaints, etc. raised through the Open Door will be treated with confidentiality and respect. Specific information concerning the matter **may not** be disclosed to anyone not directly involved in resolving the issue. Only those having a need to know may be made aware of, or consulted about, the situation.

Wal-Mart will investigate Open Door issues in a timely manner. A thorough investigation is required to determine the facts surrounding the issue or concern raised. This should be done by an individual not alleged to be a part of the Open Door issue or concern, preferably a salaried member of management.

A decision will be made on the basis of the investigation results and appropriate action will be taken, if necessary, to resolve the issue raised.

The resolution of the Open Door occurs when the supervisor or salaried member of management communicates to the Associate raising the concern the answer or that appropriate disciplinary action has been taken regarding the issue brought forth.

### Supervisory Expectations

Any supervisor or salaried member of management who:

• Fails to investigate and take action in a timely manner; or
• Discloses confidential information pertaining to the issue raised or the result to anyone not having a need to know; or
• Retaliates or causes an Associate to be retaliated against for using the Open Door process; or
• Suppresses the Open Door

**has engaged in misconduct that may result in disciplinary action up to and including termination.**

The supervisor or salaried member of management is to thank the Associate for bringing the concern or idea forward. The Associate should be assured the concern or idea will be looked into in a timely manner and given an approximate time to expect resolution.

After an Open Door issue has been resolved, it is the supervisor's or salaried member of management's responsibility to follow-up with the Associate. The supervisor or salaried member of management should ensure the Associate understands how and why the resolution was determined. If the Associate still has unresolved concerns, the Associate should be directed to the next level of supervision.

Wal-Mart will take no adverse action against any Associate based solely on the Associate's participation or lack of participation in any Open Door activity.

### Compensation

Wal-Mart will pay wages to an Associate for time that the Associate spends on Open Door activities during the Associate's shift.

Although Associates are encouraged to use the Open Door during the Associate's normal working hours, if an Associate chooses to exercise the Open Door after the Associate's working hours, through conversations with a supervisor or salaried members of management, Wal-Mart supervisors/managers must listen to after hours Open Door communications only long enough to determine whether it is appropriate to continue the communication or defer the communication to normal work hours. If the supervisor or salaried member of management continues the communication, Wal-Mart will pay wages

A61

to the Associate for the entire time that they spend in the communication. If the supervisor/manager defers the communication to normal work hours, Wal-Mart will not pay any wages to the Associate for the after hours Open Door communication.

Wal-Mart will not pay wages to, or otherwise compensate, persons no longer employed by Wal-Mart for Open Door activities. Wal-Mart will not pay wages to, or otherwise compensate, Associates for time spent by the Associate after hours to prepare written communication (e.g., letters or e-mails), unless a salaried member of management has directed the Associate to prepare the written communication after the Associate's normal working hours.

Associates who voluntarily travel to an alternate location for an Open Door discussion (e.g., District Office, Regional Office, Home Office, etc.) will not be compensated for travel time, unless the Associate is expressly authorized to travel to such location by a salaried member of management.

**Note: Only a salaried member of management has the authority to direct or authorize written communication or travel for Open Door Purposes.**

The supervisor or salaried member of management who participates in the after hours Open Door discussion will immediately complete a time adjustment slip to compensate the Associate for compensable after hours Open Door activities.

### Resources

| | |
|---|---|
| **Printed Materials:** | WMP-25 - Wal-Mart Associate Guide<br>Open Door Poster |
| **Online Resources:** | Supervisor/Management Procedures for Handling After Hours Open Door Activities |
| **Personal Contacts:** | Immediate Supervisor<br>Facility Manager<br>District Manager/Director of Operations<br>Regional Personnel Managers |

All Material Wal-Mart Stores Inc. Confidential. © 2003.

Coaching for Improvement, Policy PD-30

**Wal-Mart® Corporate Policy**

## Coaching for Improvement

**Type: Division 01 and 18 Field Only**

### Coaching for Success

**Number: PD-30**

**Revised: 04/18/05**

Coaching for Success can be defined as an informal, ongoing process of helping Associates achieve results by building on Associates' strengths, developing their skills, providing encouragement and increasing their confidence. In other words, it means increasing the likelihood of the Associate's personal success and enhancing their ability to contribute significantly to the team's success.

Coaching for Success is an essential part of leadership - spending time with Associates where the work is done, being available to instruct, listen and advise. It provides Associates with a constant flow of feedback. In this manner, help is provided when it is needed most as well as communicating enthusiasm, pride, and support. Coaching for Success often resolves or solves a situation before it gets to the point of Coaching for Improvement.

### Coaching for Improvement

Coaching for Improvement occurs when an Associate's behavior (job performance or misconduct) falls to meet the Company's expectations, even after Coaching for Success. It is a more formal process designed to encourage and assist an Associate to improve their job performance or behavior to meet the Company's expectations. It allows the Associate to be involved in their own improvement plans and assume responsibility for their behavior. Our aim is to retain Associates who have the interest, ability, and desire to be successful.

### Applies To

- All Associates regular, full time, peak time, Hourly and Salaried.
- Special considerations apply to Associates Employed Less Than 90 Days and Home Office Temporary Associates. See Associates Employed Less Than 90 Days and Home Office Temporary Associates section.

### The Coaching for Improvement Process

Coaching for Improvement is designed to be progressive. Apply Coaching for Improvement in a fair, timely, and consistent manner. Always start at the appropriate Coaching Level depending on the classification of behavior to be addressed. More serious levels of coaching are used at appropriate intervals until either the Associate's conduct or performance reaches the desired improvement or all coaching levels have been exhausted. However, there will be some situations where use of the Coaching process is not warranted and instead, the Associate's employment is automatically terminated. (See Gross Misconduct section below.)

Coachings should be conducted in a manner which allows the Associate to explain their behavior and to learn from the discussion.

Investigations are a routine part of the coaching process. It ensures a complete review of the facts and allows time for proper consideration of appropriate disciplinary action. During the investigation, the Associate may be suspended without pay if it is in the best interest of all parties involved.

Salaried Members of Management suspended without pay must receive their salary through the end of their current pay week.

Refer to the Investigation and Suspension Policy (PD-57) for additional information.

### Guidelines for Administering the Coaching for Improvement Process

1. Gather the facts including witness statements, if appropriate.

A63

Coaching for Improvement, Policy PD-30

2. Discuss the situation with the Associate to get their side and any additional facts. Gather Associate(s) statement, if applicable.
3. Properly classify whether the action is related to job performance or a specific behavior (misconduct or gross misconduct), including a specific reference to any policy or procedure including Health Privacy and Security Standards.
4. Determine the appropriate level of coaching. Depending upon the behavior, steps may be skipped.
5. Complete the Coaching for Improvement in the System.
6. Follow the procedures for effective coaching (set climate, etc.).
7. Conduct the Coaching for Improvement session, along with an hourly supervisor or another salaried member of management present, if the facts and the initial discussion with the Associate conclude a coaching is appropriate.
8. The Associate must complete the Plan of Action Section for both the Written and Decision-Making Day level of Coaching for Improvement.

**Coaching for Improvement Levels**

Level One - Verbal Coaching
Verbal Coaching is used to notify an Associate that their conduct or performance does not meet Wal-Mart's stated expectations, and what they need to do to correct the situation. It is always done verbally and in a constructive, non-intimidating way.

- Advise the Associate that this is the first level of our Coaching for Improvement process.
- The Supervisor should document the time, place and content of this conversation in the Coaching for Improvement System in the Behavior Observed Section.
- The Associate is not required to acknowledge the coaching.
- The Hourly Supervisor and salaried member of management should enter the Coaching into the system and then acknowledge the Verbal Coaching once it has been conducted.

Level Two - Written Coaching
The Written Coaching is a more serious discussion than a Verbal Coaching. It is the first level of Coaching for Improvement, which requires the Associate's acknowledgement.

- The Coaching for Improvement, with an acceptable detailed action plan, should be completed and acknowledged by the Associate.

Level Three - Decision-Making Day
This is the final opportunity for an Associate to evaluate their behavior in view of Wal-Mart's expectations prior to Termination.

- Level Three must also be formally documented and should be acknowledged by the Associate.
- Clearly explain the deficiencies noted at earlier Coaching for Improvement Levels, if any, and the specific improvement required.
- The Associate should complete an acceptable detailed action plan.

Decision-Making Day.

- After conducting the Level Three session, the Associate is given one (1) day off with pay to decide whether they will make the required improvement. The Decision-Making Day is the Associate's next scheduled workday. The Associate should be paid for the number of hours they were actually scheduled to work. For payroll, designate these hours as "Other Pay - Decision-Making Day".
- Meet with the Associate at the start of the next scheduled work day after the Decision-Making Day to review the Associate's detailed action plan developed during the Decision-Making Day and to discuss their decision as to making the required improvement. The Associate should at this time input their detailed Action Plan into the Coaching for Improvement System.
- An Associate may be given only one (1) Decision-Making Day within a 12 month period. If the Associate has already been given a Decision-Making Day within the preceding 12 month period and their performance or behavior continues to not meet Company expectations, the Associate is subject to immediate termination.

Demotion may be included as part of the coaching process at Level Three - Decision-Making Day for both job performance and misconduct issues. Demotions should always be accompanied by appropriate

Coaching for Improvement, Policy PD-30

documentation.

**Level Four – Termination**
Associates who are deemed to have engaged in Gross Misconduct are subject to immediate termination. This is not part of the Coaching for Improvement process. If the salaried member of management is uncertain if a particular behavior is Gross Misconduct, the District Manager/Director of Operations, Regional Personnel Manager, or the personnel representative for the area should be contacted to discuss the situation before any disciplinary action is taken. For matters pertaining to Health Privacy Standards, you may also call Wal-Mart's HIPAA Privacy Officer at 1-800-421-1362 or 479-621-2929. For matters pertaining to Health Security Standards, e-mail HIPAA EPHI Report at hipaaeph@wal-mart.com.

Any level of Coaching for Improvement for a violation of the Health Privacy Standards will be forwarded electronically to the HIPAA Privacy Officer.

**Behavior Classification**

Three behaviors are addressed below by this policy:

- Job Performance.
- Misconduct.
- Gross Misconduct.

Any combination of these behaviors may result in additional disciplinary action up to and including termination.

Job performance includes behavior that does not meet the reasonable expectations/standards set for all Associates in the same or similar position.

Misconduct includes behavior other than job performance, which falls below stated expectations, violates Company policy, does or may interfere with safe, orderly, or efficient operations or which creates a hostile or offensive environment for Associates, Customers/Members, and/or Suppliers, including compliance with Health Privacy and Security Standards.

Examples of misconduct include, but are not limited to:

- Attendance or punctuality that does not meet clearly communicated Company/facility guidelines.
- Unauthorized use of Company time (i.e. loafing) or personal business on Company time.
- Reckless use of equipment.
- Horseplay.
- Harassment/Inappropriate Conduct.
- Profanity.
- Understocking merchandise.
- Insubordination.
- Grazing (i.e., eating food items from an open bag, eating items from claims, etc.)
- Inappropriate disclosure of another person's (Associate or Customer/Member) or Company confidential information.
- Unauthorized sale of restricted items (i.e., alcohol, tobacco, pseudo ephedrine, spray paint, R-rated movies, M-rated games, or any other item restricted by Wal-Mart guidelines or law).
- Improper release of prescription medications from the Pharmacy.
- Unauthorized use or disclosure of health information in violation of the Health Privacy and Security Standards Policy. (i.e., An Associate answering the phone in Pharmacy or Optical and releasing information without first verifying the identity of the caller).

Gross Misconduct will not be tolerated. Coaching for Improvement will not be used to address gross misconduct. The employment of an Associate who is deemed to have engaged in gross misconduct is subject to immediate termination. Associates terminated for gross misconduct are not eligible for re-hire. The following list is not all-inclusive but serves as examples of conduct, which are usually classified as gross misconduct and may result in immediate termination:

- Intentional misuse of Company time (claiming pay for time not worked).
- Theft.

A65                    5/6/2005

- Dishonesty/Compromised integrity.
- Fraud.
- Abuse of Associate discount.
- Falsification of Company records.
- Possession/use of a firearm or other dangerous weapon on Company property.
- Possession/use/consumption of drugs or alcohol on Company property; and/or reporting to work impaired by either substance.
- Serious Harassment/Inappropriate Conduct.
- Fighting/Assault.
- Rude/Abusive conduct toward a Customer/Member or another Associate.
- Under-ringing merchandise or ringing an Associate's own purchase.
- Grazing (i.e., opening packages, purposefully damaging items, removing items from the shelf to eat, or any other act which causes a financial loss to the Company).
- Unauthorized surveillance of any Associate or salaried member of management.
- Negligent sale of restricted items (i.e., alcohol, tobacco, pseudo ephedrine, spray paint, R-rated games or movies, or any other item restricted by Wal-Mart guidelines or law).
- Unauthorized sale of any type of firearm.
- Negligent release of prescription medications from the Pharmacy.
- Violation of certain federal, state, or local criminal statutes.
- Any willful use or disclosure of health information in violation of the Health Privacy and Security Standards (i.e., Associate discloses health information without a business reason to disclose or to harm the reputation of the other person).
- Supervisor or salaried member of management who directed, knew or upon reasonable inquiry should have known that an hourly Associate worked without being properly compensated.

If assistance is needed determining if a particular infraction should be classified as Gross Misconduct, call the District Manager/Director of Operations, Regional Personnel Manager or the personnel representative for the area to discuss prior to termination. For matters pertaining to Health Privacy Standards, you may also call Wal-Mart's HIPAA Privacy Officer at 1-800-421-1362 or 479-621-2929. For matters pertaining to Health Security Standards, e-mail HIPAA EPHI Reports at hipaaeph@wal-mart.com.

**Associates Employed Less Than 90 Days and
Home Office Temporary Associates**

Associates employed less than 90 Days and Home Office Temporary Associates should be given verbal feedback regarding their performance and behavior. The formal coaching process is preferred, but not required.

Issues of performance should be addressed before an Associate is terminated, allowing them an opportunity to meet Company expectations. However, any performance issue may be grounds for termination.

**Refusal to Provide Plan of Action/Acknowledge Expected Behavior**

Associates are required to provide an acceptable written plan of action with both the Written and Decision-Making Day levels of Coaching for Improvement. If the Associate fails to provide the acceptable written plan of action and acknowledge the expected behavior, the salaried member of management who administered the coaching and the next level of management should:

- Restate the problem, why it is a problem, and the expectations.
- Ask the Associate to confirm and restate their understanding.
- Listen to the Associate's response and explanation.
- Explain that if the Associate refuses to write an acceptable plan of action and acknowledge the expected behavior, they will be advanced to the next level of coaching, up to and including termination.

**Refusal to Acknowledge a Coaching for Improvement**

If the Associate refuses to acknowledge a Coaching for Improvement, you should:

- Restate the problem, why it is a problem and the expectations.
- Ask the Associate to confirm and restate their understanding.

Coaching for Improvement, Policy PD-30

- Listen to the Associate's response and explanation.
- Explain that acknowledging the coaching is to acknowledge the Coaching for Improvement session was held. The Associate may also include any comments on the coaching, including that they do not agree.
- Always have another salaried member of Management present for the discussion and to acknowledge the completed coaching.

If the Associate refuses to acknowledge the Coaching for Improvement, the next level of supervision should discuss the situation with the Associate who is being coached and also must acknowledge the completed coaching.

**Retention/Active Period**

Coaching for Improvement documentation will be maintained electronically for 12 months under an "active" status. Twelve months after the last Coaching for Improvement session the Coaching for Improvement documentation becomes "inactive". Notify the Associate that due to their improved behavior/performance, the Coaching for Improvement documentation is now "inactive".

"Inactive" coachings will be electronically placed in a separate "Inactive" database which is maintained for five (5) years after the Associate leaves the Company.

All coachings pertaining to Health Privacy Standards must be retained for at least six (6) years by the Company and Wal-Mart's HIPAA Privacy Officer.

**Leave of Absence**

The active period of a coaching is suspended during a leave of absence. When the Associate returns to work, the "clock" will start to run again.

An Associate was issued a Written Coaching January 4. She took a leave of absence from May 4 until July 4. The active period of the coaching is then extended for the same length of time as her leave. Thus, instead of the coaching expiring January 4 (12 months from the date of issuance), it will expire March 4.

**Resources**

| Forms: | Coaching System: Coaching for Improvement System |
|---|---|
| Guides: | Coaching for Improvement Guide |
| Related Policies: | Investigation and Suspension Policy (PD-57) HIPAA Privacy Policy (PD-59) |
| Personal Contacts: | District Managers/Director of Operations Regional Personnel Managers Corporate Associate Relations HIPAA Privacy Officer Legal Department Information Security Official |

All Material Wal-Mart Stores Inc. Confidential. © 2005.

A67

After you have read the contents of this handbook:

## 1. Read and sign the Acknowledgment,

## 2. Separate the Acknowledgment at the perforation, and

## 3. Give the signed Acknowledgment to your Manager.

This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract. From time to time, Wal-Mart may determine that it needs to change some of the policies or programs in this handbook in order to better meet the requirements of our Associates and the Company. If any policies or programs are changed, modified, deleted, or supplemented, Wal-Mart will notify Associates as soon as possible.

I acknowledge that I have received and read this handbook as well as this Acknowledgment, and that I have had the opportunity to ask my Manager questions about both and that I fully understand the contents of both as they relate to my employment with Wal-Mart. I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract.

Date: 7/04/01

Social Security Number: Redacted

Print Your Name: Rose M. Bailey

Signature: Rose M. Bailey

A68

New Hire Orientation Training Plan

## new hire orientation training plan

Associate: _Rose M Pullim_ Sponsor: _____

Hire Date: _____ Division: _____ Dept. _____

### DAY ONE

- ✓ Meet Store Manager
- ✓ Participate in Welcome Session
- ✓ Watch the *History/Legacy* video
- ✓ Watch/discuss the *Division 01 Combo* video (or *Supercenter Orientation* video)
- ✓ Wal-Mart Culture Lesson - Respect for the Individual ‹
- ✓ Meet the Management Team
- ✓ Review Yellow Dot Program
- ✓ Review personnel paperwork
- ✓ Review Benefits Information
- ✓ Watch/discuss the *Benefits* video
- ✓ Participate in a Question & Answer session
- ✓ Meet Sponsor
- ✓ Participate in a Store Tour
- ✓ Review Wal-Mart Today's *New Associate Orientation* issue

### Pipeline & Computer Based Learning (CBL)

- ✓ Introduction to Pipeline, Policy Manual & CBL
- ✓ Print & review Training Plan (under Training in Pipeline)
- ✓ Read policy PD-10, Statement of Ethics (under Policy in Pipeline)
- ✓ Discovery Basic (Level 1: 7 days to complete)
- ✓ Three Basic Beliefs (Level 1: 7 days to complete) ‹
- ✓ Associate Safety (Level 1: 7 days to complete)
- ✓ Customer Safety (Level 1: 7 days to complete)
- ✓ Store Manager to show and discuss the *You Picked a Great Place to Work* video
- ✓ Participate in a Question & Answer Session
- ✓ Watch/discuss the *End of Day One* (Division 01 Combo) video

*Associate's Initials:_____ Personnel Manager's Initials:_____*

### DAY TWO

- ✓ Watch *Customer Service - Just Plain Old Common Sense* video
- ✓ Wal-Mart Culture Lesson - Strive for Excellence
- ✓ Watch *Customer Service - Magic of a Blink* video
- ✓ Review & discuss the Transfer/Promotion policy
- ✓ Discuss the evaluation process
- ✓ Participate in a Question & Answer session
- ✓ Watch *Stakeholder* video
- ✓ Discuss the Associate Stakeholder Bonus Program
- ✓ Practice basic functions of the SMART System

### Pipeline & Computer Based Learning (CBL)

- ✓ Review Job Descriptions (under Training in Pipeline)
- ✓ Hazard Communications (Level 1: 7 days to complete)
- ✓ Bloodborne Pathogens (Level 1: 7 days to complete)
- ✓ Customer Service (Level 1: 7 days to complete)
- ✓ Loss Prevention (Level 1: 7 days to complete)

*Associate's Initials:_____ Personnel Manager's Initials:_____*

A69

New Hire Orientation Training Plan                                    Page 2 of 2

**DAY THREE**

✓ Turn in Benefits forms
✓ Wal-Mart Culture Lesson - Customers & Customer Service
✓ Watch *All the Kings Horses* video
✓ Watch Associate Safety Video #6 (if applicable)
✓ Visit with the Risk Control Team
✓ Participate in a Safety Tour
✓ Observe the use of general & power equipment
✓ Meet with your Supervisor
✓ Participate in a Question & Answer Session
✓ Participate in a Wal-Mart Cheer

Pipeline & Computer Based Learning (CBL)

✓ Review 5 Commitments (under Wal-Mart Stores in Pipeline)
✓ Sexual Harassment (for hourly only)
✓ Sexual Harassment (for management only)
✓ Inappropriate Behavior
✓ Alcohol Manangement (Supercenters only)
✓ Personal Protective Equipment (only if applicable to job code)
✓ Spend time exploring Pipeline & the Policy Manual

*Associate's Initials:_____ Personnel Manager's Initials:____*

This Training Plan is to be used as a tool to help Associates in new positions, along with helping Sponsors better coach new Associates. This should be printed by the Personnel Manager and completed by the new Associate. Please sign and date below.

Associate: _Rose M Pulliam_

Personnel Mgr: _Betti A Suryheally_

Completion Date: _____

| Home Page | Search |
| About Wal-Mart | Benefits | Contact Pipeline | Home Office | International | News Brief |
| Phone & Info | Programs | Policy Manual | SAM'S Club | Training | Wal-Mart Stores |

Copyright© 1997, 1998 Wal-Mart Stores, Inc. All rights reserved.

A70

nted from the Wal-Mart Intranet Copyright© 1998          Printed on 10/7/98 at 12:18 PM

# COMPLETED TRAINING REPORT FOR ROSE BAILEY

: 02/07/2006

| Course(s) | Type | Date Completed | Time in Course | Times Taken | Score |
|---|---|---|---|---|---|
| ADA | ONLINE | 10/16/2002 | 20 | 1 | 91 |
| APPAREL PROCESSING | ONLINE | 8/13/1999 | 20 | 1 | 100 |
| Apparel Toolbox 1 | ONLINE | 2/22/2002 | 6 | 1 | 85 |
| Apparel Toolbox 2 | ONLINE | 2/22/2002 | 7 | 1 | 82 |
| Apparel Toolbox 3 | ONLINE | 2/22/2002 | 6 | 1 | 90 |
| Apparel Toolbox 4 | ONLINE | 2/22/2002 | 4 | 1 | 90 |
| Associate Safety | ONLINE | 7/16/1999 | 20 | 1 | 90 |
| BAGGING | ONLINE | 8/14/1999 | 15 | 1 | 100 |
| Baler and Compactor | ONLINE | 8/11/1999 | 7 | 1 | 100 |
| Bloodborne Pathogens | ONLINE | 5/27/1999 | 12 | 1 | 80 |
| Building An Endcap | ONLINE | 9/20/2004 | 11 | 3 | 90 |
| CHECK TENDERING | ONLINE | 8/17/1999 | 32 | 1 | 93 |
| CUSTOMER SERVICE ALWAYS | ONLINE | 4/6/2002 | 1 | 1 | 100 |
| Cash Drawer Maintenance | ONLINE | 8/14/1999 | 20 | 1 | 93 |
| Corporate Ethics | ONLINE | 9/29/2004 | 2 | 3 | 100 |
| Customer Safety | ONLINE | 7/16/1999 | 8 | 1 | 100 |
| Customer Service | ONLINE | 7/16/1999 | 15 | 1 | 83 |
| DISCOVERY BASIC TRAINING | ONLINE | 5/27/1999 | 7 | 1 | 100 |
| Diversity & Inclusion Hry | ONLINE | 11/1/2004 | 6 | 2 | 90 |
| Electronic Article Surveillance | ONLINE | 1/13/2000 | 27 | 1 | 93 |
| FEATURE PRESENTATION | ONLINE | 8/13/1999 | 13 | 1 | 87 |
| Family Medical Leave Act | ONLINE | 8/13/1999 | 10 | 1 | 89 |
| General Equipment | ONLINE | 8/6/1999 | 18 | 1 | 88 |
| Global Competencies | ONLINE | 9/12/2003 | 6 | 1 | 100 |
| Hazard Communications | ONLINE | 5/24/2004 | 14 | 4 | 93 |
| Hourly Pay Plan | ONLINE | 6/4/2004 | 32 | 1 | 90 |
| Inappropriate Behavior | ONLINE | 8/6/1999 | 21 | 1 | 80 |
| Information Verification | ONLINE | 11/1/2004 | 1 | 1 | 100 |
| Integrity | ONLINE | 4/6/2002 | 1 | 1 | 100 |
| Loss Prevention | ONLINE | 7/16/1999 | 29 | 1 | 81 |
| MODULARS/ FIXTURES | ONLINE | 8/13/1999 | 13 | 1 | 80 |
| Orientation Post Test | ONLINE | 9/10/1999 | 5 | 1 | 80 |
| PI Overview | ONLINE | 8/11/1999 | 33 | 1 | 93 |
| PROFIT | ONLINE | 8/13/1999 | 9 | 1 | 100 |
| Personal Protect Equip. | ONLINE | 6/11/1999 | 18 | 1 | 93 |
| Pricing Equipment | ONLINE | 8/12/1999 | 34 | 2 | 100 |
| RISK CONTROL 2002 | ONLINE | 11/5/2003 | 12 | 1 | 100 |
| Resources for Living | ONLINE | 8/13/1999 | 19 | 1 | 100 |
| Restricted Items | ONLINE | 3/14/2005 | 16 | 1 | 87 |
| Riser/Highwall Mainten | ONLINE | 8/13/1999 | 5 | 2 | 100 |
| Risk Control | ONLINE | 7/12/2004 | 16 | 1 | 80 |
| SCANNING | ONLINE | 8/14/1999 | 28 | 1 | 99 |
| SCANNING CREDIBILITY | ONLINE | 8/18/1999 | 12 | 1 | 100 |
| SCANNING EXCEPTIONS | ONLINE | 8/18/1999 | 35 | 1 | 82 |
| SMART System Overview | ONLINE | 8/12/1999 | 15 | 1 | 80 |
| STOCKING GENERAL | ONLINE | 8/13/1999 | 22 | 1 | 80 |
| STOCKROOM MAINTENANCE | ONLINE | 8/11/1999 | 17 | 1 | 96 |
| Sexual Harassment Hourly | ONLINE | 8/6/1999 | 22 | 1 | 93 |
| TECH CERTIFICATION TEST | ONLINE | 8/17/1999 | 41 | 1 | 93 |
| TENDERING | ONLINE | 8/17/1999 | 41 | 1 | 87 |
| TICKETING | ONLINE | 8/12/1999 | 20 | 1 | 90 |
| Three Basic Beliefs | ONLINE | 6/11/1999 | 19 | 1 | 100 |
| Tobacco Compliance | ONLINE | 2/2/2004 | 2 | 1 | 87 |
| Where do I go From Here? | ONLINE | 8/11/1999 | 12 | 1 | 84 |
| Workplace Violence Prevention--Hourly | ONLINE | 9/25/2004 | 16 | 2 | 87 |
| YOU'VE EARNED IT – HRLY | ONLINE | 2/28/2003 | 5 | 1 | 90 |
| You've Earned It -Hourly | ONLINE | 3/1/2004 | 31 | 1 | |

**Wal-Mart Confidential**

A71

## EXIT INTERVIEW

WMP-20 Revised 04/03
An Exit Interview is to be conducted for all Associates leaving the employment of Wal★Mart Stores, Inc. DATE OF TERMINATION MUST BE THE LAST DAY WORKED, EXCEPT IN CASES OF A LEAVE OF ABSENCE, SUSPENSION, OR 3 DAYS UNREPORTED ABSENCE

Associate Name _Lisa Bailey_                    Social Security No. _REDACTED_

Associate ID No. _____     Facility/Dept./Store # _2555_   ☑ Hourly  ☐ Management

Actual Last day Worked _5/4/05_                  Vacation Avail (Mgmt. Only) _55.02_

Updated Address and Phone Number: _612 Candlestick Lane, Newark DE_

Detailed Statement of Termination. This Section Needs To Be Completed By The Associate for Voluntary Termination or By The Manager/Supervisor for Involuntary Termination. (Please be specific.)

_____

_____

| VOLUNTARY TERMINATION (Eligible to re-apply) | | INVOLUNTARY TERMINATION (Eligible to re-apply) | |
|---|---|---|---|
| 03 ___ | Not Available For Work (NVL) | 37 ___ | Misconduct w/Coachings (CON) |
| 04 ___ | Failure to Return From L.O.A. (NRL) | 47 ___ | Excessive Absences and/or Tardies (EAT) |
| 05 ___ | Refused Offer of Work (ROW) | 53 ✓ | Insubordination (INS) |
| 06 ___ | Job Abandonment/Three Days Unreported Absence (DUA) | 55 ___ | Inability to Perform Job (IPJ) |
| | | 66 ___ | 1st Violation of Fraternization Policy (FVP) |
| 10 ___ | To Leave the Area (LTA) | 72 ___ | Unintentional Violation of Corporate HIPAA* Privacy Policy (UVH) *Health Insurance Portability and Accountability Act |
| 16 ___ | Child Care/Dependent Care Issues (CHI) | 75 ___ | Deceased (Call Profit Sharing & Life Ins.) (DEA) |
| 17 ___ | Due to Health (DTH) | 92 ___ | Lack of Work (Job Eliminated, Location Closed, Reduction in Force) (LOW) |
| 20 ___ | Work Hours (HRS) | 97 ___ | End of Temporary Assignment (ASC) |
| 21 ___ | Salary (PAY) | | |
| 22 ___ | Working Conditions (WOR) | | |

| | | INVOLUNTARY TERMINATION (Mandatory No Rehire) | |
|---|---|---|---|
| 24 ___ | Benefits (BEN) | | |
| 25 ___ | Career Opportunities (PRM) | 77 ___ | Intentional Violation of Corporate HIPAA* Privacy Policy (IVH) *Health Insurance Portability and Accountability Act |
| 28 ___ | Supervisor (SUP) | | |
| 29 ___ | Walked Off Job (WOJ) | 78 ___ | Gross Misconduct - Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets) (GMI) |
| 30 ___ | Stay at Home (SAH) | | |
| 31 ___ | Attend School (EDU) | 79 ___ | Gross Misconduct - Other (GMO) |
| 85 ___ | Retirement (RTD) | 99 ___ | 2nd Violation of Fraternization Policy (FRA) |
| 106 ___ | Failure to Produce Employment Documents in a Timely Manner (FTP) | 107 ___ | Falsification of Employment Documents (FED) |

Re-Hire Recommended ☐ Yes  ☑ No (Explain-General Comments) _____

The following Wal★Mart property must be collected at the time of Exit Interview: (Please check all that apply)
(✓) Badge  (✓) Discount Card(s)  ( ) Weight Belt  ( ) Other _____
(✓) Smock  ( ) Company Credit Cards/Phone card  ( ) Box Cutter

NOTE: To be considered for re-employment, you must re-apply. Your previous work record with Wal★Mart will be reviewed. The Company assumes obligation to contact you for possible re-employment. Where state law allows, a Neutral Reference will be provided to external employers seeking information regarding your employment with Wal★Mart Stores, Inc. Dates of employment and last position held is the only information that be released.

_Refused to sign 5/4/05_                         _Jennifer Lawrence_  5/4/6
ASSOCIATE _____ DATE                       SALARIED MEMBER OF MANAGEMENT ___ DATE

_Vada L. Fields_  5-4-05                          _____  8/2/05
HOURLY SUPERVISOR ___ DATE                        FACILITY MANAGER ___ DATE

A72

*Performance Appraisal*
## Salesfloor Associate

*mgt need Practice*

Practices 10-Foot Rule.

Follows Dress Code Policy.

Assists Customers in finding merchandise.

Shows sense of urgency with all assignments.

Follows proper procedures for handling claims merchandise.

**Softlines/Apparel** – Is knowledgeable about:

Sizing and colorizing.

Hanging softlines.

Rack rules.

Fitting room procedures.

**Hardlines** – Is knowledgeable about:

Cutting keys.

Cutting chain.

Cutting fabric.

Mixing paint

Live pet department.

N/A

*Been here 6 yrs never good not had assist in training tele problem problem*

*res disagre*

Zones the department.

Maintains features.

Follows proper procedures for:

Ordering.

Markups/markdowns.

Signing/flagging/pricing/labels.

Promptly get returns from Courtesy Desk.

Maintains all risers properly

N/A

*RB N/A*

Follows all safety/emergency policies and procedures.

Properly uses ladders and ensures they are not left on the salesfloor.

Ensures stable stacking of merchandise.

Follows proper lifting techniques.

Ensures all displays are secured in a safe and proper manner.

*RB*

*4/21/05*

Attendance and punctuality is within acceptable Company guidelines.
Days Absent: **3**   Days Tardy: **5**

Current on CBLs     Company Goal: 100%     Associate Current % **100%**

A73

| Name: Rose Bailey | | Store# 2555 | Position: Salesfloor Associate | |
|---|---|---|---|---|
| SS# | | | Current Pay Rate: | |
| Review Period: Yearly | | | Increase Amount: | |
| From: 2004 | | To: 2005 | New Pay Rate: 10.75/hr | 5/2/05 |

☐ 90 Day    ☑ Annual    ☐ Follow Up

## STRENGTHS

Customer Service
Knowledgeable
Works well in Various Areas

Zoning
Returns

## AREAS FOR IMPROVEMENT

4/23/05 Back Rules — Trained by assistant mgt over 5 years ag
Tekan Experience — trained by asst mgt

Explained that there is new back rules RB

## ASSOCIATES COMMENTS / GOAL SETTINGS

if mgt would abuse the good workers is Bad workers would be problem.

I am the only associate in dept 33 that some one would now come you say that I didn't know back rule — you either clockwise or counterwise when doing light color to dark color when coloring

☐ EXCEEDS EXPECTATIONS    ☑ MEETS EXPECTATIONS    ☐ BELOW EXPECTATIONS

## SIGNATURES:

| Associate's Signature | Print Associate's Name | Date |
|---|---|---|
| | Jennifer B | 4/19/05 |
| Hourly Supervisor Signature | Print Hourly Supervisor Name | Date |
| | Brian W. Hendricks | 4/19/05 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| | Myrl Cordovan | 4/19/05 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A74



| Performance Appraisal **Salesfloor Associate** | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|

| **Customer Service** | | | |
|---|---|---|---|
| Practices 10-Foot Rule. | | ✓ | |
| Follows Dress Code Policy. | ✓ | ✓ | |
| Assists Customers in finding merchandise. | | ✓ | |
| Shows sense of urgency with all assignments. | | ✓ | |
| Follows proper procedures for handling claims merchandise. | | ✓ | |
| **Softlines/Apparel** – Is knowledgeable about: | ✓ | | |
|     Sizing and colorizing. | ✓ | | |
|     Hanging softlines. | ✓ | | |
|     Rack rules. | ✓ | | |
|     Fitting room procedures. | | ✓ | |
| **Hardlines** – Is knowledgeable about: | | | |
|     Cutting keys. | | | |
|     Cutting chain. | | | |
|     Cutting fabric. | | | |
|     Mixing paint | | | |
|     Live pet department. | | | |

| **Productivity** | | | |
|---|---|---|---|
| Zones the department. | | ✓ | |
| Maintains features. | | ✓ | |
| Follows proper procedures for: | | | |
|     Ordering. | | ✓ | |
|     Markups/markdowns. | | ✓ | |
|     Signing/flagging/pricing/labels. | | ✓ | |
|     Promptly get returns from Courtesy Desk. | | ✓ | |
|     Maintains all risers properly | | ✓ | |

| **Safe Work Practices** | | | |
|---|---|---|---|
| Follows all safety/emergency policies and procedures. | | ✓ | |
| Properly uses ladders and ensures they are not left on the salesfloor. | | ✓ | |
| Ensures stable stacking of merchandise. | | ✓ | |
| Follows proper lifting techniques. | | ✓ | |
| Ensures all displays are secured in a safe and proper manner. | | ✓ | |

| **Dependability** | | | |
|---|---|---|---|
| Attendance and punctuality is within acceptable Company guidelines.<br>Days Absent:_____  Days Tardy: _____ | ✓ | | |

| **Training** | | | |
|---|---|---|---|
| Current on CBLs     Company Goal: 100%     Associate Current % _____ | | ✓ | |

A75

| Name: ROSE BAILEY | Store# 2555 | Position: SALES FLOOR ASSOCIATE |
|---|---|---|
| SS# | | Current Pay Rate: 9.10 |
| Review Period: ANNUAL | | Increase Amount: 4% |
| From: 5-25-03 | To: 5-25-04 | New Pay Rate: 9.46 |

☐ 90 Day     ☑ Annual     ☐ Follow Up

**STRENGTHS**

Uses her time wisely; always willing to help others.

**AREAS FOR IMPROVEMENT**

Training on Telxon

**ASSOCIATES COMMENTS / GOAL SETTINGS**

no comments

☐ EXCEEDS EXPECTATIONS    ☑ MEETS EXPECTATIONS    ☐ BELOW EXPECTATIONS

**SIGNATURES:**

| _Rose M Bailey_ | _Rose M Bailey_ | 4-14-04 |
|---|---|---|
| Associate's Signature | Print Associate's Name | Date |
| _Melva Etheridge_ | Melva Etheridge | 4-14-04 |
| Hourly Supervisor Signature | Print Hourly Supervisor Name | Date |
| _Christy Drakine_ | _Christy Drakine_ | 4-14-04 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| _____ | _Cathy Wills_ | 4-22-04 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A76

| *Performance Appraisal*<br>*Salesfloor Associate* | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|

| **Customer Service** | | | |
|---|---|---|---|
| Practices 10 Foot Attitude. | | ☑ | ☐ |
| Practices 10 Foot Attitude. | ☑ | ☐ | ☐ |
| Wears appropriate work attire | ☑ | ☐ | ☐ |
| Assists Customers in finding merchandise. | ☑ | ☐ | ☐ |
| Shows a sense of urgency with all assignments. | ☐ | ☑ | ☐ |
| Follows proper procedures for handling claims merchandise. | | | |
| Softlines/Apparel -- Is knowledgeable about: | ☑ | ☐ | ☐ |
|    Sizing and colorizing. | ☑ | ☐ | ☐ |
|    Hanging softlines. | ☑ | ☐ | ☐ |
|    Rack rules. | ☐ | ☑ | ☐ |
|    Fitting room procedures. | | | |
| Hardlines -- Is knowledgeable about: | N/A | ☐ | ☐ |
|    Cutting keys. | N/A | ☐ | ☐ |
|    Cutting chain. | N/A | ☐ | ☐ |
|    Cutting fabric. | N/A | ☐ | ☐ |
|    Mixing paint. | N/A | ☐ | ☐ |
|    Live pet department. | N/A | ☐ | ☐ |
| Homelines -- Is knowledgeable about: | N/A | ☐ | ☐ |
|    Razor case procedures | N/A | | |
|    Perfume/cologne procedures | | | |

| **Productivity** | | | |
|---|---|---|---|
| Zones the department. | ☑ | ☐ | ☐ |
| Maintains features. | ☐ | ☑ | ☐ |
| Follows proper procedures for: | | | |
|    Ordering. | ☐ | ☑ | ☐ |
|    Markups/markdowns. | ☐ | ☑ | ☐ |
|    Signing/flagging/pricing/labels. | ☑ | ☑ | ☐ |
| Promptly gets returns from Courtesy Desk. | ☐ | ☑ | ☐ |
| Maintains all risers properly. | | | |

| **Safe Work Practices** | | | |
|---|---|---|---|
| Follows all safety and emergency policies and procedures. | ☐ | ☑ | ☐ |
|    Properly uses ladders and ensures they are not left on the salesfloor. | ☐ | ☑ | ☐ |
|    Ensures stable stacking of merchandise. | ☐ | ☑ | ☐ |
|    Follows proper lifting techniques and uses back support belt when lifting. | ☐ | ☑ | ☐ |
| Ensures all displays are secured in a safe and proper manner. | | | |

| **Dependability** | | | |
|---|---|---|---|
| Attendance and punctuality is within Company guidelines.<br>Days Absent: _0_    Days Tardy: _0_ | ☑ | ☐ | ☐ |

| **Training** | | |
|---|---|---|
| Current on CBLs    Company Goal: 100% Associate Current % _100 %_ | ☑ | ☐ |

| Name: ROSE BAILEY | Store# 2566 | Position: SALESFLOOR ASSOC |
|---|---|---|
| SS# | | Current Pay Rate: 8.65 |
| Review Period: YEARLY | | Increase Amount: .45 |
| From: 05/25/02 | To: 05/25/03 | New Pay Rate: 9.10 |

☐ 90 Day     ☑ Annual     ☐ Follow Up

## STRENGTHS

REQUIRES LITTLE TO NO DIRECTION
ALWAYS IN HER DEPARTMENT TAKING CARE OF THE CUSTOMERS
VERY DEPENDABLE
GOOD ZONER

## AREAS FOR IMPROVEMENT

CONTINUE TO LEARN OTHER AREAS OF THE STORE
CONTINUE TO LEARN DEPARTMENT MANAGER FUNCTIONS

## ASSOCIATES COMMENTS / GOAL SETTINGS

☑ EXCEEDS EXPECTATIONS  ☐ MEETS EXPECTATIONS  ☐ BELOW EXPECTATIONS

SIGNATURES:

| Associate's Signature | Print Associate's Name: Rose M Bailey | Date 4/27/03 |
| Hourly Supervisor Signature | Print Hourly Supervisor Name: Edwina Riley | Date 5-18-03 |
| Salaried Manager's Signature | Print Salaried Manager's Name: MIKE PINKSTON | Date 4/27/03 |
| Facility Manager's Signature | Print Facility Manager's Name | Date 5-12-03 |

A78

*Performance Appraisal*
# Salesfloor Associate

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|
| **Customer Service** | ☒ | ☐ | ☐ |
| Practices 10 Foot Attitude. | ☒ | ☐ | ☐ |
| Wears appropriate work attire | ☒ | ☐ | ☐ |
| Assists Customers in finding merchandise. | ☐ | ☒ | ☐ |
| Shows a sense of urgency with all assignments. | ☐ | ☒ | ☐ |
| Follows proper procedures for handling claims merchandise. | ☒ | ☐ | ☐ |
| Softlines/Apparel -- Is knowledgeable about: | ☒ | ☐ | ☐ |
|    Sizing and colorizing. | ☒ | ☐ | ☐ |
|    Hanging softlines. | ☐ | ☒ | ☐ |
|    Rack rules. | | | |
|    Fitting room procedures. | ☐ | ☐ | ☐ |
| Hardlines -- Is knowledgeable about: *N/A* | ☐ | ☐ | ☐ |
|    Cutting keys. *N/A* | ☐ | ☐ | ☐ |
|    Cutting chain. *N/A* | ☐ | ☐ | ☐ |
|    Cutting fabric. *N/A* | ☐ | ☐ | ☐ |
|    Mixing paint. *N/A* | ☐ | ☐ | ☐ |
|    Live pet department. *N/A* | ☐ | ☐ | ☐ |
| Homelines -- Is knowledgeable about: *N/A* | ☐ | ☐ | ☐ |
|    Razor case procedures *N/A* | ☐ | ☐ | ☐ |
|    Perfume/cologne procedures | | | |

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|
| **Productivity** | ☒ | ☐ | ☐ |
| Zones the department. | ☐ | ☒ | ☐ |
| Maintains features. | | | |
| Follows proper procedures for: *N/A* | ☐ | ☐ | ☐ |
|    Ordering. *N/A* | ☐ | ☐ | ☐ |
|    Markups/markdowns. | ☐ | ☒ | ☐ |
|    Signing/flagging/pricing/labels. | ☒ | ☐ | ☐ |
| Promptly gets returns from Courtesy Desk. | ☒ | ☒ | ☐ |
| Maintains all risers properly. | | | |

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|
| **Safe Work Practices** | ☐ | ☒ | ☐ |
| Follows all safety and emergency policies and procedures. | ☒ | ☐ | ☐ |
|    Properly uses ladders and ensures they are not left on the salesfloor. | ☐ | ☐ | ☐ |
|    Ensures stable stacking of merchandise. *N/A* | ☐ | ☐ | ☐ |
|    Uses back support belt when necessary. | ☒ | ☐ | ☐ |
|    Follows proper lifting techniques. | | | |
| Ensures all displays are secured in a safe and proper manner. | | | |

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|
| **Dependability** | ☐ | ☒ | ☐ |
| Attendance and punctuality is within Company guidelines. | | | |

Days Absent: *5*    Days Tardy: *20*

| | EXCEEDS | MEETS | BELOW |
|---|:---:|:---:|:---:|
| **Training** | ☒ | ☐ | ☐ |
| Current on CBLs    Company Goal: 100% Associate Current % *100* | | | |

A79

# PERFORMANCE APPRAISAL

| | | |
|---|---|---|
| Name: Rose Bailey | Store # 2555 | Position: sales |
| SS#: | | Current Pay Rate: 8.20 |
| Review Period: Yearly | | Increase Amount: .46 |
| From: 05-25-01 | To: 04-23-02 | New Pay Rate: 8.66 |

☐ 90 Day          ☑ Annual          ☐ Follow Up

## STRENGTHS

- Keeps Girls department zoned well
- keeps up with her returns and helps with processing other departments returns
- Assist department manager with repairing opened packages.
- is beginning to do top part of the fitting room ladies

## AREAS FOR IMPROVEMENT

- Zoning Speed (We work as a team) other areas may need your help
- Recognize workload (meaning assisting other departments with zone)
- Be more willing to work in other departments in form others when taking break/lunch.

## ASSOCIATES COMMENTS/ GOAL SETTINGS

Communication is 2 ways Situation everyone should tell each other know when they face break.

*This is an evaluation of the Associate's Overall Job Performance.*

☑ EXCEEDS EXPECTATIONS    ☐ MEETS EXPECTATIONS    ☐ BELOW EXPECTATIONS

SIGNATURES:

| | | |
|---|---|---|
| Rose M Bailey | Rose M Bailey | 04/05/2002 |
| Associate's Signature | Print Associate's Name | Date |
| Michelle | Michelle Taylor | 4-5-02 |
| Hourly Supervisor's Signature | Print Hourly Supervisor's Name | Date |
| | Edward Rains | 04/05/2002 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| | David Ross | 4.5.02 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A80

| *Performance Appraisal* <br> *Salesfloor Associate* | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|

| *Customer Service* | ☐ | ☒ | ☐ |
|---|---|---|---|
| Practices 10 Foot Attitude. | ☒ | ☐ | ☐ |
| Wears appropriate work attire | ☒ | ☐ | ☐ |
| Assists Customers in finding merchandise. | ☐ | ☒ | ☐ |
| Shows a sense of urgency with all assignments. | ☒ | ☐ | ☐ |
| Follows proper procedures for handling claims merchandise. | | | |
| Softlines/Apparel -- Is knowledgeable about: | ☒ | ☐ | ☐ |
|    Sizing and colorizing. | ☒ | ☐ | ☐ |
|    Hanging softlines. | ☒ | ☐ | ☐ |
|    Rack rules. | ☒ | ☐ | ☐ |
|    Fitting room procedures. | ☐ | ☐ | ☐ |
| Hardlines -- Is knowledgeable about: | ☐ | ☐ | ☐ |
|    Cutting keys. | ☐ | ☐ | ☐ |
|    Cutting chain. | ☐ | ☐ | ☐ |
|    Cutting fabric. | ☐ | ☐ | ☐ |
|    Mixing paint. | ☐ | ☐ | ☐ |
|    Live pet department. | ☐ | ☐ | ☐ |
| Homelines -- Is knowledgeable about: | ☐ | ☐ | ☐ |
|    Razor case procedures | ☐ | ☐ | ☐ |
|    Perfume/cologne procedures | | | |

*N/A NEEDS TO BE TRAINED* (Hardlines)

*N/A NEEDS TO BE TRAINED* (Homelines)

| *Productivity* | ☒ | ☐ | ☐ |
|---|---|---|---|
| Zones the department. | ☐ | ☒ | ☐ |
| Maintains features. | | | |
| Follows proper procedures for: | ☐ | ☒ | ☐ |
|    Ordering. | ☐ | ☒ | ☐ |
|    Markups/markdowns. | ☐ | ☒ | ☐ |
|    Signing/flagging/pricing/labels. | ☐ | ☒ | ☐ |
| Promptly gets returns from Courtesy Desk. | ☐ | ☒ | ☐ |
| Maintains all risers properly. | | | |

| *Safe Work Practices* | ☒ | ☐ | ☐ |
|---|---|---|---|
| Follows all safety and emergency policies and procedures. | ☐ | ☒ | ☐ |
|    Properly uses ladders and ensures they are not left on the salesfloor. | ☐ | ☒ | ☐ |
|    Ensures stable stacking of merchandise. | ☐ | ☒ | ☐ |
|    Uses back support belt when necessary. | ☐ | ☒ | ☐ |
|    Follows proper lifting techniques. | | | |
| Ensures all displays are secured in a safe and proper manner. | | | |

| *Dependability* | ☒ | ☐ | ☐ |
|---|---|---|---|
| Attendance and punctuality is within Company guidelines. <br> Days Absent: 1 DAY    Days Tardy: 0 TARDIES | | | |

| *Training* | ☒ | ☐ | ☐ |
|---|---|---|---|
| Current on CBLs    Company Goal: 100% Associate Current % 100% | | | |

A81

# PERFORMANCE APPRAISAL

| | | |
|---|---|---|
| Name: ROSE BAILEY | Store # 2555-01 | Position: GIRLSWEAR ASSOC. |
| SS#: | | Current Pay Rate: $7.80 |
| Review Period: YEARLY REVIEW | | Increase Amount: $.40 |
| From: MAY 25, 2000 | To: MAY 25,2001 | New Pay Rate: $8.20 |

☐ 90 Day          ☒ Annual          ☐ Follow Up

## STRENGTHS

ROSE IS VERY DEPENDABLE HAS GREAT ATTENDANCE AND PUNCTUALITY. ROSE PROVIDES GREAT CUSTOMER SERVICE ON A DAILY BASIS. ROSE FOLLOWS THE RACK RULES PROCEDURES TO COMPANY GUIDELINES. ROSE IS VERY TRUSTWORTHY SHOWS GOOD INTEGRITY. ROSE RESPECTS HER FELLOW ASSOCIATES PRIVACY AND CONFIDENTALITY. ROSE DOES A GOOD JOB WORKING RETURNS ON A DAILY BASIS. ROSE DOES A GOOD JOB ZONING HER AREA ON A DAILY BASIS. ROSE FOLLOWS ALL SAFETY PROCEDURES ALWAYS. CBL TRAINING IS 100% UP-TO-DATE. DRESS CODE 100%

## AREAS FOR IMPROVEMENT

ROSE MUST LEARN TO BE MORE FLEXIBLE WORKING IN OTHER AREAS.
ROSE MUST LEARN THE TEXLON (960) AND IT'S FUNCTIONS.

## ASSOCIATES COMMENTS/ GOAL SETTINGS

*No Comments*

*This is an evaluation of the Associate's Overall Job Performance.*

☒ EXCEEDS EXPECTATIONS   ☐ MEETS EXPECTATIONS   ☐ BELOW EXPECTATIONS

SIGNATURES:

| | | |
|---|---|---|
| *Rose M Bailey* | ROSE BAILEY | May 1, 2001 |
| Associate's Signature | Print Associate's Name | Date |
| | BETTY SLACUM | May 1, 2001 |
| Hourly Supervisor's Signature | Print Hourly Supervisor's Name | Date |
| *A.D. Ham* | ANTHONY D. HAMMOND | May 1, 2001 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| | DAVID ROOD/J. MILLER | May 1, 2001 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A82

### Performance Appraisal
## Salesfloor Associate

| | EXCEEDS | MEETS | BELOW |
|---|---|---|---|

**Customer Service**

| | EXCEEDS | MEETS | BELOW |
|---|---|---|---|
| Practices 10 Foot Attitude. | | ☒ | ☐ |
| Wears appropriate work attire | ☒ | ☐ | ☐ |
| Assists Customers in finding merchandise. | ☐ | ☒ | ☐ |
| Shows a sense of urgency with all assignments. | ☐ | ☒ | ☐ |
| Follows proper procedures for handling claims merchandise. | ☐ | ☐ | ☐ |
| Softlines/Apparel -- Is knowledgeable about: | ☒ | ☐ | ☐ |
|    Sizing and colorizing. | ☒ | ☐ | ☐ |
|    Hanging softlines. | ☐ | ☒ | ☐ |
|    Rack rules. | ☐ | ☒ | ☐ |
|    Fitting room procedures. | ☐ | ☐ | ☐ |
| Hardlines -- Is knowledgeable about: | ☐ | ☐ | ☐ |
|    Cutting keys. | ☐ | ☐ | ☐ |
|    Cutting chain. | ☐ | ☐ | ☐ |
|    Cutting fabric. | ☐ | ☐ | ☐ |
|    Mixing paint. | ☐ | ☐ | ☐ |
|    Live pet department. | ☐ | ☐ | ☐ |
| Homelines -- Is knowledgeable about: | ☐ | ☐ | ☐ |
|    Razor case procedures | ☐ | ☐ | ☐ |
|    Perfume/cologne procedures | | | |

N/A

**Productivity**

| | EXCEEDS | MEETS | BELOW |
|---|---|---|---|
| Zones the department. | ☐ | ☒ | ☐ |
| Maintains features. | ☐ | ☒ | ☐ |
| Follows proper procedures for: | ☐ | ☐ | ☐ |
|    Ordering. | ☐ | ☐ | ☐ |
|    Markups/markdowns. | ☐ | ☐ | ☐ |
|    Signing/flagging/pricing/labels. | ☐ | ☒ | ☐ |
| Promptly gets returns from Courtesy Desk. | ☐ | ☒ | ☐ |
| Maintains all risers properly. | | | |

N/A

**Safe Work Practices**

| | EXCEEDS | MEETS | BELOW |
|---|---|---|---|
| Follows all safety and emergency policies and procedures. | ☒ | ☐ | ☐ |
|    Properly uses ladders and ensures they are not left on the salesfloor. | ☒ | ☐ | ☐ |
|    Ensures stable stacking of merchandise. | ☒ | ☐ | ☐ |
|    Uses back support belt when necessary. | ☒ | ☐ | ☐ |
|    Follows proper lifting techniques. | ☒ | ☐ | ☐ |
| Ensures all displays are secured in a safe and proper manner. | | | |

**Dependability**

| | EXCEEDS | MEETS | BELOW |
|---|---|---|---|
| Attendance and punctuality is within Company guidelines. | ☐ | ☐ | ☒ |

Days Absent: 2    Days Tardy: 12

**Training**

| | EXCEEDS | MEETS |
|---|---|---|
| Current on CBLs    Company Goal: 100% Associate Current % 100% | ☒ | ☐ |

A83

## PERFORMANCE APPRAISAL

| | | |
|---|---|---|
| Name: Rose Bailey | Store # 2885 | Position: D-26/33 sals 532 |
| SS#: | | Current Pay Rate: 6.50 |
| Review Period: Annual | | Increase Amount: .30 |
| From: 5-25-99 | To: 5-25-00 | New Pay Rate: 6.80 |

☐ 90 Day          ☒ Annual          ☐ Follow Up

### STRENGTHS

- Rose is a dependable associate.
- Her work quality is good when able to be thorough. (cobwebbing racks/organizing)
- Rose needs little supervision while working.

### AREAS FOR IMPROVEMENT

- Continue to work on communicating with peers to achieve goals each evening (no carts)
- Work on keeping a higher sense of urgency when zoning.
- Learn to be more outspoken with management.

### ASSOCIATES COMMENTS/ GOAL SETTINGS

No Comment

*This is an evaluation of the Associate's <u>Overall</u> Job Performance.*

☐ EXCEEDS EXPECTATIONS     ☒ MEETS EXPECTATIONS     ☐ BELOW EXPECTATIONS

### SIGNATURES

| | | |
|---|---|---|
| *Rose M Bailey* | Rise M Bailey | 4/22/00 |
| Associate's Signature | Print Associate's Name | Date |
| *signature* | Suzanne Audoian | 4/9/00 |
| Supervisor's Signature | Print Supervisor's Name | Date |
| *signature* | Jean Paul Keller | 4-9-00 |
| Signature of Next Level of Supervision | Print Supervisor's Name | Date |

A84



*Performance Appraisal*
## *Salesfloor Associate*

**Customer Service**

Practices 10-Foot Rule.
Follows Dress Code Policy.
Assists Customers in finding merchandise.
Shows sense of urgency with all assignments.
Follows proper procedures for handling claims merchandise.
Softlines/Apparel – Is knowledgeable about:
Sizing and colorizing.
Hanging softlines.
Rack rules.
Fitting room procedures.
Hardlines – Is knowledgeable about:
Cutting keys.
Cutting chain
Cutting fabric.
Mixing paint
Live pet department.

**Productivity**

Zones the department.
Maintains features.
Follows proper procedures for:
Ordering.
Markups/markdowns.
Signing/flagging/pricing/labels.
Promptly get returns from Courtesy Desk.
Maintains all risers properly

**Safe Work Practices**

Follows all safety/emergency policies and procedures.
Properly uses ladders and ensures they are not left on the salesfloor.
Ensures stable stacking of merchandise.
Follows proper lifting techniques.
Ensures all displays are secured in a safe and proper manner.

**Dependability**

Attendance and punctuality is within acceptable Company guidelines.
Days Absent: 4   Days Tardy: 7

**Training**

Current on CBLs   Company Goal: 100%   Associate Current % 100%

A85

| Name: SUSANNE SWIFT | | Store# 2555 | Position: SALESFLOOR ASSOC. | |
|---|---|---|---|---|
| SS# | | | Current Pay Rate: | |
| Review Period: YEARLY | | | Increase Amount: | |
| From: | | To: | New Pay Rate: | 10.50    5/7 |

☐ 90 Day          ✔ Annual          ☐ Follow Up

**STRENGTHS**

Susanne is a very dependable associate. She is very efficient on the phones and offers excellent customer service when approached. She is also versatile in her talents and works well in various areas.

**AREAS FOR IMPROVEMENT**

- Telxon
- Cleanliness of Fitting Room
- Patience

**ASSOCIATES COMMENTS / GOAL SETTINGS**

I appreciate all the help I get from fellow associates. I Do enjoy the job.

☐ EXCEEDS EXPECTATIONS  ☑ MEETS EXPECTATIONS  ☐ BELOW EXPECTATIONS

**SIGNATURES:**

| Susanne L Swift | Susannel Swifts | 3/31/05 |
|---|---|---|
| Associate's Signature | Print Associate's Name | Date |
| Hourly Supervisor Signature | Print Hourly Supervisor Name | 4/14/05 Date |
| Salaried Manager's Signature | Print Salaried Manager's Name | 3/31/05 Date |
| Facility Manager's Signature | Print Facility Manager's Name | 3/31/05 Date |

A86

| Performance Appraisal<br>*Salesfloor Associate* | E X C E E D S | M E E T S | B E L O W |
|---|---|---|---|
| **Customer Service** | | ✓ | |
| Practices 10-Foot Rule. | | ✓ | |
| Follows Dress Code Policy. | | ✓ | |
| Assists Customers in finding merchandise. | | ✓ | |
| Shows sense of urgency with all assignments. | | ✓ | |
| Follows proper procedures for handling claims merchandise. | | | |
| Softlines/Apparel – Is knowledgeable about: | | ✓ | |
|    Sizing and colorizing. | | ✓ | |
|    Hanging softlines. | | ✓ | |
|    Rack rules. | | ✓ | |
|    Fitting room procedures. | | | |
| Hardlines   Is knowledgeable about: | | | |
|    Cutting keys. | | | |
|    Cutting chain. | | | |
|    Cutting fabric. | | | |
|    Mixing paint. | | | |
|    Live pet department. | | | |
| **Productivity** | | ✓ | |
| Zones the department. | | ✓ | |
| Maintains features. | | | |
| Follows proper procedures for: | | | |
|    Ordering. | | | |
|    Markups/markdowns. | | | |
|    Signing/flagging/pricing/labels. | | ✓ | |
|    Promptly get returns from Courtesy Desk. | | ✓ | |
|    Maintains all risers properly | | | |
| **Safe Work Practices** | | ✓ | |
| Follows all safety/emergency policies and procedures. | ✓ | | |
| Properly uses ladders and ensures they are not left on the salesfloor. | ✓ | | |
| Ensures stable stacking of merchandise. | ✓ | | |
| Follows proper lifting techniques. | ✓ | | |
| Ensures all displays are secured in a safe and proper manner. | | | |
| **Dependability** | | ✓ | |
| Attendance and punctuality is within acceptable Company guidelines.<br>   Days Absent: _0_   Days Tardy: _0_ | | | |
| **Training** | | ✓ | |
| Current on CBLs   Company Goal: 100%   Associate Current % _100_ % | | | |

A87

| Name: SANDHYA SEN | Store# 2555 | Position: |
|---|---|---|
| SS# | | Current Pay Rate: |
| Review Period: YEARLY | | Increase Amount: .55 |
| From: 01/02/2005 | To: 01/02/2006 | New Pay Rate: |

☐ 90 Day        ☑ Annual        ☐ Follow Up

**STRENGTHS**

Productivity          Positive Attitude      Teamwork          Accident Free

Dependability       Customer Service    Sense of Urgency    100% CBL

                           Versatility

**AREAS FOR IMPROVEMENT**

Back Rule Guide

Telexon Experience

**ASSOCIATES COMMENTS / GOAL SETTINGS**

I Love my work.

☑ EXCEEDS EXPECTATIONS   ☐ MEETS EXPECTATIONS   ☐ BELOW EXPECTATIONS

SIGNATURES:  SANDHYA    SEN

| Sandhya Sen | SANDHYA SEN | 10/21/05 |
|---|---|---|
| Associate's Signature | Print Associate's Name | Date |
| | | 10/21/05 |
| Hourly Supervisor Signature | Print Hourly Supervisor Name | Date |
| | BRIAN W. HENDRICK | 10/20/05 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| | | |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A88

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROSE M. BAILEY,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        Civil Action No.
                                   )          06-603 JJF
WALMART #2555,                     )
                                   )
        Defendant.                 )


        Deposition of ROSE M. BAILEY taken pursuant to
notice at the offices of Potter, Anderson & Corroon,
1313 North Market Street, Hercules Plaza – 6th Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Thursday, October 11, 2007, before Anne L. Adams,
Registered Professional Reporter and Notary Public.


APPEARANCES:

        SARAH E. DILUZIO, ESQ.
        POTTER, ANDERSON & CORROON
          1313 North Market Street
          Hercules Plaza – 6th Floor
          Wilmington, Delaware  19801
          for the Defendant.

        ROSE M. BAILEY, PRO SE

        ALSO PRESENT:  Terrell Bailey


------------------------------------------------------------
                    WILCOX & FETZER
        1330 King Street – Wilmington, Delaware 19801
                    (302) 655-0477                    A89



**WILCOX & FETZER LTD.**
Registered Professional Reporters



Rose M. Bailey

2

ROSE M. BAILEY

1

2       the witness herein, having first been

3       duly sworn on oath, was examined and

4       testified as follows:

5                       EXAMINATION

6  BY MS. DILUZIO:

7      Q.   Good morning, Miss Bailey.  For the record,

8  could you say your name?

9      A.   Rose M. Bailey.

10     Q.   My name is Sarah DiLuzio.  I'm an attorney for

11 Wal-Mart in this litigation.  I will attempt to speak

12 up.  If at any point you don't hear me or misunderstand

13 what I'm saying, let me know and I will be happy to

14 repeat the question or rephrase it in a way you can

15 understand.

16               I will ask questions.  You will supply the

17 answers.  Verbal responses are needed.  So if you are

18 just shaking your head yes or no, I may ask you to,

19 please, give a verbal response so the court reporter can

20 take down the information.  If you need a break at any

21 time, let me know and we will be happy to take a break.

22               Have you ever been deposed before?

23     A.   No.

24     Q.   Is there any reason that you might have a

Rose M. Bailey

1   problem responding truthfully to questions today?

2     A.   No.

3     Q.   You are not on any medication or anything

4   that that would affect your memory?

5     A.   Yeah, I took medication. Yes, I did. But

6   wouldn't affect my memory. I might fall asleep.

7   don't know. But --

8     Q.   So you think that you are capable of heari

9   questions and answering them to the best of your

10   recollection?

11     A.   Best of my knowledge.

12     Q.   Great. Miss Bailey, what is your educatic

13   background?

14     A.   I am a college grad.

15     Q.   What college did you graduate from, ma'am

16     A.   University of Maryland.

17     Q.   When was that?

18     A.   Oh, my gosh. '78.

19     Q.   And what degree was that?

20     A.   Business administration.

21     Q.   Was it a BA, a four-year degree?

22     A.   Yes, it was.

23     Q.   Miss Bailey, do you remember what years

24   worked for Wal-Mart?

Rose M. Bailey

3

4

1    A.   You got me there.

2    Q.   Did you begin with Wal-Mart in May of 1999?

3    A.   1999.  Okay.  Yeah.

4    Q.   Prior to your employment with Wal-Mart, where

5  did you work?

6    A.   That's just a part-time job.  I'm not

7  affiliating my full-time job with Wal-Mart, just my

8  part-time job.  That's just a part-time job for me.

9    Q.   Wal-Mart was just a part-time job for you?

10    A.   Yes.

11    Q.   What was your full-time job?

12    A.   I don't want to disclose.

13    Q.   Ma'am, I'm afraid it's necessary for you to

14  answer these questions.

15    A.   No.  Whatever part-time jobs I had?

16    Q.   No, ma'am.  I'm asking what your full-time

17  employment is.

18    A.   I'm not revealing my full-time employment.

19    Q.   When you initiate litigation, part of the

20  process is you need to answer reasonable questions that

21  Wal-Mart poses.  This is certainly a reasonable

22  question.

23    A.   Wal-Mart has that on my application.  I work for

24  the State of Delaware.

Rose M. Bailey

1    Q.   What was your employment with the State of

2    Delaware?  What did you do for them?

3    A.   I'm an accounting specialist.

4    Q.   You remain with the state now?

5    A.   Yes, I do.

6    Q.   And how long have you been with the state?

7    A.   I moved in Delaware, 1991.  Presently I was

8    employed with the State of Maryland.  I remarried, cam

9    to Delaware.  All my service is dealing with state,

10   public service.

11   Q.   So you began with Wal-Mart in May, 1999, as a

12   part-time job; is that correct?

13   A.   Yes.

14   Q.   Prior to working with Wal-Mart, had you worked

15   at any other location in a part-time capacity in

16   addition to your full-time employment?

17   A.   I had several part-time jobs.  What was that

18   last person I worked for?  I don't remember.  Because

19   was taking breaks.  Oh, MBNA was my last job.

20   Q.   Before Wal-Mart?

21   A.   Uh-huh.  I worked for them five years, temp

22   service, Austin.  That was a good company.

23   Q.   When you say temp service, what did you do for

24   MBNA?

Rose M. Bailey

6

1    A:    Sometimes I key in the payments and also I

2  worked in the mailroom.  I worked there five years and

3  then I went to Wal-Mart.

4    Q.    You worked for MBNA for five years?

5    A.    Uh-huh, through Austin Temp Service.

6    Q.    What were you paid at MBNA?  Do you recall?

7    A.    Because you got a bonus sometimes.  I forgot.

8  It was pretty decent.

9    Q.    Do you remember if it was more or less than your

10  starting salary at Wal-Mart?

11    A.    It was more because I was data entry.  It was

12  more money.

13    Q.    You can't ballpark it for me?

14    A.    It might have been 8, 9, $10 an hour, something

15  like that.

16    Q.    And when you left MBNA, did you immediately go

17  to Wal-Mart or was there a break?

18    A.    I was still working for them.  Then I decided to

19  go ahead and work for Wal-Mart.  The work at MBNA was

20  getting slack so I said I'm going to try for a job here.

21  And so I went working full-time to get more retail

22  experience.

23    Q.    So you began with Wal-Mart in May of 1999.  What

24  was your initial position with Wal-Mart?

Rose M. Bailey

1    A.    Customer service.

2    Q.    And do you remember what your starting pay was

3    with Wal-Mart?

4    A.    $6.25.  $6 or 6.25, something like that.

5    Q.    What was your typical schedule with Wal-Mart?

6    A.    Oh, my gosh.  Well, my schedule at Wal-Mart,

7    they had me working every weekend, I was working Friday

8    Saturday, Sunday.  I might have been working sometimes

9    five days a week, almost five times a week.  But mostly

10   they want you to work on weekends.  So I was working

11   Friday, Saturday and Sundays.  Friday, Saturday and

12   Sundays.  That was a new store.  So they didn't have too

13   many people and you worked all kinds of hours.

14   Q.    So did you begin with the store when it opened?

15   A.    Probably a month after that.

16   Q.    So is it fair to say that you worked evenings

17   and weekends?

18   A.    Yes.

19   Q.    And do you recall who your supervisor was when

20   you first started?

21   A.    I think it was somebody named Susan.  You mean

22   the department manager, supervisor or the store manager'

23   Q.    I mean whoever it was you directly reported to.

24   A.    Because they had a, somebody just head of the

Rose M. Bailey

8

1  soft lines where I worked at.  They had a woman that was

2  head of that department.  Then there is an assistant

3  manager and then there was a manager.

4     Q.   So your direct manager, the head of the

5  department, who was that, if you can recall?

6     A.   I don't remember.  I think her name was Susan.

7  Because they kept switching.  You have somebody

8  six months and then somebody else.  They didn't agree

9  with the work.  Then they appointed someone else to come

10 in over that department.  It varied.  And sometimes we

11 had -- what you call those people?  It's been two years

12 since I worked there.  What do you call the guys that

13 are supposed to make sure everything is put away?  There

14 was a guy that was the head of us at the department.  He

15 would come around and make sure that you picked up

16 everything before you left the store.  What was his

17 title?  I forgot.  It's been so long.

18    Q.   Miss Bailey, while you were with Wal-Mart, do

19 you recall how long you were with Wal-Mart when you were

20 terminated?

21    A.   Five years.

22    Q.   During those five years, did you receive pay

23 increases from Wal-Mart?

24    A.   Yes.



Rose M. Bailey

9

1 Q. Was it annually?  Was it on some regular basis?

2 A. When they did your evaluation.

3 Q. Was that yearly?

4 A. Yes.

5 Q. So you received a yearly performance evaluation?

6 A. Yes.

7 Q. In connection with that, you usually would get a

8 pay increase?

9 A. Yes.

10 Q. Do you recall what your pay increases usually

11 were?

12 A. $0.25 or $0.35, $0.25.  Except for one guy, he

13 knew I knew my job.  He was fair.  But he did give me

14 $0.50.  And one supervisor that new my work -- he might

15 have gave me $2.  It was like incentive because I worked

16 on weekends.  I might have got a dollar-and-a-half and

17 that, plus my $0.50.

18 Q. Do you remember when that was?

19 A. That probably was in 2004.  The store manager,

20 the one they terminated.  If you did good work, you got

21 good incentive.

22 Q. Who was that store manager?

23 A. Dave Train or somebody.  He wasn't with us long

24 David somebody.  Was it T-R-A something?  I forgot.

Rose M. Bailey

10

1  Q.  And who would normally conduct your annual

2  performance reviews?

3  A.  It could have been someone that might have

4  transferred -- all my interviews was based on -- like

5  somebody would have been my department manager.  Might

6  send them down to another store.  It might have been

7  somebody that was there for two months did my

8  evaluation.  If they didn't know it, they would call my

9  department manager in.  They didn't verbally give it to

10 me.  They just sat in.  And they went through it with

11 me.  They'd say I don't know too much about you.  So I'm

12 bringing in the department manager to do your interview.

13            But my last interview was done on the floor

14 by a guy named George.  I can't think of their titles.

15 But all my interviews except for one -- and Anthony, he

16 really had been my boss for three months, the one that

17 was fair that give me my $0.50.  They always switched

18 around.  The department manager could be in here

19 one month in this department and then they switch them

20 over to the hard lines and soft lines.  They might have

21 been in customer service assistance.  It was just

22 switching back and forth.

23 Q.  Was it typically your department manager who

24 filled out your evaluation?

Rose M. Bailey

1

1    A.    I think she based it on what the department --

2    probably.  I cannot say that.  I cannot say that.

3    Because I had been there five years.  And this lady that

4    was the head of boys, they combined her department.  I

5    got a list of things that she said was brought to her

6    attention that people did not know what they were doing.

7    But I had been there four, five years.  And she,

8    basically, wrote out the steps and made a copy off the

9    machine what a customer service or sales associate

10   should be doing, which I didn't understand because I had

11   been there five years.

12            And she had been over there as department

13   manager, but yet she's got a piece of paper saying it's

14   been brought to my attention some people do not know how

15   to do their job functions, which was kind of strange.

16   And she know me.  She know I'm a good worker.  Even

17   they're saying it now, she was a good worker.

18            So the way they did the evaluation was kind

19   of strange.  Who really evaluated me, I don't know.  All

20   I know, I was called in time for your appraisal and this

21   is what we are going to give you based on your work.

22   Q.    Did you generally receive satisfactory

23   performance evaluations?

24   A.    Sure.  But this time the reason why they kept

Rose M. Bailey

12

1    saying they didn't give me my $0.50 was because one time

2    they said I missed 21 days, which I had not missed 21

3    days.

4    Q.    What year is this, ma'am?

5    A.    That was in 2003.  The last evaluation I was

6    late three times.  I was 20 minutes late.  Because I was

7    at the doctor's office.  And I called and told the store

8    manager I would be a few minutes later.  Over on Harmony

9    Road the traffic is backed up when I'm coming from the

10   doctor.

11          One time I called and said I had a sinus

12   infection.  I wouldn't be in.  I probably only missed

13   two times, one time, one year.  But due to the time of

14   me getting like five minutes late, that was counted

15   against you as far as getting the $0.50 raise.

16   Q.    Did you except that if you showed up for your

17   work and did your job that you would get a $0.50 raise

18   every year; is that what you expected?

19   A.    No.  I expect for them to be fair.  Do not give

20   the people that don't show and the person that works

21   faithfully for you on Friday, Saturday and Sunday and

22   customers compliment that you are always in your

23   position and do your job.  And I know who to go to if I

24   need to find something in infants or whatever because

Rose M. Bailey

1

1   you have been working a long time and been faithful to

2   them.  Yes, I expect to get what other people get.  If

3   they get $0.50 for not even coming, yes, I do expect to

4   get my $0.50.

5       Q.   We are going to come back to your last

6   evaluation.  Right now I would like to talk about your

7   claims in this lawsuit.  You were terminated from

8   Wal-Mart on May 4, 2005; is that right?

9       A.   That's correct.

10      Q.   And that was for insubordination?

11      A.   They called it insubordination.  Yes, that's

12   what they said based on a one-sided story.  There is

13   always two sides to the story.  That was based on what

14   the person I went to and told them I was going to report

15   them for doing what they did, yes.

16      Q.   What was your salary at that point, at the point

17   you were terminated?

18      A.   I don't even know.  That's been two years ago.

19      Q.   Was it $10.75 an hour?  Does that sound right?

20      A.   It could have been 10, yes.  I'm not sure.  I

21   never calculated it.  It might have been 10.  I don't

22   know.  I have to go back -- do I have a pay stub?  I

23   have to research that.

24      Q.   Why do you believe you were terminated?

Rose M. Bailey

14

1    A.    Because, number one, I'm the only one that

2  stayed late at the store.  And this lady named Cindy was

3  always harassing me to do the work.  See, they have this

4  thing, the slackers, they could care less.  But the

5  workers, the hard workers, they are going to harass you

6  to do the other people's work.

7    Q.    Who informed you that you were being terminated?

8    A.    The next Wednesday when I came in was the store

9  manager, Jennifer.

10   Q.    Jennifer Lawrence, does that sound right?

11   A.    Yes.

12   Q.    Do you know what race Miss Lawrence is?

13   A.    The people in the store says she was -- I don't

14  know.

15   Q.    Was she African-American?

16   A.    She's -- I can't exactly say she's pure

17  African-American.  We don't know whether you got one

18  mixed parent, mixed race or whatever.

19   Q.    If I were to tell you Miss Lawrence signed a

20  statement indicating she was African-American, do you

21  have any reason to doubt that?

22   A.    It was hard to tell about her because we all

23  thought she was -- she's not truly -- like I said, I

24  don't know her parents.



Rose M. Bailey

1    Q.  Was anyone else present with you on May 4th whe

2  you were terminated other than Miss Lawrence?

3    A.  My good friend was teaching me how to use a

4  Telezon had been there all those years.  I keep

5  forgetting his name.  He was nice.  He brought us pizza

6  What was his name?

7    Q.  Toby Fields, does that ring a bell?

8    A.  Yeah, Toby.

9    Q.  Was he assistant store manager?

10    A.  Yes.  He came up from Rehoboth.

11    Q.  Do you know what race Mr. Fields was?

12    A.  Yes.

13    Q.  What was that?

14    A.  He was white.

15    Q.  Do you know what Miss Lawrence's title was?

16    A.  Comanager.  Because one time she jumped on

17  somebody that called her something else.  Comanager, I

18  never will forget that part.

19    Q.  The two of them met with you on May 4th to

20  inform you --

21    A.  Yeah.  He came and got me.  And I said I know

22  I'm getting terminated.  He said don't think about it

23  like that.  He came and got me on the floor.  I was

24  waiting for them to come get me.

Rose M. Bailey

16

Q.    And why was that?

A.    Because right is right and wrong is wrong.
Nobody can shove a cart and tell me to put anything
away.  A lot of people think I'm a young kid.  But I
actually was 51.  At that time, I was 50.  I'm no young
kid.  I'm 50 years old.  A lot of people think I'm young
and they thought they could harass me like that.  You
say what I'm saying?

Q.    I need for you to describe what you mean by
someone harassed you.

A.    All the people in the store -- when I came in
the store, I helped the first shift put away the
returns.  And then I went over to my department.
Ten minutes before the store closed, I had to get my
stuff off the floor.  And she knows the other people
told her, no, I'm not going to do it.  No, I can't do
that.  But she knows I always stay last.  I'm the last
one leaving the store.  She's going to go and tell her
friend that she's smokes cigarettes between -- he was
new at the store.  He didn't even know my name.  He did
not know me.  Yet she could go tell me to make me do
something.  I only had 10 minutes to get out of the
store to go home, to make her put it away because she
does it good and she's always the last person leaving

Rose M. Bailey

1    the store.

2              I said, no, I got to get my stuff up.  I

3    help when I come in.  The other two girls, they tell her

4    blank no.  I got my work to do.  Get the cashiers to do

5    it.  But yet they come to get the person that's not a

6    slacker but the one that will do the work to do

7    something in 10 minutes, all them carts from the returns

8    from up front.

9              And I said, Cindy, I got to do my work.  So

10   she goes and tells that guy something, her friend.  He

11   wants to see you.  I said, see me?  He doesn't really

12   know me.  What does he want to see me about?

13              He goes, get a cart and put it away.  I sai

14   excuse me.  I said, where do you work at?  What is your

15   title?  You hadn't been in this store that long.  I saic

16   I got to do my work.  All right.  Go ahead and do your

17   work.  I said I got to do my work first.  I said I got

18   10 minutes to get out of the store.  Anyway, do it, put

19   it away.

20              I said excuse me.  I came back.  I got to

21   thinking, is this job worth someone harassing you

22   because you are a good worker?  I go back and said,

23   excuse me, there is other people in this store.  We all

24   do it as a team.  Don't single out one person.  I canno

Rose M. Bailey

1  do that.

2          And I said, where is Cindy at anyway?  Why

3  is she singling me out?  Sometimes push comes to a

4  shove.  You pushed that cart into me and told me put

5  that stuff away.  I let you slide.  But the girl that

6  you jumped on came and told me she reported you.  I said

7  she got one more time to shove something or tell me in a

8  nasty way, then that's it.  I'm reporting her to the

9  company.  And if the company don't deal with it, then I

10 know how to quit.

11 Q.    That was a lot what you just told me.  I want to

12 break it down a little.  You kept saying she.

13 A.    Cindy.  I don't know her last name.  Cindy was

14 looking for a big promotion.  If the work was done, the

15 more she would be promoted.  So she knows Miss Rose was

16 the last one leaving that store.  So she was going to

17 harass me, keep harassing me.  Go back, put this away.

18         I said I do it when I come in the store.  I

19 go up and the get the returns which is never done in the

20 daytime.  Even on weekends, Toby can vouch for that.  He

21 was new.  I would be the only one in my department

22 because most of the people had taken off.  I would sort

23 it out and get it back to the department.  They always

24 depended on me.

Rose M. Bailey

1

1    But Cindy, her attitude, oh, we don't need

2   this person in here.  We don't need that person in here.

3   We need to get rid of that person, that person, this

4   person.  Well, they can get rid of me.  See how the

5   store runs without --

6       Q.   Do you know Cindy's position or her title?

7       A.   They had just gave her that position.  What was

8   that title?

9       Q.   Was she a support manager?

10      A.   Yeah, support manager.  That's what it was.  Sh

11  had just gotten that job and she wanted to throw around

12  her authority to make her look good.  The more you do,

13  the more promotion they get.  Because I questioned one

14  of the assistant managers.  I said tell me something,

15  how do you all get to these positions?  He said if you

16  got a few good workers and you can get them to do the

17  work, then you can get promoted up to the next level.

18      Q.   Who was that that you questioned?

19      A.   That's okay.

20      Q.   I'm sorry?

21      A.   I forgot the name.  But I asked somebody.  The

22  didn't stay long.  I question people.

23      Q.   You said Cindy, I will refer to as Cindy, went

24  and got some other individual who came and told you

Rose M. Bailey

20.

1   put the carts away?

2       A.   No, he didn't come tell me.  She went over there

3   and told him something.  I don't know what she told --

4   the new guy named Clifford.  Clifford don't know my name

5   from A through Z.  He was transferred from the Camden

6   store up to Delaware.  He never associated with people.

7   I thought he was new because when he came to the store,

8   she was up front telling him how to separate the

9   returns.  And he didn't work on my shift much.  He was

10  mostly a daytime supervisor.  He was not a nighttime

11  supervisor.

12      Q.   That's Cliff, Radcliff?

13      A.   Yes.

14      Q.   Sinclair was his last name?

15      A.   All I know, they kept saying this Cliff.  On the

16  nights when he did work, I probably wasn't in the store

17  on a Tuesday night.  If he worked the nightshift, very

18  seldom I was on his shift.

19      Q.   Do you know what his position or title was?

20      A.   They said he was assistant manager.

21      Q.   Cindy, do you know what her race was?

22      A.   Cindy -- oh, I don't know.  I can't say.  All I

23  know, she was, she could have been Mexican, Spanish.

24  She's a white lady is all I know.



Rose M. Bailey

1    Q.    I'm interested in how you perceived her.

2    A.    She is a white lady I guess.

3    Q.    And how about miss Sinclair, Cliff?

4    A.    Jamaican Afro-American.   The accent I remember.

5    Q.    This incident that you were describing, do you

6    remember what day that happened?

7    A.    Oh, yes.   It had to be -- I was off the next

8    day.  It had to happen May 2nd.

9    Q.    That's 2005, correct?

10   A.    Yes.

11   Q.    To step back a minute, Cindy approached you and

12   asked you to do returns; is that correct?

13   A.    No.  She said Clifford wants you.  I said,

14   Clifford who?  Clifford, the store manager.  I said,

15   where is he at?  Over in hardware.  So I had to stop my

16   stuff, go way over the store to hardware.  I said, yes

17   sir.  Do I know you?  Do I really know you?  No, he

18   said, get the carts and put them away.  I said, excuse

19   me, sir, do I really know you?  Do you really know me?

20   He goes -- I said because I only got 10 minutes in thi

21   store to get out of here.  I said, who is going to do

22   work?  Well, go ahead and do yours.  Then if you get a

23   chance, come back.

24          So I got thinking.  Why would this lady

Rose M. Bailey

22

1  go -- these girls stood up in her face and told her no.

2  I'm going to ask her why you singled me out that way,

3  why you told that man that I didn't do some work.  Yes,

4  I did go looking for her.

5      Q.    The first interaction you had with Cindy that

6  evening, was it when she came up to you and said you

7  need to go see Cliff?

8      A.    No, ma'am.

9      Q.    What happened before that?

10      A.    On April 29th, a few days before this incident,

11  I was over there down on my knees -- I really was sick.

12  I should have been home -- folding shirts.  It was two

13  little boys playing with carts.  I thought it was them.

14  So a cart came flying over to me, over to my left side.

15  And I didn't respond.  I said that's them kids.  Then I

16  heard somebody say, hey, you, put that away.  I thought

17  oh, no, oh, no.

18          It was the stuff that this lady, a new lady

19  at the jewelry counter tried to make me put away, that

20  blue face cloth.  It was a bath mat and something else.

21  I said, no, ma'am, the returns are up to the fitting

22  room.  You're new.  You probably don't know the

23  procedures.  Take it up there and somebody will surely

24  put that away for you.



Rose M. Bailey

1          She comes back with the same merchandise an

2   slammed it over there to me.  And I said, okay, I ain't

3   saying nothing.  Today I don't feel good.  So right at

4   that time while I was on my knees, another girl had

5   answered that within the store.  She goes and tells the

6   store manager that Cindy was harassing her.  And she

7   goes, I just reported Cindy.  She can't come around me.

8   She can't say nothing to me, talking nasty to me about

9   doing this and doing that.

10         I said, yeah, she just came over here and

11  slammed a cart into me.  But I thought it was those two

12  boys.  I said she got one more time to mess with me.

13  I'm not messing with her.  I'm stay in my own corner an

14  do my own work.  I think she was mad.  Maybe because of

15  that incident, she might have been mad at that person.

16  Put that away.  Four items in the cart.  Why you messin

17  with me?  I'm not bothering you.

18      Q.   Okay.  Let me just back up.  What department

19  were you in where you were folding the clothes?

20      A.   I worked in girls.

21      Q.   Like little girls' clothes?

22      A.   Uh-huh.

23      Q.   So you are on the floor; you are folding

24  clothes?



Rose M. Bailey

24

A.    Uh-huh.

Q.    You see a couple little boys playing.  And then a cart, does it actually hit you?

A.    Yes, the cart came up, boom.  I go, oh, that's those bad kids that come in here.  Then she goes, hey -- I didn't look up.  I just looked around -- hey, you, put that away.  I said uh-uh, uh-uh, mm-mm, mm-mm, mm-mm, no way.  I called the store office and reported it.

Q.    Let me back up a minute again.  Who said, hey, you, put that away?

A.    Cindy.  I asked the new lady at the jewelry counter to carry over -- they put the return carts by the fitting room.  I said, ma'am, you might be new, but the returns go over there if you are not familiar with the store.  I said take it over there and someone will surely help.  It will get put away.  She said okay.  The same little stuff came back flying across the floor. The blue face cloth, the bath mat and CD's in the cart came flying back.  She goes, hey, you, put that away.  I go uh-uh, uh-uh, uh-uh.

Q.    Miss Bailey, did you see Cindy push the cart?

A.    Yes.  Because I didn't look up.  She said, hey, you.  I said, who is she talking to?  She knows my name. Hey, you, put that away.  I go uh-uh.

**W&F**

Rose M. Bailey

1    Q.   So you saw her push the cart?

2    A.   Yes.  Oh, no, no, no.  I said I didn't pay no

3  attention.  Two boys were there and the cart come

4  flying.  So when I didn't look up, she said, hey, you,

5  put that away right now.  I go, oh, no, she didn't do

6  that to me.  No, you didn't.  I said, that's the same

7  stuff that lady had.  I said, no, she ain't doing that

8  to me.  I said that's the same stuff I just sent over

9  there.  Why are you sending that back over here to me?

10   Q.   On April 29th, to be clear, you are folding the

11 clothes.  A cart comes and hits you.  You don't see who

12 pushes it, right?

13   A.   No, I do not.  But when I looked around and saw

14 them two boys had their carts, after she said, hey, you

15 that's when I focused on what was going on.  I go that

16 was her that's saying that to me.  I said I ain't payin

17 her no attention.  Why is she coming over here slamming

18 something?  When I didn't look up at the cart, she

19 brought it to my attention, here's your cart, now put i

20 way.

21   Q.   I'm trying to go slow so we know what happened.

22 You feel the cart.  You think it's these boys you see

23 playing.  And then you hear Cindy telling you to put

24 these things away?

Rose M. Bailey

1    A.    The two boys had their carts.  So I knew it was

2    her.  I knew it was Cindy.

3    Q.    So you assumed it was Cindy?

4    A.    I don't assume.  I knew when you said, hey, you,

5    and hit the cart, put it away.  I said, no, that's the

6    same stuff that lady, I'm not putting that away.  You

7    should have trained the new lady.  Our procedures in the

8    store is that a few little items you can go put it in

9    the bin behind customer service.  Why are you sending it

10   back over to me?

11   Q.    So this is the same cart you recognize as having

12   earlier told another store associate --

13   A.    It wasn't a cart.  She had four items.  She was

14   new.  And she thought that she could come throw it over

15   on my side because she was in jewelry and she probably

16   didn't want to leave the jewelry counter.  I said, no,

17   ma'am, this is not a returns.  I'm folding clothes.

18   This is not a return cart.  Please, take it up to the

19   dressing room is where the return carts are.

20   Q.    So up by the dressing room there are carts that

21   when people return items to the store they go in carts;

22   is that right?

23   A.    It might be stuff that you might be cleaning up

24   earlier and the nightshift might be putting away

Rose M. Bailey

1   merchandise and they found something out in that

2   department, like cereal and clothes or gum and clothes.

3   So each night they pull that out so they can put all th

4   merchandise on the shelf.  They might pull that stuff

5   out.  That's why sometimes it's a lot of return carts a

6   the front of the store.

7       Q.   So it's carts filled with merchandise that

8   either have been returned or was found in the wrong

9   place in the store that needs to be put in the right

10  place?

11      A.   Yeah.  Or somebody went by and spilled over a

12  whole rack and instead of somebody putting the cloths

13  back they threw it in a cart.

14      Q.   You feel the cart.  You look up.  Cindy says p

15  these things away.  You say, no, I'm not putting these

16  things away?

17      A.   I didn't tell her no.  I knew where they

18  belonged.  They belonged in the return bin behind

19  customer service.  It's a bin for every department, a

20  blue bin, which she should have told the lady, if you

21  run into any problems, explain the procedure to her.

22  have return bins at the front of the store.  So you ca

23  familiarize yourself that if this CD goes in the

24  electronic bin, that this blue face cloth and bath mat

Rose M. Bailey

28

1   goes in the home container.  You don't come back and

2   throw it on another customer.  You are not training your

3   people.

4           So she thought it would be easy for her to

5   give to someone, to me being smart -- I don't know what

6   her problem was that night -- to bring it back to me.

7   Because I asked the lady because I wanted someone to

8   show her where it goes.

9       Q.   So did you put the items away?

10      A.   I took them and put them in the bin because it

11  was getting late.  The lady was cleaning up for jewelry.

12  The store was getting ready to close.  Sometimes you

13  cannot, are really not supposed to leave the jewelry

14  counter.. They rent a space in our store.  Shoes and

15  jewelry, they rent spaces.  They have different

16  guidelines for her than actually Wal-Mart people, soft

17  lines, because they rent a space.

18      Q.   So you put the items from the cart up in the

19  return bins behind customer service; is that right?

20      A.   Uh-huh.

21      Q.   What did you do with the cart?

22      A.   I left it out front with the other carts.

23  That's what she should have told the lady.  I'll take

24  care of it.  You are new or if any questions.  That's

Rose M. Bailey

1  where you greet people.  You don't come back and bash

2  the customer that's down trying to get her work done an

3  come over and slam a cart into her.  No, that's

4  inappropriate.

5          That's why I got mad and told her I was

6  reporting her.  That's not good behavior.  You are

7  telling the lady she can go ahead, set that in anybody

8  cart.  Because they are renting a space from us, they

9  don't have to take it up front.  So she should have

10  broken it down to her, this is what we should actually

11  do with this.  If you have a question, page one of the

12  managers.  They will help you solve the issue.

13      Q.   So you told Cindy after --

14      A.   I didn't say nothing to her.  I let her have

15  way that night.  I don't think I said nothing but

16  laughed.  Because about that time, here come the girl

17  from around the corner.  I don't know her name.  I th

18  she said she worked for the City of Wilmington.  She

19  telling me what she did to her.  And I said, yeah, sh

20  came over here and slammed that came.  But she's got

21  more time to step on my toes and I'm going to report

22  to the head company.

23      Q.   So you did not tell Cindy that you were goin

24  report her that night?

WILCOX & FETZER LTD.
Registered Professional Reporters

A117

Rose M. Bailey

30

1    A.    No.   I let Cindy have her way that night.

2  Because I was trying to be a good Christian Samaritan.

3  I don't like confrontations.   I let people do a couple

4  things to me and that's it.   So I let her slide.   She

5  just got that job title.

6    Q.    And you don't know the name of the other

7  associate that came up to you and said something about

8  Cindy?

9    A.    All I know is she told me -- I'm a quiet person.

10  I don't mingle with people.   Very few people I associate

11  with.   I always -- like the girls say, you are always in

12  your corner.   If I need something from infants, I can

13  always count on you because you're always in your

14  position.   I never talked to them, but the girl speaking

15  something.   And she knew -- she said I worked for the

16  City of Wilmington.   But she had went to the store

17  manager and told him.   She said she wasn't no longer

18  allowed to come around her or say anything to her

19  anymore.

20    Q.    So this other associate told you that she had

21  complained about Cindy; is that right?

22    A.    Yes, yes.

23    Q.    Did you make any complaint about Cindy following

24  this incident on April 29th?



Rose M. Bailey

1    A.    No.    It wasn't no need.    She had had a meeting.

2    They were going to open up a new store.    She had had a

3    meeting after she got the position, brung her little ic

4    cream and whatever.    And she goes -- some, a couple

5    people, we was asking about the new store because I

6    don't live that far from Maryland.    I say, well, maybe

7    I'll transfer down there.    That's closer to my house.

8    And, oh, I'm going wherever.    What was that guy?    Merl

9    or something.    Because he hadn't been there that long

10   either.    I'm going wherever he's going.    And she just

11   followed him around the store and whatever.

12          So there wasn't no need to go in there

13   because she already made buddies with him and telling

14   him everything that people were doing and having some

15   people written up and getting fired already.    So it

16   wasn't a need going to him.    Because I asked him, I ne

17   to change my hours because I was, something happened t

18   my arm from doing, you know, reaching up and putting t

19   rack of clothes away and stuff.    I said I need to take

20   day off.    You know what I mean.    Can I see you for a

21   minute?    Oh, no, I'm busy.    That's what he told me.    (

22   no.    I need to change my work hours because I have

23   damaged my arm here.    Oh, no, no, no, no.    I said I ne

24   to change my hours or change the department or someth:

Rose M. Bailey

32

1  I told him.  And he said, no, he was busy.

2              So I didn't bother with him because I got

3  some stuff.  I sense people.  I sense them out.  And a

4  lot of people sensed him out.  So there wasn't any need

5  going to him.  I done my five years.  And why would

6  someone that hadn't been there as long as I had been

7  there come in and start trouble for people that had been

8  in Wal-Mart and to the people that was faithful to them.

9  Very seldom did I call in sick.

10  Q.   So you had previously had interaction with the

11  store manager, Merl; is that right?

12  A.   I didn't have no interaction.  I wanted to ask

13  him could I change department.  Too much was going on

14  over there.  They wasn't doing the work.  It was during

15  the holidays.  You know how the store gets a break if

16  they hire people that's on public assistance.  Well, the

17  public assistance people, they used them for a tax

18  break.  And they wouldn't do the work.  And the work got

19  piled up.  I go on vacation and come back.  Nothing was

20  clean.  Everything was waiting for a unit manager that

21  left.  Thank God you are back, Rose.  I go, why didn't

22  the department manager tell them guys how to do this

23  stuff?  You can't always depend on me.  I'm not always

24  going to be here in the store.  No, I'm glad -- every

Rose M. Bailey

1    time I go on vacation, oh, we are glad you are back.

2    Well, respect me.  You know what I mean?  Respect me.

3    If you do that, give me my $0.50 raise like you do with

4    the people that don't come show up.

5        Q.    I'm trying to be really focused here on what I'

6    asking.  You did not complain about Cindy on April 29th

7    because you thought that she was friendly with the stor

8    manager; is that fair to say?

9        A.    Yes, yes.

10       Q.    And the store manager is Merl, right?

11       A.    Yes.

12       Q.    Do you know what race he is or what did you

13   perceive his race to be?

14       A.    I don't know much because his mother -- he's

15   white.  White, Spanish or something.  I forgot.  Anyway

16   the mother would always be in the store.  White I guess

17   I don't know.

18       Q.    And you had previously tried to approach Merl

19   and didn't find him very approachable?

20       A.    No.

21       Q.    So that was maybe another reason why you didn'

22   report Cindy after April 29th?

23       A.    An incident that happened with two Afro-America

24   girls was on the floor talking, which they shouldn't

Rose M. Bailey

34

1   have been.  They should have been over there doing their

2   work.  Merl approached them, get to work or something he

3   told them.  I think that he was reported to the home

4   office because the next day when he came over, which I

5   think was inappropriate, when he came over to apologize

6   to one of the girls, he brought the guy from the lube

7   shop.  He brought him down as a backup.

8           I said, if you are going to apologize to

9   somebody, do it in the office.  Why are you doing this

10  on the floor?  Guys, you have a head office up front.

11  When he came over there -- I think one of them reported

12  him -- told them to get to work and quit talking, I

13  don't know, he must have said it real angry.  Anyway, he

14  brought the guy over there with him and apologized to

15  the lady and told her that if her son needed a job, he

16  was going to college, he could work so many hours.  The

17  tact that he used in apologizing, you do it in the

18  office.  You don't come on the floor and bring somebody

19  from way across the store standing there behind him.

20  Q.    This was just another incident that you had

21  heard about with Merl that you didn't like?

22  A.    No.  When he came back and apologized, I was in

23  the store that night.  I said, what's going on?  Why is

24  that guy standing behind him?  She said -- they told me

Rose M. Bailey

1   he was apologizing the way he talked to them that night

2          But I think somebody said I'm going to call

3   the store and report it to the corporation.  Because if

4   they do something in the store, you can go right to that

5   phone and call, pay phone, and they will take the report

6   and they will investigate.  I think one of them ladies

7   called and reported it.

8      Q.  So you knew there was a way for you to report

9   concerns that you had to someone other than Merl?  So,

10  in other words, you could have picked up that phone on

11  April 29th --

12     A.  No, I'm not going to no pay phone and waste my

13  money calling no -- I don't know what they call, a 700

14  number or 800 number.  No.  No, I don't do things like

15  that.  Hopefully people come to their common sense.

16  Because why get the home office involved when they can

17  work it out within.  They got how many managers,

18  assistant managers, support managers.  It could be

19  resolved right there.  Head office, it would take two

20  three weeks for something to get resolved.

21          But, anyway, them girls, they might have

22  thought it was appropriate.  I didn't use the Open Door

23  Policy because there was no need.  It would be my word

24  against him and he's new in the store anyway.

Rose M. Bailey

1    Q.    So you knew about the Open Door Policy?

2    A.    Yes.  But I would never go to someone with his

3    behavior, no, no.  You are the one being talked down to.

4    No, I didn't use that.

5    Q.    Did you tell any of the assistant managers other

6    than Merl -- there are assistant store managers in the

7    store, right?

8    A.    On what night?

9    Q.    April 29th.

10    A.    There is a shift manager coming in at that time.

11    They don't know me.  Most of them people are new.  Their

12    shift manager comes in and makes a report of what they

13    see when they come in the store.  Was everything dealt

14    with the way it's supposed to be?  You are changing

15    shift at 9:00.  And sometimes the shift is changing.

16    The other person is in the office writing down on the

17    paper.  It could have been a third shift guy on that

18    doesn't even know my name.  All he knows, the girl works

19    over in girls and does a good job.  That's what he used

20    to tell me when he'd come in.

21    Q.    Was Cindy your direct supervisor?

22    A.    No, she was a support manager.  She was ahead of

23    the cashier.  What do you call that?  Cashier manager,

24    ahead of the people that does the cash register.

**W&F**

Rose M. Bailey

1    Q.   So who was your supervisor then April 29, 2005?

2    A.   They just got that new guy.  They was switching

3   left and right.  It could have been Brian.

4    Q.   Did you tell Brian about your run-in with Cindy

5   on April 29th?

6    A.   No.  Because Brian is the person that is behind

7   the scene.  No, I did not.  Because Brian wasn't in the

8   store.

9    Q.   The next time you saw him, you didn't tell him?

10   A.   I didn't see him.  He was probably on dayshift.

11   They can work two nights and be on the dayshift.  They

12   might have placed him back on first shift at that time.

13   He's a supervisor, but he may not work my nightshift

14   every night.  I think they alternate, which I think is

15   strange.  Your boss, you might see him one or two nights

16   or he might be working nights I'm not there.

17   Q.   On April 29th, was there a supervisor there that

18   you reported to?

19   A.   The store was getting ready to close.  No, I

20   didn't report anything.

21   Q.   But was there someone there, a supervisor who

22   you could have reported to?

23   A.   I don't even know.  I don't remember.  That's

24   been two years ago.



Rose M. Bailey

38

1    Q.    Normally when you would work, would there be a

2    supervisor on duty who you could bring concerns to?

3    A.    Not at that time because they're getting ready

4    to switch shifts here.  You got to let that person know

5    what's going on so the third shift person can pick up.

6    At that time, we was getting ready to go home.

7    Q.    I'm asking generally for your whole shift, what

8    would you normally work on nightshift?  Between 5 and

9    10, was there a supervisor who oversaw the girls

10   department?

11   A.    No, oh, no, no, no.  No.  It could have been

12   just assistant manager in the store.

13   Q.    So there would be at least an assistant manager

14   in the store?

15   A.    He might have been down there in lawn and garden

16   somewhere.  Nobody that's affiliated with soft lines.

17   Q.    But there would be a manager in the store?

18   A.    Assistant manager is assigned to a department of

19   each -- they get so many departments.  The department

20   managers are the ones that's supposed to makes sure the

21   merchandise is color, sized and in order.  Support

22   manager, which is her, is equal to an assistant manager,

23   is the person that is supposed to see the stuff is put

24   back in order.  She would have been the manager, the

**W&F**

Rose M. Bailey

1   support manager.  She's supporting the manager because

2   he may not be available.

3       Q.   Was there someone in the store on April --

4       A.   Support manger, she could have been there with

5   one manager, assistant manager, not the store manager

6   because sometimes he doesn't work nights.  Could have

7   been an assistant manager.  Could have been two

8   co-support managers.  Most of the time it's two support

9   managers and one assistant manager is trying to run the

10  whole store.  He could have been up front with a

11  customer or he would tell you I'm not available at this

12  moment.

13            That's why they went back and -- one time

14  they did away with this.  And we was shocked when they

15  brought it back when Merl came in the store.  They did

16  away with support managers.  They were no longer needed

17  They were not fulfilling their job duties of making su

18  stuff was put away.  But when Merl came in and she got

19  telling him things, they went back to this system.  Sh

20  was to support whoever was on duty.  Might have been o

21  manager, but she is the manager.  You go to managers t

22  see that things are run smoothly.  Managers does not

23  come back and throw carts into you and say do this.  S

24  is the title manager, manager.

Rose M. Bailey

40

1    Q.    Miss Bailey, I understand that.  But what I'm

2    asking you is:  Was there anyone else --

3    A.    No.  She might have been the only person that

4    was available at that time.

5    Q.    Can you let me finish?  I'm not finished.  My

6    question is:  In the entire store, was there any other

7    person with the title manager or higher, supervisor or

8    manager, on April 29th other than Cindy?  Was she the

9    only manager in store?

10    A.    No.  Not available.

11    Q.    So there were other managers in the store?

12    A.    I'm saying if it was one manager in that store,

13    I don't who it was.  I'm explaining to you, I do not

14    know that there are shift managers.  They probably came

15    on because they had a lot of new people was coming on.

16    All I know, the girl -- someone just -- but they are up

17    in that front office.  They come in.  Their shift comes

18    in.  Call a meeting with that shift.  This is the list

19    of duties that we have to fulfill before we leave the

20    store.  That person could have been in his meeting.

21    When they come in, they get meetings on what needs to be

22    done.  Because they are probably unloading the truck and

23    he's in there discussing things with them.  Okay?

24    Q.    Okay.  So did you work third shift?

Rose M. Bailey

1    A.   No, I worked second shift.  Third shift was

2  people that came in.  Some people came in 9 to 7 in the

3  morning.

4    Q.   Was there a second shift manager?

5    A.   At that time of night, I'm explaining to you,

6  after 9 or 10, it's another guy that comes on.  It was

7  two new people.  I don't even know their names.

8    Q.   So at the time of night on April 29th that this

9  incident happened with the cart with Cindy, the second

10  shift manager had gone and the third shift manager was

11  there; is that right?

12    A.   He probably was in a meeting.  If they come in

13  at 9, they do meetings.  He may not have been available

14  to me.  Because my son, you know, he had to get that

15  work done.  He probably had his meeting to conduct.  He

16  didn't have time to take the complaint.

17        But like I said, I didn't report it.  No,

18  didn't report it.  But I told people what happened.  An

19  I told them that if she does it again, I'm not even

20  going to deal with the store.  I'm going to deal with

21  the head corporation.  Because it says that she also ha

22  CBL training.  You are not to intimidate no one on the

23  floor, which she did also.

24        So, no, we have policies.  And if she

Rose M. Bailey

42

1  continued it on, I said I will report her.  I'm not

2  going through the store.  I'm going to the head thing

3  because they got the buddy, buddy system in here and

4  whatever.  You know what I mean?  All they want to do is

5  make sure the store is run right.  They don't care how

6  people are treated.  No, I did not report.  Did I report

7  it to another manager?  No, I did not.

8      Q.    You did not try to report it to anyone in

9  management?

10     A.    No.  Ma'am, I was sick at the time.  I didn't

11  feel like getting up looking for no manager.  I was sick

12  that day.  I was telling the lady I should be home, but

13  I don't feel good.  I was going through some health

14  issues.  And I didn't have time to argue with somebody

15  that night.

16     Q.    The next time you came in to work, did you tell

17  anyone, supervisor or any other manager what happened?

18     A.    No.  But I told my coworkers.  I said, uh-huh,

19  she tried to be smart about something.  I said uh-huh.

20  I'm said I'm going to bypass the store because it's too

21  much favoritism in here.  He appointed her to harass

22  people.  Why would somebody even go there with them?

23  Not me because that was a part-time job, not a full-time

24  job.

Rose M. Bailey

1    Q.   What does that have to do with whether or not

2 you reported an incident you thought was inappropriat

3    A.   I let the head corporation know.  And if the

4 head corporation -- like I said, I let her do it one

5 more time.  More than one incident, I want two

6 incidents.  I wanted two incidents with her before I

7 report anything.  One I let you slide, but two, I wan

8 two incidents with her.

9    Q.   So April 29th, the only people you told about

10 the incident with the cart were your coworkers; is th

11 right?

12    A.   Uh-huh.

13    Q.   Who are these coworkers?

14    A.   I told Lanna.  I told the girl from City of

15 Wilmington.  I don't know her name.

16    Q.   Do you remember anyone else you told about i

17    A.   The people I told, they left right after I l

18    Q.   Skipping forward.  I think we started with

19 April 29th.  We were originally talking about May 2n

20 So you had this incident with Cindy on April 29th.

21 then on May 2nd, which is just a few days later, you

22 have this other incident with Cindy; is that right?

23    A.   Yes.

24    Q.   So back to May 2nd now, which I actually hav

Rose M. Bailey

44

1  calendar so I can give the day of week, it was a Monday

2  and you had been working nightshift; is that right?

3      A.   What day?  Yeah, it was Monday.  Because Tuesday

4  I was off.  Now, do you think -- yeah, May 2nd.  Do you

5  think I would come back May 4th if I knew you was going

6  to terminate me?  I would end my assignment right then

7  on there.

8      Q.   On Monday, May 2nd, you were working nightshift?

9      A.   Yes.

10     Q.   According to your earlier testimony, it was late

11 in your shift, close to 9:00 at night?

12     A.   Yes.  According to Cliff, when he went to the

13 ECO meeting, he said he was locking the doors, alarm

14 doors in the back.  So it had to be time to close.  It

15 was closing time, 10 or 15 minutes before the store

16 would close.

17     Q.   And that was about 9:00 p.m.?

18     A.   No, no, no.  We close at what time?  Was it 10

19 or 11:00?

20     Q.   So it was closer to 10 or 11 at night?

21     A.   I forgot what time the store even closed.  It

22 was getting close to 11.

23     Q.   So it's getting close to 11.  Cindy comes up to

24 you and says go see Cliff.  That's the first time you

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

A132

Rose M. Bailey

1  talked to her day that shift?

2      A.    First time.  But I heard her over there asking

3  the other ladies, go get some stuff put away.  And the

4  said no.  Whatchamacallit said I have to clean up my

5  department tonight.  There was two in their department

6  and one in mine.  And they were telling her, no, go ge

7  somebody else.  When she got to me, Cliff wants to see

8  you.  Cliff wants to see me?  I said I don't really kn

9  him.  I go, why would he want to see me?

10              And he really didn't know me either becau

11 I asked him, I turned around and I said, excuse me, do

12 really know you?  Do you know what department I work?

13 He said over there in soft lines somewhere.  I said I

14 work in girls and I'm running two departments again.

15 I'm running girls and infants tonight.  Because the

16 person that is supposed to pick that stuff up, she lef

17 She didn't do nothing.  I'm running two.  Okay.  Then

18 ahead, go ahead and do what you have to do.  But them

19 carts -- I said, excuse me, Cliff, if you were in the

20 store all night, I didn't even know you was here.  I

21 didn't know you was in this store.  I said I didn't

22 think nobody was here but the two support managers.  A

23 I goes, is this your department, sir?  Because I didn'

24 know him.  He said yes.

Rose M. Bailey

46

1    He never stepped away from the thing to go

2   see what was going on or how many returned carts or

3   what.  So I got thinking.  I go that's very strange for

4   someone coming over here.  And so I go back and I had

5   asked him where is Cindy at.  I said she's sitting in on

6   my evaluation.  And first she told the man that I wasn't

7   available.  She couldn't find me.  But I was up front

8   going up there and getting the returns.  And no one had

9   put away and the bin was this high.  So I go, I said,

10   she's trying to start something with me.  She said at my

11   interview, she went and told the guy that she couldn't

12   find me.  And I go, can't find me?  He was going to

13   write me up that day.  I said I have been in this store

14   15 minutes.  I don't know what she's talking about.

15    Then she goes, oh, oh, oh.  I looked at her.

16   I said, what, Cindy?  You saw me.  Oh, I didn't know, I

17   didn't know, I didn't know.  Yeah, she was here.  He was

18   going to jump on me because she said couldn't find me.

19   I said, oh, no, this is it.  This is it.  She likes to

20   cause trouble.  Trouble.

21   Q.   The incident that you were just describing where

22   Cindy told somebody you weren't there but in fact you

23   were, that was not May 2nd, right?

24   A.   No.



WILCOX & FETZER LTD.
Registered Professional Reporters

A134

Rose M. Bailey

1    Q.    If we could focus on May 2nd for a minute, you

2    went over to Mr. Sinclair because Cindy told you to,

3    right?

4    A.    Uh-huh.

5    Q.    He told you to put the returns away.  You

6    explained you were doing other work and he said that's

7    fine, do your other work?

8    A.    Uh-huh.  I said I only got 15 minutes left

9    before I'm off the clock.  Yes.

10   Q.    Did you, at any time, raise your voice to Cindy'

11   A.    No.  I asked him where was he?  He goes, Cindy,

12   Cindy, Cindy, come here.  I go, where is Cindy at?

13   Maybe he thought I was going to tell her off or

14   something.  He was like hollering into toys, come, come,

15   come, Cindy.  I go, is this a set up or something?  It

16   was so funny.  Come, come, come, Cindy, Cindy, come,

17   come.

18            And I goes, no, I want an explanation why

19   was singled out in here.  And I said, Cindy, why are you

20   keep harassing me like this?  I'm calling the store

21   manager because this is the second incident you've done

22   to me.  Oh, no, no, no, we'll talk about it.  I said no,

23   no, no, no, no, no, no, no, no, you done overdid it

24   now.



Rose M. Bailey

48

1   What's so funny, I walked right past him.

2   He never said did you get the clothes up.  He's

3   hollering, Cindy, Cindy, come here, come here.  Why he

4   calling her for?  Got their heads together or something.

5   I don't know what's going on in here.  This is strange.

6   So I walked up to her when he said, Cindy, Cindy, come,

7   come, come.  I go, I said, uh-huh, you two are trying to

8   start something with me.  I said, Cindy, you know what,

9   I'm going to report you to the head company.  You keep

10  harassing me.

11   And then I walked off and went back to my

12  part and put my stuff away.  I probably left the store

13  again the last one.  I was 15 minutes because I had to

14  walk across the store and tell her I was going to report

15  her.  That guy said -- it was so funny.

16  Q.   So at some point during this evening, May 2nd,

17  you did not raise your voice to Cindy?

18  A.   No, I did not.  I just went to her and I said,

19  Cindy, I'm going to report you.  That guy was hollering

20  her name clear across the floor.  Wait a minute.  He's a

21  manager.  I said, why is he calling her like that?

22  Protecting her or something?  What is going on with

23  these people?  He don't even know me.  It was so funny.

24   I was telling the guys how he goes, Cindy,



A136

Rose M. Bailey

49

1    Cindy, Cindy. I hadn't even got to her. I go, uh-oh,

2    instead of him saying, Rose, come here, let me explain

3    what's going on, he was hollering her name.

4        Q.    So you went to see Mr. Sinclair and then you

5    asked him where was Cindy, and before you could approach

6    Cindy, Mr. Sinclair called her over; is that your

7    testimony?

8        A.    Was calling.

9        Q.    Did Mr. Sinclair escort you into the office at

10   any time?

11       A.    No. We never went into the office. When I

12   left, he looked at me like -- he never said a word. He

13   never said -- of course, he didn't know me. He never

14   said good night, Rose, or did everything get put away,

15   cleared up. That man never looked at me. He go -- you

16   know, he looked at me like. So she went and told Merl.

17   I know the whole thing. I know what happened.

18       Q.    I'm trying to get your recollection of events,

19   Miss Bailey. So Mr. Sinclair calls Cindy over. You sa

20   to Cindy I'm going to report you because you are

21   harassing me?

22       A.    No. Instead of him coming down there, if he

23   thought I was going to be radical or something, he's

24   standing in hardware, she's way down in toys, he's

Rose M. Bailey

50

1   calling, come, come, come.  I go, uh-oh, something ain't

2   right here.  Then she said no, no, no.  I said, Cindy,

3   why are you trying to start trouble with me?  I'm going

4   to report you to the head office.  She goes, no, no, no,

5   it's not like that.

6        Q.    Where were you when you said that to her in the

7   store?

8        A.    Almost to toys where she was.  He was in

9   hardware.

10        Q.    So it was just you and Cindy standing in the

11   aisle?

12        A.    Yeah.  It was probably just me and her.

13        Q.    And you asked her why she was singling you out?

14        A.    I said, Cindy, you done did it now.  You

15   harassed me.  Why you keep harassing me?  I'm not

16   messing with you.  Why you keep harassing me?  Yes, I

17   asked her.  I got a right to ask anybody that wants to

18   single me out.  There's 100 people in the store, 50,

19   whatever it was.  Why are you singling out one person?

20        Q.    Why do you think she singled you out?

21        A.    Because she wanted some work to get done which

22   backed up on her and she didn't want to look bad in

23   front of Merl because she wanted to become assistant

24   manager.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Rose M. Bailey

49

1    Cindy, Cindy.  I hadn't even got to her.  I go, uh-oh,

2    instead of him saying, Rose, come here, let me explain

3    what's going on, he was hollering her name.

4        Q.   So you went to see Mr. Sinclair and then you

5    asked him where was Cindy, and before you could approach

6    Cindy, Mr. Sinclair called her over; is that your

7    testimony?

8        A.   Was calling.

9        Q.   Did Mr. Sinclair escort you into the office at

10   any time?

11       A.   No.  We never went into the office.  When I

12   left, he looked at me like -- he never said a word.  He

13   never said -- of course, he didn't know me.  He never

14   said good night, Rose, or did everything get put away,

15   cleared up.  That man never looked at me.  He go -- you

16   know, he looked at me like.  So she went and told Merl.

17   I know the whole thing.  I know what happened.

18       Q.   I'm trying to get your recollection of events,

19   Miss Bailey.  So Mr. Sinclair calls Cindy over.  You say

20   to Cindy I'm going to report you because you are

21   harassing me?

22       A.   No.  Instead of him coming down there, if he

23   thought I was going to be radical or something, he's

24   standing in hardware, she's way down in toys, he's

Rose M. Bailey

50

1    calling, come, come, come.  I go, uh-oh, something ain't

2    right here.  Then she said no, no, no.  I said, Cindy,

3    why are you trying to start trouble with me?  I'm going

4    to report you to the head office.  She goes, no, no, no,

5    it's not like that.

6       Q.   Where were you when you said that to her in the

7    store?

8       A.   Almost to toys where she was.  He was in

9    hardware.

10      Q.   So it was just you and Cindy standing in the

11   aisle?

12      A.   Yeah.  It was probably just me and her.

13      Q.   And you asked her why she was singling you out?

14      A.   I said, Cindy, you done did it now.  You

15   harassed me.  Why you keep harassing me?  I'm not

16   messing with you.  Why you keep harassing me?  Yes, I

17   asked her.  I got a right to ask anybody that wants to

18   single me out.  There's 100 people in the store, 50,

19   whatever it was.  Why are you singling out one person?

20      Q.   Why do you think she singled you out?

21      A.   Because she wanted some work to get done which

22   backed up on her and she didn't want to look bad in

23   front of Merl because she wanted to become assistant

24   manager.

W&F

Rose M. Bailey

51

1    Q.   Do you think it had anything to do with your

2  race?

3    A.   My race?

4    Q.   Yes.

5    A.   I don't know how Merl perceived me.  I don't

6  know how he perceives Afro-American women.

7    Q.   I'm asking about Cindy, your perception that

8  Cindy had singled you out, do you believe that she did

9  that based on your race?

10    A.   I don't know what it was, race, work or what.  I

11  cannot answer her thoughts.

12    Q.   Did you think it was because of your race?

13    A.   I don't know.  I don't know.  Could have been.

14  Nice single Afro-American woman.

15    Q.   The two woman that you had previously seen Cindy

16  ask to do the returns, do you know what race they were?

17    A.   No.  One was an African probably and one is

18  black.  We black.

19    Q.   So do you have any reason to think that it was

20  based on your race?

21    A.   Could have been.  If someone perceived us as

22  being lazy people and if you're trying to be promoted to

23  the next level, and if he has a way of approaching

24  African-Americans any kind of way, yes, she could be a

Rose M. Bailey

52

1  protege of him.  I don't know.  That's a very hard

2  question.

3     Q.   Okay.  Did Cindy say anything to you that night

4  or any other night that made you think she had it out

5  for you because of your race?

6     A.   Yes.  I told you when I did my evaluation, I

7  don't know why she was called in the office on my

8  performance appraisal.  My evaluation, why is she there?

9  She was not my department manager.  She was nothing,

10  just got this title from this to there.

11    Q.   So you think because she was at your previous

12  performance evaluation --

13    A.   Yes, because there was a guy named Brian from

14  downstate that went to one of them parochial schools.

15  He thinks he owned the world.  If he asked you a

16  question, he perceived you as being smart, divas mean, I

17  don't know what his thought was, but when he sent her to

18  get me, you have a pager.  Rose, come to the office.

19  You see what I'm saying?  Why do you send her to look

20  for me?  And why did she come back and say I'm not in my

21  right place where I should be?

22    Q.   When was your performance evaluation that you

23  are referencing?  When was that?

24    A.   That was a few weeks before that incident

Rose M. Bailey

1    Q.    Was it in April, 2005?

2    A.    Uh-huh.  Yeah, because if they terminated me --

3    but they still gave me my vacation pay.  They terminated

4    me.

5    Q.    Let me back up a minute.  I want to finish up

6    with May 2nd.  You didn't yell at Cindy.  Mr. Sinclair,

7    Cliff, didn't come down and say why are you yelling,

8    come, come, see me in the office; that didn't happen?

9    A.    No.

10    Q.    So if Mr. Sinclair and Miss Brittingham both

11    gave signed statements that said that what happened was

12    you yelled at Cindy, Mr. Sinclair heard you yelling from

13    across the store, came down and asked you to come into

14    the office because he heard you yelling, that's not

15    true?

16    A.    No, that's not true.

17    Q.    Nothing about that is true?

18    A.    No.  Because he's standing there hollering her

19    name waving, Cindy, Cindy, Cindy, Cindy.

20    Q.    Were customers in the store in the vicinity --

21    A.    No.  There wasn't no customers in the vicinity

22    because he was locking the doors, the alarm doors by

23    automotive and stuff.  He had, after I said, well,

24    what's going on, do you know me, he had left his

Rose M. Bailey

54

1   position to lock the doors.  There was not no customers

2   in there at all.  Because if any customers were in that

3   store, they should have been in the line checking out.

4       Q.   So you did not have a discussion with Cliff on

5   May 2nd where he said yelling at a manager in front of

6   customers is insubordination?

7       A.   No.  As God is my witness, that man never said a

8   word to me.  Never.  If he had said insubordinate, I

9   wouldn't have even came back to Wal-Mart.  Like I told

10  Toby when he came and got me, I said I know I'm being

11  terminated based on one side of the story.  That's fine

12  with me.  I'm sick anyway.  I need to take time off

13  anyway.  That was fine.

14      Q.   Let's move forward then.  May 2nd is when this

15  happened.  May 3rd you didn't work.  That was a Tuesday,

16  right?

17      A.   May 3rd I didn't work.  You say May 2nd or 3rd?

18      Q.   May 3rd you did not work; is that right?

19      A.   No, I did not work.

20      Q.   You come into work on May 4th, right, which is a

21  Wednesday?

22      A.   Yes.

23      Q.   This is in the evening, right?

24      A.   Uh-huh.



WILCOX & FETZER LTD.
Registered Professional Reporters

A144

1    Q.   You immediately go to work, start doing your

2  job?

3    A.   Yes, I did my job.  And it was around 5:30, 6:00

4  when Toby came and got me.

5    Q.   And what did he say?

6    A.   He said come, go with me.  He didn't want me to

7  leave because I was one he could depend on.  They told

8  me to come get you.  I said I know what was coming.

9  Because Merl and Cindy.  I said I know.  I'm not happy.

10  It could be a blessing.  Don't worry about it.  I'm

11  sorry they got you to come get me of all people that's

12  trying to train me of something they should have trained

13  me five years ago.  We laughed and joked all the way to

14  the office.

15          You know good people.  You know what I mean?

16  Jennifer Lawrence has a nasty attitude.  She approached

17  me.  I said, excuse, ma'am, get Cindy in here so we can

18  get two sides of the story.  I don't have to bring

19  nobody in here.  I'm doing this based on Merl.  Merl

20  told me to do this.  She knew she was losing a good

21  person too.  I turned to Toby, you know what, it was

22  nice working with you.  I'm going to miss you.  You be

23  good.  Because he came up from Rehoboth.

24          And I told Jennifer I'm not mad.  If this is

Rose M. Bailey

56

1   what you want, then you have it.  Then she gave me a

2   number to call somebody.  She wanted me to talk to

3   somebody, Ron somebody.  And I said maybe I will call

4   him.  I said, you know what, I may not call him.  I said

5   but I am going to let them know that no manager can do

6   what she did to me.  And that was it.

7            Then I thanked them for the years I had been

8   there.  They didn't escort me out or nothing because I

9   had forgot my jacket and went back in there and got my

10  jacket.  I said bye to them and that was it.

11      Q.   Did Miss Lawrence ask you to apologize to Cindy

12  for yelling?

13      A.   Oh, no.  She said that I didn't -- no.  That's

14  not what said.  She said I never showed no remorse or

15  something.  She never asked me -- ask me to apologize to

16  somebody that did something to me?  No, she never asked

17  me.  Oh, no.

18      Q.   Did Miss Lawrence explain to you that you were

19  being terminated for insubordination?

20      A.   She said Cindy said I yelled at her.  Yes, yes,

21  yes.

22      Q.   Did she ask you your side of that event?

23      A.   I told her to call her in there and we can

24  discuss it.  She said, no, I have to do what the store

1  manager, Merl, told me to do.

2     Q.   During this exit interview with Miss Lawrence,

3  did you, at any time, tell me Miss Lawrence you thought

4  the reason that Cindy had singled you out was because of

5  your race?

6     A.   No.  We didn't get into no race.

7     Q.   Did you say that you thought Cindy had been

8  harassing you?

9     A.   Yes.

10     Q.   You did that say?

11     A.   Yeah.  I said Cindy keep picking on me, yes.

12     Q.   You didn't say why you thought Cindy was picking

13  on you?

14     A.   She didn't ask me.  She goes I don't have to

15  call nobody in here.  I know what the manager said.  She

16  had to go by what the store manager told her.  Then I

17  turned to my friend Toby.  I said, you know what, Toby,

18  some people don't realize there is two sides to the

19  story.  If you are going to give one side of the story,

20  then you are going to be a one-way person.  He said

21  that's right, that's true.

22            (Bailey Exhibit No. 1, Exit Interview, was

23  marked for identification.)

24  BY MS. DILUZIO:



Rose M. Bailey

58

1    Q.    Miss Bailey, do you recognize this document?  It

2    says exit interview at the top.

3    A.    Yes.

4    Q.    Was this document in the room on May 4th when

5    you were meeting with Miss Lawrence regarding your

6    termination?

7    A.    Yes.

8    Q.    And do you see on there where it says you are

9    being terminated for insubordination?

10   A.    Uh-huh.

11   Q.    At the bottom there it requests your signature

12   and it says here you refused to sign.  Do you see that?

13   A.    Yeah.  I told her I wouldn't sign because there

14   is two sides to the story.  I not saying I was

15   insubordinate.  The people that did it to me, maybe they

16   were insubordinate and need more managing coaching.

17   Yes, I did refuse to sign.  She said she had to write

18   that down that I was there and she did talk to me.  So

19   she wrote that in.  Yes, she did write it in.  I'm not

20   signing something saying I'm insubordinate when you

21   ain't got two sides to the story.

22   Q.    So you didn't write on this document or say to

23   Miss Lawrence this isn't fair I'm being fired, it's

24   because of my race?  You didn't say anything like that?

Rose M. Bailey

1   A.   We never discussed no race.  I never hardly say

2   nothing to her.  I cut it short.  Thank you for the

3   years I have been here, short and brief.  Because that's

4   a permanent job which I probably shouldn't have been

5   even working there.

6   Q.   Your claims in this litigation, Miss Bailey, are

7   that you were terminated on the basis of your race.  So

8   I'm just trying to find out, did you say that to

9   Miss Lawrence?

10   A.   No, I didn't tell her that.

11   Q.   And you didn't write that on your exit

12   interview?

13   A.   I wrote an exit interview?

14   Q.   On this document I showed you, you didn't write

15   anything on there?

16   A.   I don't have to write nothing.  If I'm going to

17   sue you, I don't have to write anything.  Do I?

18   Q.   So you didn't write anything down on here?

19   A.   Jennifer has a very nasty attitude.  Everything

20   is I don't care, I don't care, I don't care, I don't

21   care.  Even when she was in the store, she did not speak

22   to people.  Nobody liked her.  So the only person I did

23   most of my talking to was Toby, the guy that was sitting

24   besides me.  Because whatever I said, she was cutting me

Rose M. Bailey

60

1    down.  Everything was -- okay, forget it, Cindy -- I

2    mean, forget it, Jennifer.

3              Then I said thank you.  I have been working

4    for you all two-and-a-half years, Friday, Saturday and

5    Sunday.  I got work to do.  This is like a release to

6    me.  We didn't talk about no race.  We wasn't in there

7    that long.

8              The only thing she accused me of was give me

9    my box cutter.  I said, box cutter?  The whole time I

10   have been in the store, you never gave me no box cutter.

11   Because there was some girls they gave box cutters.  And

12   Cindy, she had spread rumors that they was waiting in

13   the break room for somebody with box cutters.  But she

14   said give me my box cutter.  I said I don't cut no

15   merchandise.

16             Oh, that was strange.  She was asking me for

17   Wal-Mart materials.  Give me the box cutter.  I guess

18   somebody told her a lie on me.  I said, oh, Lord, these

19   people in this store.  But it was something Cindy had

20   got for two other girls.  The new people were the ones

21   they gave box cutters to to open up the freight.  I said

22   box cutter?  Please.  You know, that was so weird.

23   Q.   So during the exit interview, Miss Lawrence gave

24   you a phone number.  Like a 1-800-Wal-Mart, was that the

Case 1:06-cv-00603-JJF   Document 18-4   Filed 12/14/2007   Page 11 of 50

1  phone number or was it something else?

2     A.   Yeah.  She gave me Ron's number.

3     Q.   Who was Ron?  Who did you understand Ron was?

4     A.   I never knew who he was until I was telling

5  Lanna -- they asked me what happened.  I was telling

6  them I was terminated.  They said it was that short guy

7  that used to wave and speak to me all the time.  He was

8  the head of the store.  But I never knew him because he

9  would be in at daytime.  The guy would always say, hey,

10 how are you doing when he was visiting the store.  It

11 was a little short older man.  But he came up from

12 Camden to check on the store.

13         She gave me that number to call on him.  I

14 said, Toby, these folks, they ain't got but one side of

15 the story.  She goes, here, I want you to call the store

16 manager.  I said, call him?  I'm being terminated.

17 Reason why, one girl has been terminated four times.  If

18 you call him them and plead your case, they will rehire

19 you.  But I wasn't ready to be rehired.  No way.

20         But she told me to call him and explain to

21 him what happened.  I said, no, I'm calling the head

22 office and let them know that I was terminated and the

23 reason why I was terminated and the reason why I told

24 this lady that.  So I did call the store.  And I told

Rose M. Bailey

62

1   the lady what she did.  And she gave me some lady's

2   number to call.  But she never was in.

3   Q.   Who did you call first?  What number did you

4   call?

5   A.   I went home and it was the Employee Open Policy

6   number, 1-800 number.  I researched my files.  And I

7   called that number and I spoke to some lady.  And she

8   told me I need to speak to Tonya Harding and tell her

9   what happened.  I called -- you know, I'm working.  So

10  they called me back one time and we couldn't get up with

11  each other.

12  Q.   So was that that same day; on May 4th you went

13  home and called this 1-800 Wal-Mart number or whatever

14  number was in the Open Door Policy?

15  A.   I went home and called and said I was terminated

16  based on a recently support manager which they had did

17  away with the position but somehow they thought it was

18  necessary to bring it back.  And then the reason I went

19  and told her that was because her behavior towards me

20  was when she pushed that cart over there and also her

21  sending me out the door to work when some people don't

22  do nothing but stay over there on the cellphones, which

23  they stood up one night and watched them on the

24  cellphone but they didn't say nothing to them due to a

Rose M. Bailey

6

1  tax break.  They were the people they got from this tax

2  program or whatever.

3     Q.    Just a couple more questions, then we will take

4  a break.  When you called the number the next morning,

5  the 1-800 number, did you say that you thought your

6  termination was based on your race or was in retaliation

7  for your having said that you were going to report

8  Cindy?

9     A.    Yes, it could have been based on Merl, two white

10  people and one black woman, yes, it could have been

11  based on that.

12     Q.    My question is:  Is that what you said when you

13  called the 800 number?

14     A.    No, I didn't tell them that.  No.  I was just

15  telling them that -- no.  I never got a chance to talk

16  to anyone.  Even when I called Ron, the store manager,

17  his secretary, somebody called me but I wasn't home.  I

18  think the man had already left, wasn't even working for

19  the company no more.

20     Q.    Who was that?

21     A.    Ron.

22     Q.    So you called the 1-800 number and you also

23  called Ron?

24     A.    Yes, I did.  I called both of them and let them

Rose M. Bailey

64

1    know.

2    Q.    Did you tell Ron that you thought your

3    termination was motivated --

4    A.    Never got a chance to speak to him.

5    Q.    Did you leave a message?

6    A.    Yes.  The secretary called and asked me.  What

7    was her name?  Star somebody.  I wasn't home.  She left

8    a message on my home machine.  At that time, I'm running

9    back and forth between Johns Hopkins and different

10   places.

11   Q.    So you never followed up to talk with any of

12   these folks?

13   A.    I called them back and told them a certain time

14   when they could reach me, probably the time the office

15   was closed.  No, they never called me back.  I called

16   her back and left a message and that was it.

17   Q.    How many times did you call back?

18   A.    My Lord, I don't remember that.  That was two

19   years ago.  Maybe I should have called them on my

20   cellphone.  I don't remember how many times I called

21   them.  I probably called them two or three times.

22   Q.    Any of those times that you called, did you say

23   that you thought your termination had been motivated by

24   your race?



Rose M. Bailey

1   A.   I never spoke to the people that should have

2   been there.   Who are you referring to?

3   Q.   I'm referring to the phone calls that you made.

4   Did you speak with anyone or leave a message that

5   said --

6   A.   I didn't leave a message because I didn't know

7   what they were going to ask me.   I did not leave a

8   message.

9   Q.   The first time you called you talked to a person

10   though, right?

11   A.   I talked to a customer service girl.   She gave

12   me Tonya Harding's number.   What is her name?   Tonya

13   something.   Maybe I got it in my file.   Anyway, she gave

14   me her number to call her.   But I never got up with her.

15   That was an Arkansas number they gave me.

16   Q.   Did you tell that first person you spoke with

17   that you thought your termination was in retaliation for

18   your having told Cindy you were going to report her?

19   A.   My question again?   If I'm leaving a message, I

20   don't know what that person wants from me.   Who are you

21   referring to?

22   Q.   The person that answered the phone when you

23   called the 1-800 number that first took your complaint.

24   A.   She said what are you calling about.   I said I

Rose M. Bailey

66

1  was terminated last night due to the fact of me going to

2  a support manager, Cindy, and telling her that I was

3  going to report her to you all.  But I never got a

4  chance to explain it.  But she pushed a cart over there

5  into me.  The only thing the lady asked me, she said she

6  did not hurt you; did she?  I said, no, it didn't hurt

7  me.  She goes, okay, good, but I need for you to call

8  what you call them and explain what went on in the

9  store.

10    Q.    So you did tell this customer service person who

11  answered the 1-800 number, you told her that you thought

12  you were terminated because you had said to Cindy that

13  you were going to report her; you said that?

14    A.    I told them exactly what they told me.  I said I

15  was terminated based on someone saying I was yelling,

16  but I didn't yell.  I'm right to you.  I'm not yelling.

17  First of all, I don't talk loud.  No way.

18            So, yes, I explained to her.  She said, what

19  happened?  I explained to her -- the cause of

20  termination is what she asked me.  And I explained it to

21  her.  Okay.  I'm going to give you a number to call.

22  Any customer service, they take a message and refer it

23  to someone else.  That's all she could do.

24    Q.    I understand that.  I'm trying to understand

Rose M. Bailey

67

1    what exactly you told her.  Did you tell her -- try and

2    listen to this.  This is a very narrow question.  Did

3    you tell this customer service rep on the 1-800 number

4    that you thought you were being terminated because you

5    had said to Cindy that you were going to report her?

6        A.    Yes.

7        Q.    You said that?

8        A.    Say that again.

9        Q.    Sure.  Did you tell the customer service

10   representative that you thought the reason that you were

11   terminated was because you had told Cindy that you were

12   going to report her?

13       A.    Report her for shoving, some incidents that had

14   happened in the store.

15       Q.    So is that a, yes, you did say you thought you

16   were terminated because you said you were going to

17   report Cindy?

18       A.    Yes, yes, yes, I told her that.

19       Q.    You did tell her that?

20       A.    Yes.  I said I walked up to her and I told her,

21   and the next thing I know they are telling me I'm

22   terminated because I told someone that I was going to

23   report them to the main office.  I said that's why they

24   gave me this open policy number to call.  So I'm callir

Rose M. Bailey

68

1    today to report an incident.

2    Q.   And she referred you to another number --

3    A.   Yes, she did.

4    Q.   -- that you called and left a message with,

5    right?

6    A.   Yes.

7    Q.   And that individual, did they get back to you?

8    A.   No.  Her secretary called and left a message for

9    me to call them back.  And I called them.  The office

10   wasn't open.

11   Q.   And you never called again?

12   A.   No.  They called me.  We kept playing telephone

13   tag.  By that time, I had already written up my papers.

14   Q.   For the EEOC?

15   A.   Yes.  Because there is always a way of

16   contacting people through mail.  If I call and say this

17   has happened and they cannot get up with me, they can

18   always correspond by mail.  You have to communicate with

19   me.

20   Q.   But you didn't think it was important to follow

21   up and follow up with these people about what happened?

22   A.   No.  Because someone said what you need to

23   probably do is file a complaint against somebody that

24   would terminate a person that's been there five years

Rose M. Bailey

1   versus a person that has been there short term, has

2   caused people to leave because of them promoting her

3   based on brown nosing.

4             Because cashiers, I thought six months I

5   asked to be a cashier manager and you told me no.  She

6   goes, well, they gave it to me.  How come she get it?  I

7   don't think it's fair.  But she had got in cahoots with

8   telling everything.  So they kept promoting her,

9   promoting her, promoting her.

10            And recently I just found out that they

11  wasn't even supposed to be promoting people to cashier

12  managers.  They was supposed to be taking the test.  And

13  she had not taken the test for that position.  I got

14  people that keep in contact with me.

15            MS. DILUZIO:  We are going to go ahead and

16  take a break.

17            (Thereupon, a recess was had.)

18  BY MS. DILUZIO:

19    Q.   I would like to now move on to a different

20  topic.  The May 2nd incident with Miss Brittingham was

21  not the first altercation you had had with a manager in

22  the store; was it?

23    A.   No, it's not.

24    Q.   Didn't you get into an argument with Pearl

Rose M. Bailey

70

Robinson on March 30, 2005?

A.    I did not get in an argument with Pearl

Robinson.    That was not an argument.    It was a -- I was

on break.    And Miss Pearl Robinson interfered in

something that she shouldn't have been in.

Q.    And the two of you exchanged words?

A.    No, I didn't exchange no words with her.    Could

you elaborate what you mean, exchange words?

Q.    Sure.    Let me back up.    Miss Robinson was a

service manager at Wal-Mart, right?

A.    She was not a service manager.    She was head of

the stockroom.

Q.    Head of the stockroom?

A.    I don't even know what her title was because

that was the fourth time that they rehired her.    One

time they had her selling credit cards, then to cashier.

She had been terminated four times because of her mouth.

Q.    Was she a manager?

A.    I don't even know because she worked dayshift.

Some say she was the boss.    They heard me tell her --

no, I didn't say nothing to her.    Only when she followed

me up to the front of the store in front of the manager,

that's when I told her I'm on my break.    Why are you

messing with us?    You know what I mean?    Yes, I did say

Rose M. Bailey

71

1   that. And it was in front of the supervisor, in front

2   of Tommy, whatever his name was.

3       But Pearl had just gotten that job. You

4   pull the freight from the back. The guy is telling me

5   she's not supposed to be saying anything to us. She was

6   not a support manager, system manager, comanager, store

7   manager. She was just the head of that department over

8   by where they pull the freight from the back.

9     Q.   Miss Robinson is African-American; is that

10   correct?

11     A.   Yes, she is.

12     Q.   Why don't you tell me from your recollection

13   what happened that day with Miss Robinson?

14     A.   It should be in your documentation from the

15   Equal Opportunity. I'm quite sure you have those

16   reports. Do you not have those records, ma'am?

17     Q.   First, I ask questions and you answer them.

18   Second, I need your recollection of the events.

19     A.   What happened was, again, I was working two

20   departments, girls and infants. A person was coming

21   into the store. What was her name? Diedra was coming

22   into the store. And her and another person was stopped

23   where I was. They were talking.

24       Meantime, a young little girl come and asked

Rose M. Bailey

72

1   me for some bottles.  And I said, well, I don't know.

2   And I showed her the baby bottles.  And she came back

3   and she said I don't know which one my mom wants.  Let

4   me go ask her.  I say, okay, I will stand here, but

5   really I'm getting ready to take my break.

6               So I stand there waiting for the young girl

7   to come back.  Diedra and the maintenance man was

8   standing there talking because they live in the

9   neighborhood and they were standing there talking about

10  something.  And I was just standing there.  Pearl comes

11  between us with this great long flatbed.  And the guy

12  asked something about a crib -- oh, no.  She goes,

13  aren't you two ladies working?  We snicker at her.

14  Because I'm out there listening to what they are saying

15  is going on in the neighborhood and we didn't pay her no

16  mind.

17              Here she comes back again, said the guy

18  wanted a crib.  Well, which one of you are working in

19  infants?  And I go, ain't nobody really working in

20  infants.  But I'm on my break.  I'm on break.  I'm just

21  waiting for the girl to come back.  The girl had a

22  question.

23              So, meantime, she gets right on the Walkie,

24  I got two ladies -- now you refer to us as two ladies

Rose M. Bailey

73

1    standing up here talking doing no work.  I go uh-uh,

2    uh-uh.  I'm going to stand right here.  I ain't taking

3    no break.  I'm waiting for the manager to come.

4            The manager came.  Brian came and looked up

5    and saw it was me and kept right on walking.  And he

6    goes over into the men's department.  He stands back and

7    looks at us.  I said I wonder why he's standing looking

8    at us.  And he wouldn't say nothing.

9            So he calls back up.  He calls another

10   manager to come, Tommy.  He says, Tommy, could you come

11   here?  Come to the front of the store.  So they took

12   them so long.  I said there goes Brian, Diedra, he

13   walked right past us.  But he's standing over there

14   looking at us.  I'm just standing up here listening.  I

15   don't know what you all are talking about.  I don't live

16   in that neighborhood.

17           So Pearl had said something.  I said okay.

18   I said look, Diedra, I ain't standing up here.  So we

19   started walking up to the store and come Tommy.  She

20   come right behind us, blah, blah, blah.  I said let me

21   tell you one thing.  You don't address me that way as a

22   lady.  I said, Tommy, don't be telling her to address us

23   as a lady, these ladies up here talking.  I said, Pearl,

24   you know my name.  I have been working in the store with

Rose M. Bailey

74

1    you for five years.  You mean to tell me you don't know

2    my name?  Why are you referring to me as this lady?  My

3    name is Rose.

4                And she goes, you ain't got your badge on.

5    I said, well, you know my name.  I said my name is Rose,

6    R-O-S-E, Rose.  It's not this lady.  I don't appreciate

7    you doing that like you don't know me because you in a

8    different department.  We all started out the same.

9                And Tommy said something.  Tommy said let's

10   go in the office and talk about it.  I said she don't

11   address me that way and I don't appreciate that.  If you

12   don't know people's names, just say sales associate or

13   the girl in the girls department.  Don't be telling me

14   these two women up here are not doing their work.  You

15   know I do more work.

16               So we went in the office and she started

17   telling stories.  I said let me tell you one thing.  You

18   are condescending yourself telling stories.  So Pearl,

19   we went in the office.  And Brian, he doesn't say

20   nothing.  He picks Tommy up because he don't want to be

21   in the midst of no problem.  So Tommy came from the back

22   and but yet Brian was supposed to come.  They must have

23   switched places.  But he didn't want to get involved.

24               So when Pearl said, oh, well, this lady, she

Rose M. Bailey

75

1   can out talk me, I'm gone -- she got up and left -- I

2   said, yeah, because you are in here telling stories on

3   people.  If you think people ain't working, you come up

4   and say, ladies, how are you doing today or stuff.

5   Don't get over there behind the thing and telling a

6   manager I'm not doing my job.  And so that was it.  She

7   got up and left.

8          Then I said, Tommy, you have a nice day.

9   Because you know what you tell me, if you can't do the

10  work, we don't need you.  You know I was doing my work

11  and I'm going to take my break and that was the end of

12  that.

13  Q.    When you were having this discussion with Pearl

14  and the manager before you went back into the office, it

15  was on the sales floor, right?

16  A.    She come up following us with this long -- if

17  she hid me with that flatbed, there had been a lawsuit.

18  She come again with this long flatbed.  And then that's

19  when we went in the office and Tommy said she is a

20  manager of the stockroom crew.  I said we didn't know

21  she was no manager.  You fired her.  How did she become

22  a manager?  He said any problems, just call a manager.

23  If she anything, anybody say anything, next time just

24  call a manager.  Don't say nothing to her.  And that was

Rose M. Bailey

76

the end of that.  Because we did not know her title.
Because they had fired her and brought her back.  We
didn't assume her to be a manager.

Q.   But when you were having the discussion with
Miss Robinson about she shouldn't have addressed you as
lady, you were on the sales floor, right?

A.   We were up near the office.  We wasn't on no
sales floor.  I don't call it -- when you are up near
the thing -- I said we went up to the store.  She walked
up to the door.  And I asked Brian, I said I need to see
you for a minute.  He said hold on.  But the hold on was
that he wasn't getting involved.  I'm bringing Tommy in.
Diedra said I'm not going.  I'm staying right here.  I
said I know I'm not going nowhere because Pearl doesn't
address me as these two ladies.  Who is talking about?
I said, no.

Q.   So that original discussion with Miss Robinson
happened on the sales floor though, right, because you
said you were standing by the bottles waiting for the
little girl to come back?

A.   I didn't say anything to Miss Robinson then.  We
left and went to the front end of the store because the
manager's office is going to call you into the front
office.  I went to there.  I said Brian came up here.

Rose M. Bailey

1  He stood there.  I said there he is, Diedra, at the door

2  where the greeters stand.  I said, Brian, can I see you

3  for a minute?  He said hold up.  Wait a minute.  I'm

4  going to get to the issue.  But hold up.

5          But meantime, Tommy comes up there.  And he

6  goes, what's going on?  And I said that Pearl lady is

7  coming up here saying I'm not doing the work or

8  something.  Then she comes around the corner.  And I

9  said she don't be telling me, calling me no that woman,

10  lady, whatever she said about me.  She knows my name.

11     Q.  So that discussion occurred in front of the

12  office?

13     A.  Yes.  It wasn't no sales floor.

14     Q.  So when you were standing in the aisle when

15  Miss Robinson first came through, you didn't say

16  anything to her?

17     A.  I laughed at her.  I looked at the other girl

18  and we laughed.  The other girl said I'm not going

19  nowhere.  And she folded her arms and stood there.  I

20  said we will have to wait for the manager to come

21  because I'm going to prove that this girl, she doesn't

22  know what she's talking about because I'm getting ready

23  to go on break.  I don't know what she's talking about.

24  I was up there talking -- I wasn't even talking.  I was

Rose M. Bailey

78

1  listening.  I don't live in their neighborhood.  I got

2  hot because she said I was doing something I wasn't

3  doing.

4     Q.   But you didn't receive any coaching or any other

5  discipline for that, right?

6     A.   No.  Because she walked out.  She go, oh, that

7  lady can talk circles.  Let me leave.  And left.  I

8  guess she thought, been thinking about it, I have been

9  in enough mess, let me leave.  She left the office and

10 that was the end of that.

11          So I go out there and get my friend from the

12 church.  I said, Sheila, they are picking on me, telling

13 them that I'm talking about it.  And she goes -- we went

14 back to the office.  And I said tell Tommy that I don't

15 mess with nobody.  She goes she don't talk to nobody in

16 the store.

17    Q.   Okay.

18    A.   I did go back.  And I said tell them we are

19 christian people.  We don't have time for these folks.

20    Q.   I would like to talk about your April, 2005,

21 review.  We've talked about it a little bit today.  Did

22 you receive a pay increase after that review?

23    A.   Yes.  Don't ask me what it was.  Probably $0.25,

24 or $0.35.  I don't even know what it was.



WILCOX & FETZER LTD.
Registered Professional Reporters

A168

Rose M. Bailey

1          (Bailey Exhibit No. 2, Performance

2    Appraisal, was marked for identification.)

3    BY MS. DILUZIO:

4      Q.   Miss Bailey, you have in front of you a two-page

5    document.  At the top it says performance appraisal,

6    sales floor associate?

7      A.   That has been alternated.

8      Q.   Before you talk about, do you recognize this

9    document?

10     A.   None of this was here.

11     Q.   None of what?  You are looking at Page 2?

12     A.   Yes.

13     Q.   What section are you speaking wasn't there

14   during your evaluation?

15     A.   I don't remember no customer service.  That's

16   right.  They refused to give me a copy.  But to my

17   strengths, is this -- that ain't even my writing here.

18     Q.   Where are you looking at, ma'am?

19     A.   I don't remember that being on here.  Do you

20   know who wrote this up?  Brian would have been my

21   supervisor for probably a week or two.  He wrote that

22   up.

23     Q.   Is this the normal form for evaluations?  This

24   is the normal form that they would be on?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Rose M. Bailey

1    A.   They never give you a copy.  I can't answer that

2  question.  I always ask for my records.  We've never --

3  even when I was terminated, I needed this.  They

4  refused.  I sent a fax to them in personnel.  She said

5  she couldn't give it to me.

6    Q.   So you never saw a copy of your performance

7  evaluations?

8    A.   I wrote on here.  But I don't remember this part

9  up here.

10    Q.   So this is your handwriting on the side of the

11  document?

12    A.   Yes.  But I don't remember this because I

13  probably wrote a comment here.  I don't remember that

14  being in here.

15    Q.   You are pointing to the strengths section?

16    A.   Uh-huh.

17    Q.   Can we look at the first page?  The first page

18  looks like there is a checklist and then your manager

19  can either check exceeds, meets or below expectations;

20  is that right?  Is that how the rating worked?

21    A.   This was given to me on the floor.  It wasn't

22  done in the office.  When I wrote this, I was hot.

23  Giving me evaluation -- a support manager that just

24  become a store manager, George, gave me this.  I said,

Rose M. Bailey

81

1   you know what, George, since they didn't have no respect

2   for me to even give me my evaluation, that's why I wrote

3   all this right down here. Because when you are

4   evaluating me, we have to sit down and discuss this. He

5   goes, well, me and Cindy are supposed to give you your

6   evaluation. But Cindy is not here. We will just stand

7   up here. We stood up there by the furniture and he read

8   this off to me.

9       Q.   Who was that?

10      A.   George. A support manager, which only had the

11  job two or three weeks, he's the one saying that Ron

12  told me to give you your evaluation. Because when Pearl

13  said I can out talk them, he wanted no parts of me. So

14  he asked George to give me my evaluation.

15      Q.   So you are standing at the furniture counter you

16  said and George is giving you this evaluation; is that

17  right?

18      A.   Yeah. Because if we sit down -- he did it right

19  on the floor.

20      Q.   But there is a desk?

21      A.   No. You know how the furniture is wide like

22  this? You know, the furniture on display, it's a little

23  space at the end.

24      Q.   Like a counter you were standing at?

Rose M. Bailey

82

1    A.   Not a counter, but display.  I could stand there

2   and write because it's flat.

3    Q.   It looks like, on the second page, that this

4   review was signed on April 19th, '05.  Does that sound

5   about right when you would have received the review?

6    A.   Where is my signature at?  Who signed the top

7   part?  I ain't never signed it.  I never even signed the

8   thing; did I?

9    Q.   On the front page there are two initials, RB.

10  Is that you?

11   A.   That's when George was discussing.  He told me

12  anything I disagree with I can write on the paper.  He

13  told me he would give it to me.  That's when Brian

14  called me on Saturday when I came to work.  He got mad

15  because I said you tell Brian that any time an associate

16  worked for him, he should honor them and call them in

17  the office and give me my evaluation like he gave the

18  other girls.

19          That's why I say it could be discrimination.

20  I don't know.  You took the other people in the office

21  and gave them the evaluation.  Because they came back

22  and was smiling.  They told me they got $0.50.  I go

23  $0.50?  I said I don't think I got no $0.50.  You don't

24  even work Friday, Saturday and Sunday.  How do you get

Rose M. Bailey

1    $0.50?

2    Q.    Who are these people you are referring to?

3    A.    The ones that were in the suit, the ECO when I

4    filed with the ECO.

5    Q.    EEOC?

6    A.    EEOC.

7    Q.    Back to my original question, the date on here,

8    April 19th, '05, does that sound about right when you

9    got your review?

10    A.    Ma'am, I have a date book.  I have to go back

11    home and check my calendar.

12    Q.    Was it in the middle of April, 2005, when you

13    got this review?

14    A.    I'm saying that's why I was terminated, based on

15    what I wrote on this paper also.

16    Q.    Miss Bailey, if we could just get the date

17    squared away, was it the middle of April, '05, that you

18    received this review?

19    A.    I never signed this.

20    Q.    Do you have any recollection of this review?  Do

21    you recall receiving it?

22    A.    Yes.

23    Q.    Do you recall that it was in the middle of April

24    of '05?  That's what I'm asking.  I just want an

Rose M. Bailey

84

1  approximate date.

2      A.   Okay.  There is my date right there, 4/23/05,

3  ma'am.  I knew I wrote something there.  When I was

4  writing that -- the guy told me anything I disagree with

5  I could write on the paper.

6      Q.   Who told you that?

7      A.   George.  He would present it back to Brian.  He

8  would give it back to him, the store manager.

9      Q.   So let's look at the first page on the

10 right-hand margin.  It appears to say RB, disagree.  And

11 then there is a block of review items where you received

12 a meets expectations check.  And that's where it says RB

13 disagreed.  Did you write that?

14     A.   I don't know whether it was meet expectation or

15 below.

16     Q.   It looks like it was meet.

17     A.   I don't have the original copy, ma'am.  This is

18 something, blank, can't half read it.  They should have

19 lightened it up.  Whoever worked in the office should

20 have lightened that up for you.

21     Q.   My question is:  Is that your handwriting on the

22 right where it says RB disagree?

23     A.   Yes.

24     Q.   Why did you disagree?

Rose M. Bailey

1    A.    I think they had below.  Because even -- I don't

2    remember this part being in here.  Why are you putting

3    down here -- zoning is back rooms.  I don't remember

4    this part being up here.

5    Q.    You said you don't remember the strengths

6    section being there.  I'm talking about the first page

7    where you say disagree, you disagreed with the rate, you

8    wrote that, right?

9    A.    Yes, I disagreed with it.  Yes, I did because he

10    said -- he wrote on here that back rooms.  That's

11    zoning.  Zoning means you go in and zone the racks, make

12    sure the lights, darks, color sizes all the way around

13    the rack.  I'm well knowledged about that, if I can take

14    one by myself.  Because the space comes in the box how

15    them folks wanting them clothes arranged on the racks.

16    The manufacturer wanted them going a certain way on the

17    rack, colorized and certain patterns with patterns.

18    Yes, I did disagree with that.  He did not know me first

19    of all.  He had only been my boss for two weeks.

20    Q.    Going on to the left-hand margin, there are

21    several handwritten notes here.  Are these all yours?

22    A.    Yes.

23    Q.    The first one says, with regard to the review

24    item, practices 10-foot rule.  There is a note here that

Rose M. Bailey

86

1   appears to say management needs to practice.  Is that

2   what that says?

3      A.    Yes.  Because if you are a newcomer coming on

4   board and I don't know you, you have to identify who you

5   are and speak to people, which Jennifer Lawrence did not

6   never speak to us.  She never spoke to us.  Brian

7   Hendricks never spoke to us.  We had service managers

8   that would not acknowledge some people.

9           Yes, I wrote that down.  And the reason why

10  I wrote that practice 10-foot rule was because you want

11  us to do it but yet you are giving me my evaluation on

12  the floor.  Yes, I did.

13     Q.    And also on the left-hand side under the section

14  that you had marked on the right that you disagree with

15  you also wrote something out there.  Can you read to me

16  what that is?

17     A.    Been here six years.  Had good management -- I

18  had good manager that had assisted me in training to do

19  the following procedures.  I had good managers at the

20  very beginning to instruct me how to do that.

21     Q.    So that's why you felt that you did well at

22  those areas and should have received an exceeds

23  expectations; is that what you thought?

24     A.    Yes.  If you are going to depend on me, yes, if

Rose M. Bailey

87

1  I'm on vacation an nothing is done when I come back.

2  Give me what you gave everybody else. They all said

3  they exceed. Why can't I exceed?

4    Q.   The next note on here you made a note under the

5  review item that says maintains all risers properly; is

6  that right?

7    A.   Yes.

8    Q.   You said that is not applicable?

9    A.   Not applicable? I didn't work with no risers

10  really.

11    Q.   And then it says, on the left-hand column, the

12  initials RB and the date 4/21/05. Do you see that?

13    A.   Uh-huh.

14    Q.   So is it possible you wrote these notes on

15  4/21/05?

16    A.   That could have been the day I had the doctor's

17  appointments. I was dealing with the doctors when I

18  called and told them I would be late. I was at

19  Christiana Care that day. They said I was absent three

20  times. I was not absent three times.

21    Q.   You disagreed with that?

22    A.   Yes. Because I asked George. He said even if I

23  was five or seven minutes late and I called and told

24  them that I was on my way, that I'm in traffic, he said

Rose M. Bailey

88

1    they still had to mark that as an absent.

2       Q.  If you look on the second page of this document,

3    it says what your new pay rate is.  Can you read that at

4    the top?

5       A.  Uh-huh.

6       Q.  What is that?

7       A.  $10.75.

8       Q.  So do you remember now what kind of raise that

9    was for you that brought you up to 10.75?  Could it have

10   been $0.40?

11      A.  Might have been $0.35 or $0.40.  Those records

12   you would have to get from personnel.  Because I told

13   you one guy gave me a dollar and-a-half or $2.

14      Q.  If you look under the section that says

15   associates comments/goal settings, are those comments

16   there ones that you wrote?

17      A.  Yes.

18      Q.  And this is your response to the review why you

19   thought it was inaccurate?

20      A.  Yes.  They wrote Telezon experience.  That was

21   wrong.  Because Toby had just trained me.  Because when

22   I went up front and helped him sort the carts, I asked

23   him something.  And he goes, can you look it up on the

24   Telezon?  I said, oh, no.  He says, how long you been

Rose M. Bailey

89

1  here?  I said five years.  Girl, you had been here five

2  years?  I'm going to teach you when I come back the next

3  night.  So he goes and gets an index card.  He starts

4  showing me how to do it before I get terminated here.

5          But this is the strange thing.  When he was

6  in the office and Jennifer told him let a department

7  manager train her, but he came back anyway and said I'm

8  going to help you.  Because all my people in the other

9  store, I train them right away so you don't interrupt a

10 manager.  There is different things that you can push a

11 button and look up yourself.  Yes, I had just been

12 trained by Toby.

13     Q.    What is that Telzon?

14     A.    If an item doesn't have a price on it and the

15 customer is saying that it was advertised being

16 discount, you have to go in and put the numbers in to

17 see whether they overlooked the markdown or whatever.

18 Because it's run by the store.  The store does the

19 markdowns.  It's just a machine that they use.

20     Q.    What was George's race, the individual that gave

21 you this review?

22     A.    White.

23     Q.    And how about -- you said Brian was actually

24 your manager; is that right?

Rose M. Bailey

90

A.    He just become my department manager.

Q.    Was Brian the one that gave George this information --

A.    Uh-huh.

Q.    -- in the review?

A.    Yes.

Q.    And what race is Brian?

A.    White.

Q.    Was this review better or worse than your previous reviews or similar to?

A.    It was worse because I never had nobody tell me that I didn't know how to do the rack rules when everybody else said I know what I'm doing, that I didn't need no extra help come -- oh, she know what she's doing.  She don't need no help.  Everybody wanted to help, but I never got any extra help.

Q.    But your overall rating on this review was meets expectations, right?

A.    Oh, I don't know.  Where is that at?

Q.    On the second page at the bottom before the signatures.

A.    I don't remember that being there.  Because that Saturday when I came in, that's when I got called in the office.  That's when Brian told Cindy to go get me.  And

Rose M. Bailey

1   he go, oh, so where were you at?  I sent Cindy to come

2   get you.  I said I was up front getting the returns for

3   the day.  Nobody worked over here today.  He looked at

4   Cindy.  Was she?  And I go, yes, I was.  Oh, yeah, yeah,

5   yeah, she was up front.

6            So there is two Caucasians harassing an

7   older black lady.  You see what I'm saying?  And then --

8   and I go, why are we here?  Why didn't you give me my

9   evaluation the first time?  Why was I given my

10  evaluation on the floor?  Then he called me militant

11  because I was militant.  What is that, hostile,

12  militant?  Then he said I can't deal with you.  You got

13  an answer for everything.  But I never actually talked

14  to Brian.

15           But I seen Brian in action when two

16  associates went up to Cindy and told her, look, Cindy,

17  why every time I asked you for a break you want to give

18  me harassment?  When they wasn't on the sales floor, we

19  was behind customer service getting the stuff out of the

20  bin.  And he's the manager and Cindy is the cashier

21  manager.  Instead of him saying -- what was her name?

22  Brian didn't say nothing, but yet he was on duty.  And I

23  go, that's very strange.  He's a manager.  So when the

24  girl left, Brian tells Cindy, I will sure in hell have

Rose M. Bailey

1  her ass for it.  I said the girl is just telling her why

2  she can't get her break.

3    Q.    You need to speak up and a little more slowly,

4  Miss Bailey.  It's hard for the court reporter to take

5  down everything you are saying, especially if you are

6  looking in that direction.

7    A.    Brian told Cindy I will sure as heck have her

8  for it.  I go, the girl just asked her why can't she

9  have her break.  About that time, I didn't like what

10  they did or how they were handling the situation.  So I

11  turned to Brian and said, Brian, are you trying to fire

12  me; that's why I got next week off?  He goes, no, but I

13  sure as heck would take it off.  I said I am.  And that

14  was so funny.  Because the girl asked her why was she

15  always harassing her and not giving her a break.  That's

16  when I became aware of these two individuals, Cindy and

17  Brian.

18    Q.    I'm not sure how we got there, but --

19    A.    We got there because you keep on race and

20  discrimination.  Yes, there were some issues I totally

21  disagree with.  And, yes, if it had been someone of a

22  different color and had told Cindy that, this incident

23  of me being fired would not have happened.  Yes, I do,

24  in some ways, do feel that way.

Rose M. Bailey

93

Q.   Based on what?

A.   Based on some previous incidents I have seen such as that night and I couldn't believe a manager would say that.  And still a manager saying, yes, we will make sure you get your break, not talk about firing someone and you just came in the store.  Why did they transfer you from one store to another?  When you act up there to send you down here?

Q.   So based on some things you had seen on the floor --

A.   Yes.

Q.   -- you believe that your termination was motivated by your race?

A.   It could have been.  Brian, he was behind the scene on this one too, as well as he telling her to get rid of them other two girls.

Q.   I understand you are saying it could have been. My question to you is:  What evidence do you have that your race was the reason that you were terminated.

A.   Because if you speak back and speak up for your rights.  Because I have seen some Caucasians, white, back mouthing them and nothing was said.  But when we had said something, termination.

Q.   Miss Lawrence is African-American.

Rose M. Bailey

94

1    A.    I don't know what Miss Lawrence is because I do

2    not know who her parents are.  I do not know her ethnic.

3    You know what I mean?  I do not know that.

4        Q.    She is who terminated you though, Miss Lawrence?

5        A.    She said based on Merl.  She was not there.  I

6    do not have the facts but Merl called and asked me to do

7    this.  Merl, why not Merl when he was in the store, why

8    not Merl call me or why not Merl, who is white, why is

9    he getting her to do something that he has the facts on?

10      Q.    Did Miss Lawrence sign your exit interview?

11      A.    Miss Lawrence, in the thing, said she signed it

12   because she was the only manager there.  If she was not

13   there, it could have been anyone.  But, at that time, no

14   one had a comanager in the store.  And that's why she

15   had to take her orders from her supervisor, from her

16   direct supervisor.

17      Q.    So let me go back to the question.  What

18   evidence do you have that your termination was motivated

19   by your race?

20      A.    It could have been because of Brian.  Because of

21   the previous incidents, Brian and Merl, because of them

22   two, what they have done and said, yes.

23      Q.    What have they done and said that would lead you

24   to believe that?

Rose M. Bailey

95

1    A.   He told the two ladies that were standing up

2   there talking, but yet the women, the Caucasians in the

3   white, in the women's department could go to lunch at

4   the same time and nobody on the floor.  But two people,

5   you come walking by, quit talking and get to work.

6    Q.   So those two people who you heard him say that

7   to were African-American?

8    A.   Black, yes.

9    Q.   And you had seen other incidents where whites

10  were talking and no one told them to get back to work?

11    A.   No.  Another thing, you do not leave the floor

12  in women's.  Either one of you do not leave the floor,

13  nothing was said.  Yes, it could have been based on

14  racial issues.

15    Q.   Did any of your manager ever say anything that

16  would lead you to believe that their decisions were

17  motivated by your race?

18    A.   Yes.  I just said yes.  I seen a girl tell a

19  manager off right on the floor.  And I could have

20  fainted that night.  He went and got another manager.

21  And she hollered and screamed at him.  He told her put

22  that stuff -- I don't like him, blah, blah, blah, on the

23  floor.  I said, uh-oh, I don't believe this is

24  happening.  She was not terminated.  She was not.

Rose M. Bailey

96

Q.    And what was her race?

A.    White.

Q.    And who were the managers involved?

A.    The one that they got rid of that wanted
everybody to clean up the store.  What did you do, all
get together and write something to the head office?
Because he was a firm believer of keeping the store in
order.  Even the managers was behind it that night.
Because he kept everything body in line.  He comes in
the store, had a meeting every morning.  They didn't
want nobody like that.  He was for everybody.  He didn't
single out nobody.  If he saw somebody doing somebody
wrong, regardless of your color, race, whatever, he was
there.  He let them know.  But these other ones, they
were young people anyway.

Q.    Miss Bailey, I need you to identify for me what
managers you believe had this altercation with a
Caucasian associate and didn't terminate her?

A.    That was a long time ago.  I don't remember the
girl's name.  But it was a guy that they get rid off.
She stood out there that night and chewed that man out
right on the floor.  And he had a manager right with
her.  And they laughed.  They didn't like him because he
kept everything in order.  He was a person that abided

**W&F**

A186

Rose M. Bailey

1  by the policy, keeping the store clean and keeping

2  everybody working in their rightful place where they

3  belong.  They didn't like him.  So what did Wal-Mart do?

4  Bust him down and send him back.  Didn't even give him a

5  chance.

6      Q.   Who is that?  Do you remember his name?

7      A.   His name was David Trynn.  Gave everybody what

8  they deserve.  He went in the store and finally hired

9  good workers.  Yes, I seen a girl one night told Tommy

10  right off.  I'm not doing nothing.  That was on the

11  floor.

12      Q.   Miss Bailey, when was this, the day that Trynn

13  left?

14      A.   Probably 2004.  I don't know.

15      Q.   So that's not related to your termination in

16  2005; is it?

17      A.   No.  But they didn't treat him right.  So how

18  are they going to treat anybody else correctly that

19  believes in good hard work?

20      Q.   Let me just go back to the point you made.  You

21  thought that there were other associates, other

22  non-black associates who received higher pay raises than

23  you in 1999.  Is that right?

24      A.   Read that again.



Rose M. Bailey

98

1    Q.    Do you believe that there were other associates,

2    non-black associates who received a higher pay raise

3    than you in 2005?  I'm sorry.  That was my mistake.

4    A.    Oh, yes.  They told me.

5    Q.    Who were individuals?

6    A.    The ones I named in that suit.

7    Q.    Susan, is that correct?

8    A.    Yes.  I don't know her name because she left for

9    a while.  Her daughter was getting married to an Indian.

10   When they were all laughing, they said, Rose, did you

11   get your evaluation yet?  I said no.  They said we had

12   an evaluation for a week.  I said I have never received

13   my evaluation.  I said they must have done them Tuesday

14   night, the night I was off.  One was saying I got good.

15   Got good?  What do you mean?  We got our $0.50.  I said,

16   oh, you did.  Maybe they were lying, whatever.  I go

17   wait a minute.  I don't never, but one time when

18   Anthony, the fair man, gave me my $0.50.  They were

19   there laughing.  They were so happy.  All of them, good,

20   good, good, good.

21   Q.    So before you had your review, you had spoken

22   with these two other ladies who indicated that they had

23   received $0.50 raises; is that right?

24   A.    Uh-huh.



Rose M. Bailey

99

1    Q.    But you don't know that for a fact; do you?

2    A.    They was all smiles and all happy.  And I go

3    maybe they did.  I said, where is mine at?  But I know

4    the reason they didn't want to give me that.  Because

5    they told me I was making too much money anyway.  They

6    never knew how I got up to that amount.

7    Q.    Who told you that?

8    A.    One of those supervisors told me that at that

9    time.  But what took me, when we was in the break room

10   and one lady said she started at $7 an hour.  They were

11   all mad because David -- not David, the last supervisor

12   from -- Merl, the store manager.  If you can get the

13   people's department cleaned up, if you can cut the

14   department hours, you know what I mean, less hours, if

15   you get someone to go and clean up and you don't need

16   but one or two people, he was cutting our hours before

17   he knew he would no longer be our store manager.  I just

18   lost my thought.

19   Q.    Let me go back, Miss Bailey, and try and focus

20   you on this April, May, 2005, time frame.  Before you

21   get your review, you hear these two ladies talking.  Was

22   there anything else you know got a better raise than

23   you?

24   A.    I didn't hear them talking.  I asked questions.

Rose M. Bailey

100

1  I asked them what they were all smiling about.  We did

2  good, our evaluation.  I said you all did good?  They

3  said yes.  Tommy is good.  He gave us our $0.50 raise.

4  I said, who is evaluating me then, Tommy or Brian?  They

5  said Brian really, but Tommy or something.  I go, wait a

6  minute.  So Brian, I said Brian ain't even been my boss

7  that long.  How can he evaluate me?

8      Q.   Miss Bailey, do you know if these two ladies,

9  whether they were rated as meets or exceeds

10  expectations?

11     A.   I don't ask people those questions.  When they

12  said the money part, that's what I'm interested in.  I

13  don't know how they got there.  Because one didn't come

14  half the time and one was new.

15     Q.   Would you agree with me, Miss Bailey, that if

16  someone receives an exceeds expectations rating on their

17  review when you met a meets expectations that the person

18  who got exceeds should get a higher raise?

19     A.   It's not based on what they write on the paper

20  because he had not been in my department.  Because if he

21  did, he would not have mixed up these two here.

22     Q.   So you would not agree with me that someone who

23  got a better rating on their review should get a higher

24  raise; you don't think that's right?

Rose M. Bailey

101

1    A.    If you are doing the work and you are very

2    seldom late, you are exceeding.  You are not just

3    meeting.  Meeting is someone who is not there on time,

4    don't show up, barely meeting.  I think, yes, anybody --

5    exceeds should have been all the way down my page.

6    Q.    So your real complaint is that you didn't get

7    exceeds expectations?

8    A.    No, no.  My real complaint is that if people --

9    if I'm going to be faithful for you and work all

10   weekends, Fridays, Saturdays and Sundays, and I asked

11   you to change it because my arm was getting ready to

12   hurt and one manager said, no, if I change it, who is

13   going to do your work?  Well, who do it on the days I'm

14   off?  Refuse to do it.  Then give me my $0.50 raise too.

15   Q.    Let me try this question another way.  Forget

16   what you got on your review and what you think you

17   should have got on your review.  You have two employees.

18   One gets meets expectations.  One gets exceeds

19   expectations.  Do you think the one that got exceeds

20   expectations should get a higher raise?

21   A.    Yes.  Because you are above and beyond, yes.

22   Q.    That's what I'm asking.  Do you have any other

23   evidence or facts that support your claim that non-black

24   employees received higher raises other than what you

Rose M. Bailey

102

1    just told me, these two ladies told you they got $0.50

2    and you didn't?

3        A.    I'm not a personnel officer.

4        Q.    So the answer is no?

5        A.    Read what they put in ECO.  She claimed they

6    were making the same thing that I was making, but I had

7    been there longer than them.

8        Q.    Miss Bailey, back to my question.  Do you have

9    any other facts or evidence that support your claim that

10   non-black employees received higher races than you?

11       A.    I had one person say that they didn't get what

12   they thought they were going to get.  And I said I did

13   not either.

14       Q.    Who was that person?

15       A.    I'm not naming the person.  I don't even -- they

16   had nicknames.  He had a nickname.  I forget his name.

17   He's no longer in the state.  No way.  He's no longer in

18   Delaware.

19       Q.    Miss Bailey, you are the plaintiff in this

20   lawsuit.  You brought this lawsuit.  You need to come

21   forth with evidence and facts that support your claims.

22   My question to you is:  What evidence and facts do you

23   have to support your claim?

24       A.    Ma'am, ECO said I could proceed on, the Equal

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

A192

Rose M. Bailey

103

1   Opportunity Office said I could proceed on -- it's not a

2   point of whether I win or lose.  It's the principle

3   behind taking one person's word and terminating someone.

4   That's the principle behind this.  It doesn't matter

5   about the dollars and cents.  It's a matter of equal

6   treatment, equal rights.

7       Q.    Okay.  But you are still not answering my

8   question, which is:  What other evidence and facts do

9   you have -- you have two claims as far as I can tell.

10  Correct me if I'm wrong.  Your two claims, as in your

11  EEOC complaint, are that non-black employees received

12  higher pay raises than you and, two, that you were

13  terminated in retaliation for having said that you were

14  going to report Cindy --

15      A.    Yes.

16      Q.    -- and also because you were black.  Is that

17  right?  Is that your claims?

18      A.    Well, they said in ECO, black.  Yes.  That could

19  be a claim, yes, yes.

20      Q.    So those are your claims.  So my question is for

21  your first claim that non-black employees received

22  higher pay raises than you, what other evidence and

23  facts do you have to support that claim?

24      A.    I have none.



Rose M. Bailey

104

1    Q.    That's my question.

2    A.    But the record speaks for itself.  That's

3    something that they would have to pull the records to

4    see who got what and based on race and color and issue,

5    which ECO probably gave you the copy of that.

6    Q.    Miss Bailey, at any time during your employment

7    with Wal-Mart, did you report to management or the 1-800

8    number or to anyone that you were being harassed or

9    discriminated against on the basis of your race?

10    A.    No.  Because I never spoke to anyone that asked

11    me why do I feel that way.  No.

12    Q.    Did you receive training from Wal-Mart on the

13    importance of reporting discrimination and harassment?

14    Did you receive the Open Door Policy?

15    A.    Open Door Policy about discrimination?

16    Q.    Just the Open Door Policy, you were aware of the

17    Open Door Policy?

18    A.    Whatever the Department of Labor put up there,

19    if you feel you have been discrimination, you know, what

20    I mean, but I don't remember that.

21                (Bailey Exhibit No. 3, Open Door

22    Communication, was marked for identification.)

23                THE WITNESS:  I might have.  It's been so

24    long.



Rose M. Bailey

105

BY MS. DILUZIO:

Q.   Miss Bailey, I just handed you a document that's been marked Exhibit 3.   It's three pages.   At the top it says open door communications.   Do you see that?

A.   Yes.

Q.   Is this a document you ever have seen before?

A.   No.   I don't remember this.   What is the date on here?   2004.   No.   No.

Q.   Were you aware that Wal-Mart had an Open Door Policy?

A.   We had the Open Door Policy when -- I think we had gotten it not previously before my incident. Previously.   It was something that went down and then they did start doing the grassroots where you go in and evaluate a manager.   When that first went down, no, we did not have open door communication.

Q.   But as of 2005, you knew there was an Open Door Policy, right?

A.   Yes.   It says any employee has any issues, you are to contact this number, 1-800, Open Door Policy, which I did contact them after my incident.   Yes, I did.

Q.   But before that, before your termination, you did not contact anyone under this policy, right?

A.   Right.



Rose M. Bailey

106

1    Q.    The first time you called anybody was after your

2    termination, right?

3    A.    I never had an incident like this.  Yes, that

4    was my first time calling them, yes.

5            (Bailey Exhibit No. 4, Discrimination and

6    Harassment Prevention Policy, was marked for

7    identification.)

8    BY MS. DILUZIO:

9    Q.    I'm handing you what's been marked as Exhibit 4,

10   Miss Bailey.  It's another three-page document.  At the

11   top it says Discrimination and Harassment Prevention

12   Policy.  Do you have that document in front of you?

13   Have you seen this document?

14   A.    It's saying June, 2005.  I was terminated May,

15   2005.

16   Q.    It says it was updated in June, 2005.  My

17   question is:  Did you ever see a Discrimination and

18   Harassment Prevention Policy while you were an employee

19   of Wal-Mart?

20   A.    It has it on the application or whatever.  But

21   this stuff here, no.  If you got a doctor saying I

22   signed, yes, I read it, then you are good.  But I don't

23   remember it.  No, I do not.

24   Q.    Did you receive an employee handbook?

Rose M. Bailey

1    A.   Yes, I do have a handbook, an older handbook,

2  yes.  This here went in effect -- probably before I was

3  terminated, we might have had something, discrimination,

4  something that came up on the CBL maybe.  Yes, I might

5  have signed a hire book.  But that doesn't account for

6  any incidents.  I said you got it.  I'm good to go.

7  Because I'm getting old here.

8            (Bailey Exhibit No. 5, Handbook

9  Acknowledgement, was marked for identification.)

10 BY MS. DILUZIO:

11   Q.   I just handed you what's been marked Exhibit 5.

12 It says handbook acknowledgement where it says read and

13 sign the acknowledgement.  And if you read the

14 paragraph, it details that you are receiving a Wal-Mart

15 handbook.  And then there is a date and signature at the

16 bottom.  Do you see that?

17   A.   Yes.

18   Q.   Is that your signature?

19   A.   Yes.  But that's Wal-Mart, 1999, you give the

20 people the handbook.  I had two, a new one and an old

21 one.  I started there 1999.  And everyone was given a

22 handbook in '99.

23   Q.   And did you receive a new handbook when this

24 document was signed in April of 2001?  Did you receive

Rose M. Bailey

1  another handbook then?

2    A.    We had got a new handbook dealing with the

3  insurance where you can join insurance.    Probably was in

4  2001.

5    Q.    Was that the most recent handbook you remember

6  getting was 2001?

7    A.    Yeah.  Because if you sign up for the insurance

8  program or something, they gave us brand new handbooks.

9    Q.    Could the Discrimination and Harassment

10  Prevention Policy had been in your handbook?

11    A.    I don't remember.  I never read that book.  The

12  only thing, health benefits.

13    Q.    I'm going to show you one more document.  Then

14  we are going to take a break.

15        (Bailey Exhibit No. 6, New Hire Orientation

16  Training Plan, was marked for identification.)

17  BY MS. DILUZIO:

18    Q.    Miss Bailey, you have just been handed what's

19  been marked Exhibit 6.  It's a two-page document.  It

20  says at the top New Higher Orientation Training Plan.

21  And it has the name Rose Pullium.  Is that your previous

22  name?

23    A.    Yes.

24    Q.    So that's you, correct?

Rose M. Bailey

109

1    A.    Yes.

2    Q.    Do you recognize this document?

3    A.    My Lord.  Ain't no date on it.  Who gave me this

4    and didn't even date it?  I don't remember nothing, no

5    dates.

6    Q.    So you don't recognize this document?

7    A.    No.  Good God.  Pullium, I have been divorced

8    years ago.

9    Q.    Do you remember having orientation training when

10   you first started with Wal-Mart?

11   A.    We had a brief one.

12   Q.    This document indicates that there were three

13   days, different trainings on each day.  You don't

14   remember that?

15   A.    I don't remember no three-day training.  It

16   could have been when we came in one day and -- we

17   probably did come in three days while they was training

18   us on how to do our duties.

19   Q.    Do you recall receiving the lesson that appears

20   here under day one where it says Wal-Mart culture

21   lesson, respect for the individual?  Do you remember

22   that?

23   A.    That's if I can --

24                 MS. DILUZIO:  Miss Bailey, we will go ahead

Rose M. Bailey

110

1    and take a break now.

2            THE WITNESS:  That's dealing with customer

3    service.

4            (Thereupon, a recess was had.)

5    BY MS. DILUZIO:

6        Q.    Back on the record.

7            Miss Bailey, before we took a break, we were

8    talking about this new hire orientation that you went

9    through.  And I believe your testimony was that you

10   seemed to recall having gone through new hire

11   orientation; is that right?

12       A.    Yes.

13       Q.    Do you recall -- I don't know if you have this

14   paper in front of you, Exhibit 6.  New Hire Orientation

15   Training Plan it says.

16       A.    Yes.

17       Q.    Do you recall having gone through, it looks like

18   under day one, it says Wal-Mart culture lesson, respect

19   for the individual.  Do you recall that training?

20       A.    Yes.

21       Q.    Do you recall, if you go down farther, it says

22   under the second heading pipeline and computer-based

23   learning.  Do you see that?

24       A.    Yes.

Rose M. Bailey

11:

1    Q.    Was there a lot of computer-based learning at

2    Wal-Mart?

3    A.    Yeah, CBL's.  Yes.

4    Q.    What did they usually revolve around?

5    A.    On how to handle safety issues, how to wear the

6    safety belts, and on our very last one was about

7    workplace violence in the workplace.

8    Q.    So these were, basically, training tools which

9    you would go sit on a computer and watch a video; is

10   that right?

11   A.    And we would receive a score.  If you got lower,

12   you had to go back and review the whole policy and then

13   take the test over again.

14   Q.    So you would watch a video and there would be a

15   test?

16   A.    Uh-huh.

17   Q.    So under here it says that there was a

18   computer-based training called three basic beliefs.  Do

19   you see that?

20   A.    Yes.

21   Q.    Do you recall that --

22   A.    Yes.

23   Q.    -- having that training on the three basic

24   beliefs?

Rose M. Bailey

112

1    A.    I forgot what the beliefs were.

2    Q.    That was my next question, if you recall.

3    A.    Asking the customers may I help you, something

4    like that.  I don't know exactly what it was.

5    Q.    Was one of the basic beliefs respect for people,

6    respect for the individual?

7    A.    Oh, yes, number one, respect for the individual,

8    yes.

9    Q.    If you look on the second page of that document

10   under day three, it looks like there was computer-based

11   learning on sexual harassment and inappropriate

12   behavior.  Do you see that?

13   A.    Yes.

14   Q.    Do you recall that kind of training?

15   A.    Yes.

16   Q.    In connection with that training, did the

17   training module talk about the Open Door Policy and

18   about reporting any discrimination or harassment?

19   A.    I don't remember about workplace harassment or

20   improper behavior because we took that -- you know how

21   often the company goes in and updates you, familiar you

22   again with you know --

23   Q.    Yes.

24   A.    He might have explained that to me and checked

Rose M. Bailey

113

1   it off.  This was done the same day we went there.  He

2   might have did that orally.  I don't know.

3       Q.   You were familiar with the concept that if you

4   experienced any discrimination in the workplace, you

5   could report that to management?

6       A.   Yes.  You feel you have been discriminated, you

7   have the right to report it to human resource

8   department, yes.

9       Q.   You allege in your charge of discrimination that

10  Cindy terminated four African-Americans.  I'm not sure

11  if that includes you or if that's in addition to you.

12  Do you recall that?

13      A.   Yes.

14      Q.   Who are those individuals you are referring to?

15      A.   It was them two girls that didn't have much

16  respect for themselves.  I don't know their names.  I

17  forgot their names.  And it was one guy and it was me.

18      Q.   So you are included in that four?

19      A.   Yes.

20      Q.   I think we already talked about Cindy was the

21  support manager, right?

22      A.   Yes.

23      Q.   Was she authorized to terminate people?

24      A.   A support manager can go in and tell a manager

Rose M. Bailey

114

1  we need to terminate this person because she did this

2  wrong, she was late coming back from lunch, she doesn't

3  follow the rules, yes.  But verbally I don't think she

4  can.  They usually leave that up to the assistant

5  manager or the manager.

6      Q.    So she could maybe report employees if they do

7  things wrong, but she wouldn't be making the ultimate

8  decision as far as understand?

9      A.    I don't know.  Because she used to say, well, we

10  need to terminate that person because they are never

11  here.  So and so is not here.  I'm doing this

12  department.  She'd go, well, we don't need her.  We need

13  to get them terminated.  Maybe she tells them and they

14  make the final decision.

15      Q.    But Cindy wasn't the one that terminated you;

16  she wasn't in the room?

17      A.    No, she didn't.  Clifford said that he made the

18  decision.  Am I allowed to ask a question?

19      Q.    What is your question?

20      A.    My question is, if he was allowed to make the

21  decision, he was supposed to terminate me that night

22  before I came back Wednesday.  They shouldn't have let

23  me work.  He walked past me and turned his head that

24  Wednesday instead of saying I will stay here and tell

Rose M. Bailey

1    her the reason why I want her terminated.  He never gave

2    an explanation.

3        Q.    Who told you that Clifford made the decision to

4    terminate you?

5        A.    He said it at the meeting in Philadelphia.  He

6    said he took me in the office, which he never took me in

7    the office.  I never been in the office.

8        Q.    Miss Bailey, after you left Wal-Mart, did you

9    get another part-time job?

10       A.    Yes.  I'm working part-time now at Kohl's.  I

11   just started.

12       Q.    You were terminated from Wal-Mart in May, '05.

13   Right after that, did you get something else?

14       A.    No.  Because I was sick.  I was back and forth

15   to the doctors.  I got sick.  I hadn't worked part-time

16   for two years.  I just started back.

17       Q.    You just started at Kohl's.  So between Wal-Mart

18   and Kohl's, there was no other part-time job?

19       A.    I worked seasonal for JC Penny for two months.

20   I needed Christmas money.  I was broke.

21       Q.    What Christmas was that, the one that just

22   passed?

23       A.    Uh-huh.  But I took a two-year break from

24   working part-time because I was still sick.

Rose M. Bailey

116

1    Q.    So you worked at JC Penny seasonal you said.    In

2    what capacity?

3    A.    That was from November to January.

4    Q.    And what was your position?

5    A.    Stockroom.

6    Q.    What was your salary with Penny's?

7    A.    I think it was $6.75 probably.    It might have

8    been 7.

9    Q.    And then you said you didn't do anything else

10    until just recently you started at Kohl's, right?

11    A.    Yes.    Christmas coming again.    I started again,

12    a part-time job.

13    Q.    When did you start at Kohl's?

14    A.    I started the middle of July I think.

15    Q.    Of '07, right?

16    A.    Yes.

17    Q.    And what is your position with Kohl's?

18    A.    I work in Mrs., juniors and boys.    I work the

19    fitting room.

20    Q.    And what is your salary with Kohl's?

21    A.    I think $7.    Should be going up in 30 days.    Oh,

22    I like working there.

23    Q.    You work evenings and weekends there?

24    A.    Every other weekend off.    If you work one

Rose M. Bailey

1  Saturday and Sunday, you are off Saturday and Sunday.

2    Q.   When you worked with Wal-Mart, did you have any

3  benefits as a part-time employee?

4    A.   Yes.  Towards the end I joined a dental

5  insurance.

6    Q.   Was that the only benefit you received?

7    A.   I participated in their stock program.

8    Q.   Was it some kind of employee stock ownership

9  program?

10    A.   Yes.

11    Q.   Anything else you can think of, medical

12  insurance?

13    A.   No.

14    Q.   Now with Kohl's, do you have any kind of

15  benefits in addition to your pay?

16    A.   No.  I never looked into their system yet and

17  their plans.

18    Q.   And the reason you didn't work part-time those

19  two years was you were just taking a break from

20  part-time employment; is that fair?

21    A.   Yes.

22    Q.   You continued to work your full-time job durin

23  that time with the state?

24    A.   Yes.  I needed a break.  My body was wearing

Rose M. Bailey

118

1    down.

2    Q.   Miss Bailey, when you filed your complaint in

3    this action with the district court, on the front page

4    of that you put a demand of $50,000.  Do you remember

5    doing that?

6    A.   Yes.

7    Q.   What is the basis of that number?

8    A.   I don't know.  I just wrote that.  There really

9    wasn't no -- my arm.  I was looking at something.

10   Damaged my arm.  No.

11   Q.   Miss Bailey, I sent you, in the mail, written

12   discovery, interrogatories and document requests.  Do

13   you recall receiving those?

14   A.   You sent me a package when?

15   Q.   They were originally sent August 13th, 2007.

16   A.   By FedEx.

17   Q.   By first class mail.

18   A.   You are the one that stopped at the post office?

19   Q.   I don't know.  I mailed you --

20   A.   Certified mail.

21   Q.   No, by first class mail I mailed the first set

22   of interrogatories and first set of document requests on

23   August 13th.

24   A.   Terrell?



Rose M. Bailey

119

1    Q.    Let me show them to you and let me know if you

2    have seen them before.

3    A.    Oh, no.

4    Q.    You don't recall receiving these?

5    A.    You sent it by these guys?

6    Q.    No, I just put it in the mail.

7    A.    When?

8    Q.    August 13th.  You don't recall receiving these?

9    A.    No.

10   Q.    Do you recall receiving my letter where I said

11   that you hadn't answered these?

12   A.    Yeah.  This boy cleaned up and found my mail.  I

13   got these two, a package.  Terrell, did I get this in

14   the mail?

15   Q.    Miss Bailey, I'm afraid I can't have you asking

16   your son questions on the record.

17          You don't recall seeing these?

18   A.    No.

19   Q.    These are document requests and interrogatories,

20   which are written questions that I sent to you on

21   August 13th that you are required to respond to in 30

22   days.  When you didn't respond in 30 days, I sent you a

23   letter.

24   A.    No, ma'am, I did not get this.  Because I

Rose M. Bailey

120

1    certainly would have talked to my sister.  We would have

2    discussed this.  Oh, no, no, no, no.

3        Q.   But you got my letter where I said you still

4    haven't responded to my discovery?

5        A.   Got the FedEx mail, yes, I did.

6        Q.   And you didn't wonder what that was talking

7    about?

8        A.   Oh, so this is -- I was telling my son, I don't

9    know what that lady wants from me because I don't know

10   what she's talking about.  So you sent me this in the

11   mail?

12       Q.   I sent you both of these in the mail.

13       A.   Oh, I would remember.  I got a person going in

14   my mailbox.  This kind of stuff should be actually

15   certified to me.  If you can certify one of these little

16   thin pieces of paper, this should have been certified to

17   me to make sure I got it in my hand because I don't go

18   to my box.

19       Q.   Okay.  Can you hand that back to me?  I will

20   make sure you have them when you leave today.  I will

21   make you copies.

22       A.   August 13th, I would have went home and three or

23   four times we would have been over that piece of paper.

24   We would have been prepared.

1    Q.   I would appreciate it if I send these home with

2  you today if you attempt to answer them.  Let me ask a

3  few questions that are in these requests.

4              You mention that you had a file of documents

5  related to this case; is that correct?  At home, do you

6  have papers related to this case?

7    A.   Yes.  Federal court sent me procedures and all

8  that, yes.

9    Q.   In addition to that, any papers that you had

10  from the EEOC, do you have papers from the EEOC?

11    A.   Yes.

12    Q.   Do you have other documentation that you held

13  onto in connection with this lawsuit?

14    A.   Oh, when they were accusing me of hearsay stuff

15  about not knowing my job duties.  I even took pictures

16  when I came back from vacation while the store was

17  upsidedown because I wasn't there.  I guess I still got

18  those pictures if they didn't fade in my car pocket.

19    Q.   Have you interviewed any potential witnesses?

20    A.   Who is a potential witness.

21    Q.   Anybody that you intend to call that will

22  support your claims in this litigation.

23    A.   No, I'm not using no witness.

24    Q.   You are not using any witnesses?

Rose M. Bailey

122

1    A.    Half of them is gone.  And I don't know.  A

2  couple people are probably deceased.  I don't know.

3    Q.    So even before this lawsuit, back when you were,

4  before you were before the EEOC with your charge of

5  discrimination, at that point, did you have individuals

6  who you identified as witnesses for your claims that

7  would support your claims?

8    A.    I might have.

9    Q.    Do you recall who they were?

10    A.    No.  Because I'm not involved with nobody.  I

11  might have said somebody.  But, no, I'm not involved

12  with anyone.  It's just me, my own witness.

13    Q.    So you don't have any statements or any notes or

14  anything from anybody else at Wal-Mart that will support

15  your claims?

16    A.    No.

17    Q.    Did you keep, while you were employed at

18  Wal-Mart or right around the time of your termination,

19  did you keep any diary or calendar, journal?  Did you

20  write things down about what was happening at work?

21    A.    Oh, yes.

22    Q.    Do you have those records?

23    A.    Yes.  If someone didn't throw my stuff in the

24  basement, yes.

1   Q.   All these things I'm asking you about, if you

2   have documents, if the answer is yes, you have a duty to

3   give me copies of those documents.  So I'm going to send

4   this home with you today so you can read it through and

5   see what the list is.  But the rules of evidence, the

6   rules of the district court outline that you need to

7   produce or give to me copies of any documents that you

8   have that could be supporting your claims.  So if you

9   kept a journal, kept notes, whatever you kept that would

10  support your claims, that's the kind of thing you need

11  to give me copies of.  Okay?

12  A.   Claims against --

13  Q.   Wal-Mart.

14  A.   Okay.  I don't really have no claims against

15  them as far as someone pushing a cart in me, no.  I can

16  answer that question right now.  But I don't know that

17  day when Pearl jumped me, I might have did a note on

18  that.  I might have done that note.  I might have

19  documentations on that.

20  Q.   Do you have any E-mails or any records of your

21  speaking with someone at Wal-Mart about the allegations

22  in the complaint in the charge?

23  A.   No.  No.  No.  Wal-Mart associates, when I'm

24  their side of the store, no.

Rose M. Bailey

124

1  Q.   Have you kept your Wal-Mart handbook or any

2  other documents, policy kind of manuals that you got

3  from Wal-Mart?

4  A.   I might have one.  I might have one of them.

5  Two years, I got my five-year award.  I might have

6  trashed that five-year.

7  Q.   If you do have any of that, again, that's

8  something you will need to give me copies of.  And I

9  think you said earlier you didn't get copies of your

10  performance reviews; is that right?

11  A.   When the ECO wanted those documents, I faxed it

12  to Michelle.  Faxed it to her.  I only know what I did

13  with that paper.  I said, please, send me a copy of my

14  evaluation.  I need it.  It's very important.  She

15  refused to respond back to me.  Even when I worked in

16  the store, I would say give me that so next year I could

17  improve.  No, they don't give you copies.

18  Q.   So you did not have copies of your performance

19  reviews?

20  A.   Never.

21  Q.   And you still don't.  Okay.  Did you get a copy

22  of that exit interview when you were terminated from

23  Wal-Mart, that exit interview that we looked at?

24  A.   Yes.



WILCOX & FETZER LTD.
Registered Professional Reporters

A214

Rose M. Bailey

125

1    Q.    Did you get any other papers when you were

2    terminated?

3    A.    No.

4    Q.    Did you make any records with regard to the

5    phone call that you made to the 1-800 number?

6    A.    I might have wrote all the numbers and the date

7    and time on that paper she gave me with Ron somebody's

8    name.  If I can find the paper, yes, I might have that.

9    No guarantee I can find it.  I might have trashed it by

10   now.

11   Q.    It's important that you conduct a diligent

12   search for any of those documents and provide me copies

13   if you have them.

14            Did you file for unemployment after you were

15   terminated from Wal-Mart?

16   A.    Oh, no.  I work.

17   Q.    Right.

18   A.    No.  That's because Wal-Mart I worked part-time.

19   Because I got divorced and the state don't pay me

20   enough.  So I had to get a part-time job.

21   Q.    You will have these to take with you that

22   outlines all the documents that I want you to make a

23   search for in case you have them.

24            Do you intend to call any expert witnesses

Rose M. Bailey

126

1   to support your claims?

2       A.   No.

3       Q.   And you said no fact witnesses either, you don't

4   have any individuals who you want to call to support

5   your claims?

6       A.   There wasn't nobody around really, no one but me

7   and the three.  Me, the two, him and her, me.

8       Q.   I asked you about your first claim with regard

9   to the pay raises.  I'm going to ask you about your

10  second claim.  Do you have any other facts to support

11  your allegation that you were terminated because of your

12  race?

13      A.   No.  Is age on there also?

14      Q.   No, it is not.  It says race and retaliation.

15      A.   When I got the paperback, it says Jennifer was

16  the same age, the store manager.  It couldn't be based

17  on age because she was the same age as I was.  Age was

18  mentioned there in that first procedure.

19      Q.   On your charges of discrimination with the EEOC,

20  you did not mention age at all.  You mentioned race and

21  retaliation.  So that is the limit of your claims here

22  in this lawsuit.  You have three paragraphs in your

23  charge.  Discrimination, the first one, we talked about,

24  which is the pay increase issue.  The second one is your

Rose M. Bailey

127

1    belief that you were terminated because of your race.  I

2    believe you just answered my question.  What evidence do

3    you have to support that claim that you were terminated

4    based on your race?

5        A.    Based on the treatments toward Afro-Americans is

6    my belief.  And, number two, I think the lady said based

7    on my color, age, age was mentioned.  And they said that

8    Jennifer Lawrence was the same age as I am.  She is not

9    my age.  I am 52 years old.  Jennifer cannot be 52 years

10   old.

11       Q.    Back to your charge of discrimination,

12   Miss Bailey, you also claim that you were terminated

13   from Wal-Mart in retaliation for having informed Cindy

14   that you intended to report her for harassment.  So my

15   question is:  What facts do you have to support that

16   claim?

17       A.    That I told her that?

18       Q.    That that's the reason you were terminated.

19       A.    Yes.  It wasn't because of work.  It was because

20   of me speaking out to her or telling her that I'm going

21   to report her.  And she did not want that to be reported

22   to the main office because she's trying to move up the

23   ladder.

24                 Which I don't think, insubordinate, I have a

Rose M. Bailey

128

1  right to walk up to a supervisor and say I don't like
2  what you are doing.  I think I need to report you to the
3  human resource office so we can find out why you are
4  doing this.  I think -- yes, yes, yes, yes, yes, I told
5  her that.  Yes, I did, because I'm no kid.  I think they
6  thought I was 30 something.  No, actually I was 50.  I
7  might look young for my age.  But when someone is much
8  younger than me, they should respect older people.  Yes,
9  I think she discriminated against me because maybe she
10  liked somebody in the store.  Maybe she thought the
11  person liked me.  Yes, she was harassing me.  Yes, she
12  was.
13      Q.   What evidence do you have that that was based on
14  your race?
15      A.   Based on my race because I'm a black lady and
16  she's a white lady.  And that's all she talked about was
17  getting rid of us, never the other loafers, but always
18  us.  Some people look at dark as being evil.  I don't
19  know what her situation was.  I heard that said of
20  people of my color that were in my presence, yes, yes.
21      Q.   So you heard her say with regard to three other
22  employees who were of color that she thought they were
23  not good employees?
24      A.   They need to be terminated.  We don't need her.

Rose M. Bailey

129

1   They don't want to work.  We need to get rid of her.  I

2   said, uh-huh, maybe I need to get you out of the store

3   so they can run smoothly.

4      Q.    You never heard her make such claims about white

5   employees?

6      A.    No, no, no.

7      Q.    And in her direct dealings with you, we talked

8   about the April 29th incident and then we talked about

9   the May 2nd incident.  Were there any other incidents

10  between you and Cindy that you haven't told me about?

11     A.    No.  Because I didn't talk to Cindy.  I always

12  told -- I seen her in the parking lot one time.  And it

13  never occurred -- how are you going to be a leader if

14  you are in the parking lot?  You can't be no leader of

15  nobody.  Find out what was going on in the store and

16  then you come back and tell Merl and then you are out in

17  the parking lot with the girls hanging out, getting

18  information.  No.  I was the last person to leave the

19  store.  I always knew what was going on, who was out

20  there smoking.  She's out there smoking with Clifford

21  between the soda machine at nighttime.  I don't know

22  about her.

23              She should not have been in leadership

24  whatsoever in the store.  She's no leader.  To be a

Rose M. Bailey

130

1   leader, you segregate yourself from people. You don't

2   go to the parking lot with the bunch and asking the man,

3   can I entertain, night cup of coffee? No, she was not a

4   leader. To be a leader, you show me some respect. How

5   are you going to come jump on me, demand me to do

6   something when I caught you in action? No, you cannot

7   be a leader. You was only leading because you was going

8   out finding out what was going and going back and

9   reporting. And they were thanking you and then they

10  promote you. No. Cindy didn't probably care for me

11  because, number one, I did my work. I didn't associate

12  with people.

13          And another incident happened where she was

14  like a taxi or something. The night she didn't work,

15  she would come pick up people and give them rides home.

16  She didn't have a license. She wasn't a taxi. This

17  particular night it was this guy, his wife also worked

18  for the state. And he -- I don't know whether she was

19  charging him money or what. But, anyway, he said,

20  Sister Rose, can I catch a ride home with you? I said

21  who's been giving you a ride? He said Cindy but I ain't

22  riding with Cindy tonight. I said, sure, I will drop

23  you off. And she's sitting there waiting for all these

24  people like she's a migrant picking up her workers. But

Rose M. Bailey

131

1    she was off duty.

2              And she might have got mad because the guy

3    wouldn't ride with her that night.  So the guy said,

4    Miss Rose, give me a ride.  So I had, sure, I will give

5    you a ride.  I know his wife and everything.  Well, that

6    was cutting her pocket short that night.  And I think

7    she got kind of mad at me about that.  She was hot I cut

8    into her money.

9       Q.   When was that?

10      A.   That was just before this incident happened.

11   And I said, oh, maybe I shouldn't have gave that guy a

12   ride home because ever since then she was acting kind of

13   weird.  But then, again, I give who I want a ride home.

14   But that was -- she was charging people.  I don't know

15   whether the company was paying or what.  But on your

16   night off, why are you picking up people?  Be home in

17   bed.

18      Q.   Miss Bailey, just one last question.  I think I

19   asked this, but I want to be clear.  Do you have any

20   other facts or evidence that we haven't talked about to

21   support your claim that your termination was based on

22   your race or was in retaliation for your having told

23   Cindy you were going to report her?

24      A.   That evaluation, when she said in the evaluation

Rose M. Bailey

132

1   there would be retaliation.  I don't know whether they

2   told her, to put her up to make me work because of what

3   I wrote on that paper based on Brian.  Yes, it could

4   have been a setup for her to keep harassing me.  Because

5   of the previous things, she goes that person did this

6   and that, this and that.  I'll make sure they do this.

7   I'll make sure they do that.  Yes.

8            And right today, I don't know why they

9   called her in on that evaluation.  That was between me

10  and the person that wrote up the evaluation.  And she

11  said nothing to do with that.  Why did they have her in

12  there?  I double backed behind and listened to them.

13  Don't think when I walked out your door I ain't gone to

14  come and stand and hear what you were saying.  I ain't

15  stupid.  I heard what Brian was saying.

16     Q.    What did he say?

17     A.    She don't need to be working here.  I don't like

18  her.  She's militant.  She's got an answer for

19  everything.  I will get her.  I will get her.  You never

20  know -- because you close your door doesn't mean I'm not

21  going to stand there and see what your reactions are.

22     Q.    Your review in April was before the incidents

23  with Cindy, right?

24     A.    But you got to realize, I'm not there sometimes.

Rose M. Bailey

133

1    I was out of the store.  When I come back -- okay.

2    April 29th.  When was my evaluation?  April 23rd.

3       Q.    Uh-huh.

4       A.    One night she told me -- Malva was working in

5    the department, my department manager.  When she's doing

6    her work, I don't get in her way.  So I go up front and

7    help the people on dayshift put the cartons away.  She

8    saw me help the people.  So she comes by goes there is

9    35 more cartons back there.  I said, no, there shouldn't

10   be no cartons because I helped them to put them away.

11   Well, there is some back there.  Go back there and get

12   them.  I said, there ain't no cartons back there.

13              Every night she started some stuff.  So I

14   told them I think I will transfer to another store and

15   they will appreciate me.  And she said in the meeting,

16   after the meeting she come out with her smart mouth, why

17   do you think you are going to another store?  I don't

18   think so.  Why, that's harassing me.  She's done so much

19   stuff towards me.  Miss Rose wasn't feeling good, 50

20   years old, letting a probably 39, 40-year-old woman

21   abuse her verbally.  It kept right on, kept right on,

22   kept right on.  I even told Clifford because she said in

23   my evaluation does not give her the right to continue to

24   harass me.  It does not.

1    Q.    When did you tell him that?

2    A.    When I turned around and said I'm going back to

3    my department and do my work, but let me tell you one

4    thing, she has no right to harass me.  Because they had

5    her in on my interview.  I know what was said.  And I

6    went on back to my department.

7    Q.    That was on May 2nd?

8    A.    Yes.  He never took me in the office.  I told

9    him because she sat in there.  He goes evaluation?

10   That's a yes.  Ask her what happened.  So she might have

11   told him.  That's when he made his decision.  I don't

12   know.  But I said, yes, she sat in on my evaluation.

13   She's going to continue to harass me?  No, she's not

14   because I'm going to take care of it tonight.  Tomorrow

15   I will be taking care of this.

16            MS. DILUZIO:  Miss Bailey, I have no further

17   questions at this time.  As I said, I'm going to send

18   these written discovery requests home with you so you

19   can look at and attempt to answer.  And the court

20   reporter will have a transcript of these proceedings,

21   which is verbatim of everything we said to the best she

22   could take it down, and you will have an opportunity to

23   look that over.

24            THE WITNESS:  Okay.



135

1              (Thereupon, the deposition concluded at

2    2:00 p.m.)

3                    - - - - -

4              INDEX TO TESTIMONY

5
ROSE BAILEY                                          PAGE
6
     Examination by Ms. DiLuzio                       2
7
                    - - - - -
8
              INDEX TO EXHIBITS
9
BAILEY DEPOSITION EXHIBIT NO.                       PAGE
10
     Bailey Exhibit No. 1, Exit Interview            57
11   Bailey Exhibit No. 2, Performance Appraisal     79
     Bailey Exhibit No. 3, Open Door Communication   104
12   Bailey Exhibit No. 4, Discrimination and        106
     Harassment Prevention Policy
13   Bailey Exhibit No. 5, Handbook                   107
     Acknowledgement
14   Bailey Exhibit No. 6, New Hire Orientation       108
     Training Plan
15

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6

7

8           REPLACE THIS PAGE

9

10          WITH THE ERRATA SHEET

11

12          AFTER IT HAS BEEN

13

14          COMPLETED AND SIGNED

15

16          BY THE DEPONENT.

17

18

19

20

21

22

23

24

State of Delaware )
                 )
New Castle County )

### CERTIFICATE OF REPORTER

I, Anne L. Adams, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 11th day of October, 2007, the deponent herein, ROSE M. BAILEY, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.





Anne L. Adams

Certification No. 105-RPR

(Expires January 31, 2008)



## EXIT INTERVIEW

WMP-20 Revised 04/03
An Exit Interview is to be conducted for all Associates leaving the employment of Wal★Mart Stores, Inc. DATE OF TERMINATION MUST BE THE LAST DAY WORKED, EXCEPT IN CASES OF A LEAVE OF ABSENCE, SUSPENSION, OR 3 DAYS UNREPORTED ABSENCE.

Social Security No. _219 62 8 332_

Associate Name _ROSE BAILEY_                    Facility/Dept./Store # _2555_    ☑ Hourly  ☐ Management

Associate ID No. _____                          Vacation Avail (Mgmt. Only) _55.02_

Actual Last day Worked _5/4/05_

Updated Address and Phone Number: _612 CANDLESTICK LANE, NEWARK DE_

Detailed Statement of Termination. This Section Needs To Be Completed By The Associate for Voluntary Termination or By The Manager/Supervisor for Involuntary Termination. (Please be specific.)

| VOLUNTARY TERMINATION (Eligible to re-apply) | | INVOLUNTARY TERMINATION (Eligible to re-apply) | |
|---|---|---|---|
| 03 ___ | Not Available For Work (NVL) | 37 ___ | Misconduct w/Coachings (CON) |
| 04 ___ | Failure to Return From L.O.A. (NRL) | 47 ___ | Excessive Absences and/or Tardies (EAT) |
| 05 ___ | Refused Offer of Work (ROW) | 53 _✓_ | Insubordination (INS) |
| 06 ___ | Job Abandonment/Three Days Unreported Absence (DUA) | 55 ___ | Inability to Perform Job (IPJ) |
| 10 ___ | To Leave the Area (LTA) | 66 ___ | 1st Violation of Fraternization Policy (FVP) |
| 16 ___ | Child Care/Dependent Care Issues (CHI) | 72 ___ | Unintentional Violation of Corporate HIPAA* Privacy Policy (UVH) *Health Insurance Portability and Accountability Act |
| 17 ___ | Due to Health (DTH) | 75 ___ | Deceased (Call Profit Sharing & Life Ins.) (DEA) |
| 20 ___ | Work Hours (HRS) | 92 ___ | Lack of Work (Job Eliminated, Location Closed, Reduction in Force) (LOW) |
| 21 ___ | Salary (PAY) | 97 ___ | End of Temporary Assignment (ASC) |
| 22 ___ | Working Conditions (WOR) | | |

| VOLUNTARY (cont.) | | INVOLUNTARY TERMINATION (Mandatory No Rehire) | |
|---|---|---|---|
| 24 ___ | Benefits (BEN) | | |
| 25 ___ | Career Opportunities (PRM) | 77 ___ | Intentional Violation of Corporate HIPAA* Privacy Policy (IVH) *Health Insurance Portability and Accountability Act |
| 28 ___ | Supervisor (SUP) | | |
| 29 ___ | Walked Off Job (WOJ) | 78 ___ | Gross Misconduct - Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets) (GMI) |
| 30 ___ | Stay at Home (SAH) | | |
| 31 ___ | Attend School (EDU) | 79 ___ | Gross Misconduct - Other (GMO) |
| 85 ___ | Retirement (RTD) | 99 ___ | 2nd Violation of Fraternization Policy (FRA) |
| 106 ___ | Failure to Produce Employment Documents in a Timely Manner (FTP) | 107 ___ | Falsification of Employment Documents (FED) |

Re-Hire Recommended ☐ Yes  ☑ No (Explain-General Comments) _____

The following Wal★Mart property must be collected at the time of Exit Interview: (Please check all that apply)
(✓) Badge    (✓) Discount Card(s)    ( ) Weight Belt    ( ) Other _____
(✓) Smock    ( ) Company Credit Cards/Phone card    ( ) Box Cutter

NOTE:  To be considered for re-employment, you must re-apply. Your previous work record with Wal★Mart will be reviewed. The Company assumes n obligation to contact you for possible re-employment. Where state law allows, a Neutral Reference will be provided to external employers seekin information regarding your employment with Wal★Mart Stores, Inc. Dates of employment and last position held is the only information that wi be released.

_Refused to sign 5/4/05_
ASSOCIATE _____ DATE

_____ _Fields_ _5-4-05_
HOURLY SUPERVISOR _____ DATE

_Jennifer Lawrence_ _5/4/05_
SALARIED MEMBER OF MANAGEMENT _____ DATE

_____ _5/4/05_
FACILITY MANAGER _____ DATE

A230

DEPOSITION EXHIBIT
Bailey 1
10/11/07  Ospa

# EXIT INTERVIEW

WMP-20 Revised 04/03
An Exit Interview is to be conducted for all Associates leaving the employment of Wal★Mart Stores, Inc. DATE OF TERMINATION MUST BE THE LAST DAY WORKED, EXCEPT IN CASES OF A LEAVE OF ABSENCE, SUSPENSION, OR 3 DAYS UNREPORTED ABSENCE.

Associate Name _Rose Bailey_                          Social Security No. _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_

Associate ID No. _____  Facility/Dept./Store # _2555_  ☑ Hourly  ☐ Management   55.02

Actual Last day Worked _5/4/05_                     Vacation Avail (Mgmt. Only) _____

Updated Address and Phone Number: _612 CANDLESTICK LANE, NEWARK DE_

Detailed Statement of Termination. This Section Needs To Be Completed By The Associate for Voluntary Termination or By The Manager/Supervisor for Involuntary Termination. (Please be specific.)

---

| VOLUNTARY TERMINATION (Eligible to re-apply) | | INVOLUNTARY TERMINATION (Eligible to re-apply) | |
|---|---|---|---|
| 03 ___ Not Available For Work (NVL) | | 37 ___ Misconduct w/Coachings (CON) | |
| 04 ___ Failure to Return From L.O.A. (NRL) | | 47 ___ Excessive Absences and/or Tardies (EAT) | |
| 05 ___ Refused Offer of Work (ROW) | | 53 ✓ Insubordination (INS) | |
| 06 ___ Job Abandonment/Three Days Unreported Absence (DUA) | | 55 ___ Inability to Perform Job (IPJ) | |
| 10 ___ To Leave the Area (LTA) | | 66 ___ 1st Violation of Fraternization Policy (FVP) | |
| 16 ___ Child Care/Dependent Care Issues (CHI) | | 72 ___ Unintentional Violation of Corporate HIPAA* Privacy Policy (UVH) *Health Insurance Portability and Accountability Act | |
| 17 ___ Due to Health (DTH) | | 75 ___ Deceased (Call Profit Sharing & Life Ins.) (DEA) | |
| 20 ___ Work Hours (HRS) | | 92 ___ Lack of Work (Job Eliminated, Location | |
| 21 ___ Salary (PAY) | | Closed, Reduction in Force) (LOW) | |
| 22 ___ Working Conditions (WOR) | | 97 ___ End of Temporary Assignment (ASC) | |

| | | INVOLUNTARY TERMINATION (Mandatory No Rehire) | |
|---|---|---|---|
| 24 ___ Benefits (BEN) | | | |
| 25 ___ Career Opportunities (PRM) | | 77 ___ Intentional Violation of Corporate HIPAA* Privacy Policy (IVH) *Health Insurance Portability and Accountability Act | |
| 28 ___ Supervisor (SUP) | | | |
| 29 ___ Walked Off Job (WOJ) | | 78 ___ Gross Misconduct - Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets) (GMI) | |
| 30 ___ Stay at Home (SAH) | | | |
| 31 ___ Attend School (EDU) | | 79 ___ Gross Misconduct - Other (GMO) | |
| 85 ___ Retirement (RTD) | | 99 ___ 2nd Violation of Fraternization Policy (FRA) | |
| 106 ___ Failure to Produce Employment Documents in a Timely Manner (FTP) | | 107 ___ Falsification of Employment Documents (FED) | |

Re-Hire Recommended ☐ Yes  ☑ No (Explain-General Comments) _____

---

The following Wal★Mart property must be collected at the time of Exit Interview: (Please check all that apply)
(✓) Badge      (✓) Discount Card(s)     ( ) Weight Belt        ( ) Other _____
(✓) Smock      ( ) Company Credit Cards/Phone card   ( ) Box Cutter

NOTE:  To be considered for re-employment, you must re-apply. Your previous work record with Wal★Mart will be reviewed. The Company assumes no obligation to contact you for possible re-employment. Where state law allows, a Neutral Reference will be provided to external employers seeking information regarding your employment with Wal-Mart Stores, Inc. Dates of employment and last position held is the only information that will be released.

_Refused to sign 5/4/05_                              _[signature] Lawrence_  _5/4/05_
ASSOCIATE _____ DATE               SALARIED MEMBER OF MANAGEMENT   DATE

_[signature] Fields_  _5-4-05_                        _[signature]_  _5/4/05_
HOURLY SUPERVISOR _____ DATE               FACILITY MANAGER            DATE

A232

DEPOSITION EXHIBIT
Bailey 1
10/11/07  asa
PENGAD 800-631-6989

A233

# Performance Appraisal
## Salesfloor Associate



Practices 10-Foot Rule.

Follows Dress Code Policy.

Assists Customers in finding merchandise.

~~Shows sense of urgency with all assignments.~~

Follows proper procedures for handling claims merchandise.

**Softlines/Apparel** – Is knowledgeable about:

Sizing and colorizing.

Hanging softlines.

Rack rules.

Fitting room procedures.

**Hardlines** – Is knowledgeable about:

Cutting keys.

Cutting chain

Cutting fabric.

Mixing paint

Live pet department.

Zones the department.

Maintains features.

Follows proper procedures for:

Ordering.

Markups/markdowns.

Signing/flagging/pricing/labels.

Promptly get returns from Courtesy Desk.

Maintains all risers properly

Follows all safety/emergency policies and procedures.

Properly uses ladders and ensures they are not left on the salesfloor.

Ensures stable stacking of merchandise.

Follows proper lifting techniques.

Ensures all displays are secured in a safe and proper manner.

Attendance and punctuality is within acceptable Company guidelines.
Days Absent: **3**   Days Tardy: **5**

Current on CBLs    Company Goal: 100%    Associate Current % **100%**



A234

| Name: Rose Bailey | Store# 2555 | Position: Salesfloor Associate |
|---|---|---|
| SS# | | Current Pay Rate: |
| Review Period: Yearly | | Increase Amount: |
| From: 2004 | To: 2005 | New Pay Rate: 10.75/hr |

5/21/05

☐ 90 Day          ☑ Annual          ☐ Follow Up

## STRENGTHS

Customer Service          Zoning
Knowledgeable             Returns
Works well in Various Areas

## AREAS FOR IMPROVEMENT

3/05  Back Rules — trained by assistant mgt one or 5 years ago
Telxon Experience — trained by assist mgt

...here
...next stock rules  RB

## ASSOCIATES COMMENTS / GOAL SETTINGS

I am the only associate in dept 33
that you [?] said how came you
say that I didn't know that rule - you either go
clockwise or counterwise when seeing
light color to dark color when coloring.

☐ EXCEEDS EXPECTATIONS    ☑ MEETS EXPECTATIONS    ☐ BELOW EXPECTATIONS

## SIGNATURES:

| Associate's Signature | Print Associate's Name | Date |
|---|---|---|
| | Rose Bailey | 4/20/05 |
| Hourly Supervisor Signature | Print Hourly Supervisor Name | Date |
| | BRIAN W. HENDRICKS | 4/19/05 |
| Salaried Manager's Signature | Print Salaried Manager's Name | Date |
| | Myra Cochran | 4/19/05 |
| Facility Manager's Signature | Print Facility Manager's Name | Date |

A236

**Wal-Mart®
Corporate
Policy**

# Open Door Communications



**Policy**

**Number: PD-27**

**Revised:05/01/04**

All Associates (salaried and hourly) may have Open Door discussions concerning all matters pertaining to Wal-Mart. The purpose of the Open Door is to bring your suggestions, observations, problems, or concerns regarding the Company or yourself to the attention of any supervisor or salaried member of management.

We foster a work environment that welcomes early identification of challenges or problems and mutual resolution of complaints. Open communication is important to meeting the needs of Associates and Customers and is welcomed by all Wal-Mart supervisors or salaried members of management.

The door is open to anyone who chooses to telephone or talk face to face with any level of supervision in our Company. Associates are encouraged to exercise the Open Door during their normal work hours. All issues discussed will be treated confidentially and impartially. Every Associate (salaried and hourly) is assured that each issue, concern or suggestion will be given priority consideration and addressed in a manner best suited to resolve the matter satisfactorily.

**Applies To**

All current and former regular, temporary, full time, peak time, hourly and salaried Associates.

**Eligibility**

- **Subject:** Anything related to Wal-Mart is a fair subject to raise through the Open Door process. Scheduling conflicts, pay, treatment, promotional opportunities, relocation, termination, concerns about another Associate's conduct, etc. may be discussed openly.

  In addition, it is important also to discuss ideas about how to improve customer service or other operating efficiencies. The Open Door is available not only for concerns, but it also is available for ideas and suggestions as well.

- **Individual:** Every Associate has the opportunity to discuss any matter of concern to him or her and to receive assistance resolving the issue. Both hourly and salaried Associates have the same right of access and are treated consistently under this policy.

**Notice**

Associates will be advised of the Open Door communication process initially during orientation. On-going discussions reinforcing the availability of the Open Door will occur at regular intervals (i.e., weekly group or staff meetings).

Posters informing Associates about Open Door communication will be prominently displayed throughout every Wal-Mart facility.

**Access**

In using the Open Door, faster resolution may occur when the Associate goes through the immediate supervisor first. However, if the Associate feels the supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, the Associate may proceed as outlined below:

• An Associate may contact the next level of supervision or any other supervisor or salaried member of management, up to and including Senior Management. No formal "chain of command" need be followed.

A238

1

2

3

• An Associate who wishes to call the Home Office may contact his or her Regional Personnel Manager, People Director, or any level of supervision or management they choose.

## Addressing

Concerns, comments, complaints, etc. raised through the Open Door will be treated with confidentiality and respect. Specific information concerning the matter **may not** be disclosed to anyone not directly involved in resolving the issue. Only those having a need to know may be made aware of, or consulted about, the situation.

Wal-Mart will investigate Open Door issues in a timely manner. A thorough investigation is required to determine the facts surrounding the issue or concern raised. This should be done by an individual not alleged to be a part of the Open Door issue or concern, preferably a salaried member of management.

A decision will be made on the basis of the investigation results and appropriate action will be taken, if necessary, to resolve the issue raised.

The resolution of the Open Door occurs when the supervisor or salaried member of management communicates to the Associate raising the concern the answer or that appropriate disciplinary action has been taken regarding the issue brought forth.

## Supervisory Expectations

Any supervisor or salaried member of management who:

• Fails to investigate and take action in a timely manner; or
• Discloses confidential information pertaining to the issue raised or the result to anyone not having a need to know; or
• Retaliates or causes an Associate to be retaliated against for using the Open Door process; or
• Suppresses the Open Door

**has engaged in misconduct that may result in disciplinary action up to and including termination.**

The supervisor or salaried member of management is to thank the Associate for bringing the concern or idea forward. The Associate should be assured the concern or idea will be looked into in a timely manner and given an approximate time to expect resolution.

After an Open Door issue has been resolved, it is the supervisor's or salaried member of management's responsibility to follow-up with the Associate. The supervisor or salaried member of management should ensure the Associate understands how and why the resolution was determined. If the Associate still has unresolved concerns, the Associate should be directed to the next level of supervision.

Wal-Mart will take no adverse action against any Associate based solely on the Associate's participation or lack of participation in any Open Door activity.

## Compensation

Wal-Mart will pay wages to an Associate for time that the Associate spends on Open Door activities during the Associate's shift.

Although Associates are encouraged to use the Open Door during the Associate's normal working hours, if an Associate chooses to exercise the Open Door after the Associate's working hours, through conversations with a supervisor or salaried members of management, Wal-Mart supervisors/managers must listen to after hours Open Door communications only long enough to determine whether it is appropriate to continue the communication or defer the communication to normal work hours. If the supervisor or salaried member of management continues the communication, Wal-Mart will pay wages

to the Associate for the entire time that they spend in the communication. If the supervisor/manager defers the communication to normal work hours, Wal-Mart will not pay any wages to the Associate for the after hours Open Door communication.

Wal-Mart will not pay wages to, or otherwise compensate, persons no longer employed by Wal-Mart for Open Door activities. Wal-Mart will not pay wages to, or otherwise compensate, Associates for time spent by the Associate after hours to prepare written communication (e.g., letters or e-mails), unless a salaried member of management has directed the Associate to prepare the written communication after the Associate's normal working hours.

Associates who voluntarily travel to an alternate location for an Open Door discussion (e.g., District Office, Regional Office, Home Office, etc.) will not be compensated for travel time, unless the Associate is expressly authorized to travel to such location by a salaried member of management.

**Note: Only a salaried member of management has the authority to direct or authorize written communication or travel for Open Door Purposes.**

The supervisor or salaried member of management who participates in the after hours Open Door discussion will immediately complete a time adjustment slip to compensate the Associate for compensable after hours Open Door activities.

**Resources**

| Printed Materials: | WMP-25 - Wal-Mart Associate Guide<br>Open Door Poster |
|---|---|
| Online Resources: | Supervisor/Management Procedures for Handling After Hours Open Door Activities |
| Personal Contacts: | Immediate Supervisor<br>Facility Manager<br>District Manager/Director of Operations<br>Regional Personnel Managers |

All Material Wal-Mart Stores Inc. Confidential. © 2003.

A242

**All Material Wal-Mart Confidential. ©2005**

ed By: Lindsay Boutilier          Page Source: The WIRE          Date Printed: Thu Sep 15 12:12:20 CDT 2005

## Discrimination & Harassment Prevention Policy (PD-19) - National

> **DEPOSITION EXHIBIT**
> *Bailey 4*
> 10/11/07 αγκ

Updated: June 20, 2005

This Policy applies to all Associates who work for Wal-Mart Stores, Inc., or one of its subsidiary companies, in the United States ("Wal-Mart"), job applicants, Customers, Members, suppliers, and agents of Wal-Mart.

### Policy

We believe in respecting the dignity of every individual. Respectful, professional conduct furthers our mission, promotes productivity, minimizes disputes, and enhances our reputation. Thus, we are committed to providing an environment that is free of discrimination or harassment based on an *individual's status*. Every Associate should avoid any conduct that could reasonably be interpreted as discrimination or harassment.

*Individual's status* means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, sexual orientation, or any other legally protected status. *Individual's status* also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described below, by or directed at any Associate, job applicant, Customer, Member, supplier, or agent of Wal-Mart. This "zero tolerance" Policy applies regardless of whether such conduct rises to the level of unlawful discrimination or harassment.

### Prohibited Conduct

### Discrimination

We prohibit any *discriminatory action* based on an *individual's status* in all aspects of our business.

*Discriminatory action* includes firing, refusing to hire, denying training, failing to promote, and discriminating in pay or other terms, conditions, or privileges of employment based on an *individual's status*. It also includes encouraging or assisting anyone to take *discriminatory actions*.

### Harassment

We prohibit harassment based on an *individual's status* in all aspects of our business. This conduct includes:

- Using slurs or negative stereotyping;
- Verbal kidding, teasing, or joking;
- Making offensive comments about an *individual's status*, appearance, or sexual activity;
- Leering or making offensive gestures;
- Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, invitations, or other materials;
- Using Company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;
- Intimidating acts, such as bullying or threatening based on an *individual's status*;
- Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;
- Physical touching or assault, as well as impeding or blocking movements;
- Repeated unwanted sexual flirtations, advances, or propositions;
- Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors; or
- Any other conduct that shows hostility toward, disrespect for, or degradation of an individual based on the *individual's status*.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome, and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

### Retaliation

A244

We prohibit taking negative action against any Associate, former Associate, job applicant, Customer, Member, supplier, or agent of Wal-Mart for:

- Reporting conduct that may violate this Policy;
- Filing a complaint of discrimination or harassment with a government agency or court;
- Assisting another individual in reporting conduct that may violate this Policy;
- Assisting another individual in filing a complaint of discrimination or harassment with a government agency or court;
- Cooperating in an investigation; or
- Opposing discrimination or harassment.

If you experience, observe, or become aware of any conduct you believe may be retaliatory, you should immediately follow the Reporting Procedures described below.

**Reporting Procedures**

We are committed to preventing discrimination and harassment in all aspects of our business. We will take all reasonable measures to do so. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation. Therefore, the following procedures must be followed:

## Hourly Associates, Job Applicants, and Third Parties

If you experience, observe, or become aware of any conduct that may violate this Policy, you should immediately report the violation in one of two ways:

- You may report the violation to any Salaried Member of Management; or
- You may report the violation confidentially and/or anonymously to the Wal-Mart Ethics Helpline, 1-800-WMETHIC (1-800-963-8442).

If you believe a Salaried Member of Management may be violating this Policy, you are not required to report the violation to that person. You may report the possible violation to another Salaried Member of Management or call the Ethics Helpline.

You must cooperate with and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any Associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to discipline, up to and including termination.

We will take appropriate steps to ensure that there is no retaliation of any kind for using the Reporting Procedures described in this Policy. Retaliation of any kind for using the Reporting Procedures is strictly forbidden and violates this Policy.

## Salaried Members of Management

If you experience conduct that may violate this Policy, you should follow the same Reporting Procedures outlined above for Hourly Associates, Job Applicants, and Third Parties.

If you observe, receive a report, or otherwise become aware of a possible violation of this Policy, you must immediately report such conduct to the appropriate level of management for investigation. (Appropriate level of management includes, but is not limited to, the Field Logistics People Manager, Employment Advisor, Regional Personnel Manager, or People Director). A Salaried Member of Management who fails to report a violation of this Policy may be subject to discipline, up to and including termination.

## Investigation and Appropriate Action

We will take any reported violation of this Policy seriously. We will promptly and thoroughly investigate any report of a possible violation of this Policy in accordance with the procedures set forth in the Management Guidelines for this Policy and THE RED BOOK.

We will take appropriate action to eliminate conduct that violates this Policy and to ensure that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported Policy violation. Interim measures may include, but are not limited to, a leave of absence, suspension, or transfer of the Associate who reportedly violated this Policy.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an Associate has violated this Policy (or any other Policy), we will take corrective action regarding that Associate, including coaching and/or other discipline, up to and including termination.

A246

prohibit taking negative action against any Associate, former Associate, job applicant, Customer, Member,
plier, or agent of Wal-Mart for:

- Reporting conduct that may violate this Policy;
- Filing a complaint of discrimination or harassment with a government agency or court;
- Assisting another individual in reporting conduct that may violate this Policy;
- Assisting another individual in filing a complaint of discrimination or harassment with a government agency or court;
- Cooperating in an investigation; or
- Opposing discrimination or harassment.

ou experience, observe, or become aware of any conduct you believe may be retaliatory, you should
ediately follow the Reporting Procedures described below.

**orting Procedures**

are committed to preventing discrimination and harassment in all aspects of our business. We will take all
sonable measures to do so. However, if we are not aware that discrimination or harassment is taking place, we
not address the situation. Therefore, the following procedures must be followed:

**rly Associates, Job Applicants, and Third Parties**

ou experience, observe, or become aware of any conduct that may violate this Policy, you should immediately
rt the violation in one of two ways:

- You may report the violation to any Salaried Member of Management; or
- You may report the violation confidentially and/or anonymously to the Wal-Mart Ethics Helpline, 1-800-WMETHIC (1-800-963-8442).

ou believe a Salaried Member of Management may be violating this Policy, you are not required to report the
ation to that person. You may report the possible violation to another Salaried Member of Management or call
Ethics Helpline.

must cooperate with and tell the truth to the individual who investigates your report. If you do not cooperate
ou fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action.
Associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be
ect to discipline, up to and including termination.

will take appropriate steps to ensure that there is no retaliation of any kind for using the Reporting Procedures
ribed in this Policy. Retaliation of any kind for using the Reporting Procedures is strictly forbidden and violates
Policy.

**ried Members of Management**

u experience conduct that may violate this Policy, you should follow the same Reporting Procedures outlined
e for <u>Hourly Associates, Job Applicants, and Third Parties</u>.

u observe, receive a report, or otherwise become aware of a possible violation of this Policy, you must
ediately report such conduct to the appropriate level of management for investigation. (Appropriate level of
agement includes, but is not limited to, the Field Logistics People Manager, Employment Advisor, Regional
onnel Manager, or People Director). A Salaried Member of Management who fails to report a violation of this
y may be subject to discipline, up to and including termination.

**stigation and Appropriate Action**

vill take any reported violation of this Policy seriously. We will promptly and thoroughly investigate any report
possible violation of this Policy in accordance with the procedures set forth in the Management Guidelines for
olicy and THE RED BOOK.

ill take appropriate action to eliminate conduct that violates this Policy and to ensure that there is no
rence of such conduct. We may put reasonable interim measures in place during an investigation of a
ted Policy violation. Interim measures may include, but are not limited to, a leave of absence, suspension, or
fer of the Associate who reportedly violated this Policy.

ill take further appropriate action once the reported violation has been thoroughly investigated. If an
tigation reveals that an Associate has violated this Policy (or any other Policy), we will take corrective action
ding that Associate, including coaching and/or other discipline, up to and including termination.

5

6

A248

**Confidentiality**

We will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution. Any disclosure of information, other than on a need-to-know basis as described above, will constitute a breach of confidentiality and will result in discipline, up to and including termination.

**Contact Person(s)**

For guidance, contact:

| Facility | Contact |
|---|---|
| Wal-Mart Stores: | Store Manager<br>Regional Personnel Manager |
| SAM'S CLUBS: | Club Manager<br>Regional Personnel Manager |
| Field Logistics: | Field Logistics People Manager<br>Regional Personnel Manager |
| Home Office: | People Manager<br>People Director |

Last Updated: June 28, 2005

WPS_1A

After you have read the contents of this handbook:

## 1. Read and sign the Acknowledgment,

## 2. Separate the Acknowledgment at the perforation, and

## 3. Give the signed Acknowledgment to your Manager.

DEPOSITION
EXHIBIT

10/18/07 ac

This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract. From time to time, Wal-Mart may determine that it needs to change some of the policies or programs in this handbook in order to better meet the requirements of our Associates and the Company. If any policies or programs are changed, modified, deleted, or supplemented, Wal-Mart will notify Associates as soon as possible.

I acknowledge that I have received and read this handbook as well as this Acknowledgment, and that I have had the opportunity to ask my Manager questions about both and that I fully understand the contents of both as they relate to my employment with Wal-Mart. I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract.



**Date:** 1/04/01

**Social Security Number:** 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

**Print Your Name:** Rose M. Bailey

**Signature:** Rose M. Bailey

6

A252

## new hire orientation training plan

Rose M Pulliam    Sponsor: _____

_____ Division: _____ Dept. _____

## DAY ONE

t Store Manager
cipate in Welcome Session
ch the *History/Legacy* video
ch/discuss the *Division 01 Combo* video (or *Supercenter Orientation* video)
Mart Culture Lesson - Respect for the Individual
the Management Team
w Yellow Dot Program
w personnel paperwork
w Benefits Information
h/discuss the *Benefits* video
cipate in a Question & Answer session
Sponsor
cipate in a Store Tour
w Wal-Mart Today's *New Associate Orientation* Issue

Computer Based Learning (CBL)

uction to Pipeline, Policy Manual & CBL
review Training Plan (under Training in Pipeline)
policy PD-10, Statement of Ethics (under Policy in Pipeline)
ery Basic (Level 1: 7 days to complete)
Basic Beliefs (Level 1: 7 days to complete)
iate Safety (Level 1: 7 days to complete)
ner Safety (Level 1: 7 days to complete)
Manager to show and discuss the *You Picked a Great Place to Work* video
oate in a Question & Answer Session
/discuss the *End of Day One* (Division 01 Combo) video

Initials:_____ **Personnel Manager's Initials:____**

## DAY TWO

*Customer Service - Just Plain Old Common Sense* video
rt Culture Lesson - Strive for Excellence
*Customer Service - Magic of a Blink* video
& discuss the Transfer/Promotion policy
the evaluation process
ate in a Question & Answer session
*Stakeholder* video
the Associate Stakeholder Bonus Program
basic functions of the SMART System

omputer Based Learning (CBL)

Job Descriptions (under Training in Pipeline)
Communications (Level 1: 7 days to complete)
me Pathogens (Level 1: 7 days to complete)
r Service (Level 1: 7 days to complete)
vention (Level 1: 7 days to complete)

nitials:_____ **Personnel Manager's Initials:____**



A254

tation Training Plan    Page 2 of 2

## DAY THREE

Benefits forms
Culture Lesson - Customers & Customer Service
All the Kings Horses video
Associate Safety Video #8 (if applicable)
the Risk Control Team
te in a Safety Tour
the use of general & power equipment
your Supervisor
te in a Question & Answer Session
te in a Wal-Mart Cheer

mputer Based Learning (CBL)

Commitments (under Wal-Mart Stores in Pipeline)
arassment (for hourly only)
arassment (for management only)
iate Behavior
lanangement (Supercenters only)
Protective Equipment (only if applicable to job code)
e exploring Pipeline & the Policy Manual

itials:_____  Personnel Manager's Initials:____

an is to be used as a tool to help Associates in new positions, along with helping Sponsors better coach new
should be printed by the Personnel Manager and completed by the new Associate. Please sign and date

*[signature: Rose M Pulleam]*

*[signature]*

Copyright© 1997, 1998 Wal-Mart Stores, Inc. All rights reserved.

A256

**CERTIFICATE OF SERVICE**

I, Sarah E. DiLuzio, hereby certify that on December 14, 2007, I electronically filed a

true and correct copy of the foregoing **APPENDIX TO OPENING BRIEF OF DEFENDANT**

**WAL-MART STORES EAST, LP IN SUPPORT OF ITS MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of the Court using CM/ECF which will send notification of such

filing, which is available for viewing and downloading from CM/ECF, and mailed via first class

mail a copy to plaintiff at the following address:

>Rose M. Bailey, *pro se*
>612 Candlestick Lane
>Newark, Delaware 19702

>/s/ Sarah E. DiLuzio
>Sarah E. DiLuzio (#4085)
>POTTER ANDERSON & CORROON LLP
>Hercules Plaza, Sixth Floor
>1313 North Market Street
>P.O. Box 951
>Wilmington, DE 19899-0951
>Telephone: (302) 984-6000
>Telefax: (302) 658-1192
>E-mail: sdiluzio@potteranderson.com